THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE CHAPTER 11 PLAN OF HIGH VOLTAGE ENGINEERING CORPORATION IN THESE CHAPTER 11 CASES. ACCEPTANCES MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                                    :
In re:                                                              :
                                                                    :     Chapter 11
    HIGH VOLTAGE ENGINEERING                                        :     Case No.:  04 -11586 ( JNF )
    CORPORATION, et al.                                             :     Jointly Administered
                                                                    :
                                                                    :
            Debtors.                                                :
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

_____

AMENDED DISCLOSURE STATEMENT FOR DEBTORS'
THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

_____

Wakefield, Massachusetts
May 13, 2004

| | |
|---|---|
| FRIED, FRANK, HARRIS, SHRIVER<br>    & JACOBSON LLP<br>One New York Plaza<br>New York, New York 10004-1980<br>Attn:  Vivek Melwani, Esq.<br>        Gary Kaplan, Esq.<br>        (212) 859-8000 | GOULSTON & STORRS, P.C.<br>400 Atlantic Avenue<br>Boston, Massachusetts  02110<br>Attn:  James F. Wallack, Esq.<br>        Douglas B. Rosner, Esq.<br>        (617) 482-1776 |

# TABLE OF CONTENTS

PAGE

ARTICLE I. INTRODUCTION AND SUMMARY ................................................................. 5

ARTICLE II. DEFINITIONS ................................................................................................ 15

ARTICLE III. BACKGROUND ........................................................................................... 25

ARTICLE IV. RECOMMENDATION .................................................................................. 29

ARTICLE V. SUPPORT OF THE PLAN BY PARTIES IN INTEREST ................................ 29

ARTICLE VI. DESCRIPTION OF CHAPTER 11 CASES ..................................................... 30

ARTICLE VII. SUMMARY OF THE PLAN ......................................................................... 34

ARTICLE VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................... 44

ARTICLE IX. IMPLEMENTATION OF THE PLAN ............................................................ 45

ARTICLE X. DISTRIBUTIONS UNDER THE PLAN .......................................................... 51

ARTICLE XI. PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS ......................... 54

ARTICLE XII. DISCHARGE, INJUNCTIONS, RELEASES AND SETTLEMENT OF
CLAIMS ...................................................................................................... 56

ARTICLE XIII. CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE ................. 60

ARTICLE XIV. MISCELLANEOUS PROVISIONS OF THE PLAN ..................................... 62

ARTICLE XV. DESCRIPTION OF THE NEW CREDIT FACILITY DOCUMENTS ............ 65

ARTICLE XVI. CERTAIN FACTORS ................................................................................. 68

ARTICLE XVII. APPLICATION OF SECURITIES ACT ...................................................... 77

ARTICLE XVIII. FINANCIAL PROJECTIONS, VALUATION AND ASSUMPTIONS
USED ......................................................................................................... 79

ARTICLE XIX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ........................... 90

ARTICLE XX. ACCEPTANCE AND CONFIRMATION OF THE PLAN ............................. 99

ARTICLE XXI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ................................................................................................. 106

ARTICLE XXII. THE BANKRUPTCY PLAN—VOTING INSTRUCTIONS AND
PROCEDURES ...........................................................................................106

ARTICLE XXIII. CONCLUSION AND RECOMMENDATION ..........................................112

High Voltage Engineering Corporation ("HVE"), Ansaldo Ross Hill, Inc. ("Ross Hill"), Carolyn Corporation ("Carolyn"), Connectrics Acquisition Corporation ("CAC"), High Voltage Funding Corp. ("HV-FC"), Hivec Holdings, Inc. ("HIVEC"), HVE Acquisition Corp. ("HV-AC"), HVEC, Inc., Nicole Corporation ("Nicole"), Robicon Corporation ("Robicon"), and TTS Mexican Holding Company, Inc. ("TTS"), the above-captioned Debtors and Debtors In Possession, hereby propose and file this Amended Disclosure Statement (the "Disclosure Statement") for the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization, dated May 13, 2004 (the "Plan").

**THE PLAN IS THE RESULT OF EXTENSIVE NEGOTIATIONS AMONG THE DEBTORS, THE UNOFFICIAL COMMITTEE OF NOTEHOLDERS, THE CREDITORS' COMMITTEE, AND CERTAIN OF THE DEBTORS' EQUITY INTEREST HOLDERS. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULT FOR ALL HOLDERS OF CLAIMS AND INTERESTS AND THEREFORE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' CREDITORS AND EQUITY INTEREST HOLDERS AND STRONGLY URGE ALL HOLDERS OF CLAIMS AND INTERESTS IN IMPAIRED CLASSES RECEIVING BALLOTS TO ACCEPT THE PLAN.**

**THIS DISCLOSURE STATEMENT IS DESIGNED TO SOLICIT YOUR ACCEPTANCE OF THE ATTACHED PLAN AND CONTAINS INFORMATION RELEVANT TO YOUR DECISION. PLEASE READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE OTHER MATERIALS COMPLETELY AND CAREFULLY. THE PLAN IS ATTACHED AS APPENDIX A TO THIS DISCLOSURE STATEMENT. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER APPENDICES ANNEXED HERETO AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE COURT BEFORE OR CONCURRENTLY WITH THE FILING OF THIS DISCLOSURE STATEMENT. FURTHERMORE, THE PROJECTED FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL CONTINUE TO BE MATERIALLY ACCURATE; OR (B) THE DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.**

**THE CLASSES OF CLAIMS AND INTERESTS IMPAIRED (AS DEFINED IN THE BANKRUPTCY CODE) UNDER THE PLAN AND ENTITLED TO VOTE ON THE PLAN ARE CLASS 3 (PRE-PETITION SENIOR NOTE CLAIMS), CLASS 4 (GENERAL UNSECURED CLAIMS), CLASS 6 (OLD PREFERRED STOCK INTERESTS), AND CLASS 7 (OLD COMMON STOCK INTERESTS). CLASS 1 (PRIORITY CLAIMS), CLASS 2 (MISCELLANEOUS SECURED CLAIMS), CLASS 5 (INTERCOMPANY CLAIMS), AND CLASS 8 (SUBSIDIARY COMMON STOCK INTERESTS) ARE**

**UNIMPAIRED, AND HOLDERS OF CLAIMS AND INTERESTS, AS THE CASE MAY BE, IN SUCH CLASSES ARE CONCLUSIVELY PRESUMED TO HAVE ACCEPTED THE PLAN PURSUANT TO SECTION 1126(f) OF THE BANKRUPTCY CODE.  CLASS 9 (OTHER INTERESTS) IS IMPAIRED AND WILL NOT RECEIVE OR RETAIN ANY PROPERTY UNDER THE PLAN ON ACCOUNT OF ITS INTERESTS AND, THEREFORE, IS DEEMED NOT TO HAVE ACCEPTED THE PLAN PURSUANT TO SECTION 1126(g) OF THE BANKRUPTCY CODE.**

**HOLDERS OF CLASS 3 (PRE-PETITION SENIOR NOTE CLAIMS), CLASS 4 (GENERAL UNSECURED CLAIMS), CLASS 6 (OLD PREFERRED STOCK INTERESTS) AND CLASS 7 (OLD COMMON STOCK INTERESTS) ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, INCLUDING THOSE UNDER "CERTAIN FACTORS," PRIOR TO SUBMITTING BALLOTS OR MASTER BALLOTS VOTING ON THE PLAN.  IN MAKING A DECISION TO ACCEPT OR REJECT THE PLAN, EACH HOLDER OF CLASS 3 (PRE-PETITION SENIOR NOTE CLAIMS), CLASS 4 (GENERAL UNSECURED CLAIMS), CLASS 6 (OLD PREFERRED STOCK INTERESTS) AND CLASS 7 (OLD COMMON STOCK INTERESTS) MUST RELY ON ITS OWN EXAMINATION OF THE DEBTORS AS DESCRIBED IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.   IN ADDITION, CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CONDITIONS PRECEDENT THAT COULD LEAD TO DELAYS IN CONSUMMATION OF THE PLAN.  THERE CAN BE NO ASSURANCE THAT EACH OF THESE CONDITIONS WILL BE SATISFIED OR WAIVED (AS PROVIDED IN THE PLAN) OR THAT THE PLAN WILL BE CONSUMMATED.    EVEN AFTER THE EFFECTIVE DATE, DISTRIBUTIONS UNDER THE PLAN MAY BE SUBJECT TO SUBSTANTIAL DELAYS FOR HOLDERS OF CLAIMS AND INTERESTS THAT ARE DISPUTED.**

**EACH OF CLASS 3 (PRE-PETITION SENIOR NOTE CLAIMS) AND CLASS 4 (GENERAL UNSECURED CLAIMS) WILL BE DEEMED TO HAVE ACCEPTED THE PLAN IF THE HOLDERS OF CLAIMS IN EACH SUCH CLASS (OTHER THAN ANY HOLDER DESIGNATED UNDER SUBSECTION 1126(e) OF THE BANKRUPTCY CODE) WHO CAST VOTES IN FAVOR OF THE PLAN HOLD AT LEAST TWO-THIRDS IN DOLLAR AMOUNT AND MORE THAN ONE-HALF IN NUMBER OF THE ALLOWED CLAIMS THAT ARE HELD BY HOLDERS OF CLAIMS ACTUALLY VOTING IN SUCH CLASS.  CLASS 6 (OLD PREFERRED STOCK INTERESTS) AND CLASS 7 (OLD COMMON STOCK INTERESTS) WILL BE DEEMED TO HAVE ACCEPTED THE PLAN IF THE HOLDERS OF INTERESTS IN EACH SUCH CLASS (OTHER THAN ANY HOLDER DESIGNATED UNDER SUBSECTION 1126(e) OF THE BANKRUPTCY CODE) WHO CAST VOTES IN FAVOR OF THE PLAN HOLD AT LEAST TWO-THIRDS IN AMOUNT OF ALLOWED INTERESTS ACTUALLY VOTING IN SUCH CLASS.**

**THE DEBTORS WILL REQUEST THAT THE COURT CONFIRM THE PLAN UNDER BANKRUPTCY CODE SECTION 1129(b).   SECTION 1129(b) PERMITS CONFIRMATION OF THE PLAN DESPITE REJECTION BY ONE OR MORE CLASSES IF THE COURT FINDS THAT THE PLAN "DOES NOT DISCRIMINATE**

UNFAIRLY" AND IS "FAIR AND EQUITABLE" AS TO THE CLASS OR CLASSES THAT DO NOT ACCEPT THE PLAN.  BECAUSE CLASS 9 (OTHER INTERESTS) IS DEEMED NOT TO HAVE ACCEPTED THE PLAN, THE DEBTORS WILL REQUEST THAT THE COURT FIND THAT THE PLAN IS FAIR AND EQUITABLE AND DOES NOT DISCRIMINATE UNFAIRLY AS TO CLASS 9 (OTHER INTERESTS) (AND ANY OTHER CLASS THAT FAILS TO ACCEPT THE PLAN).  FOR A MORE DETAILED DESCRIPTION OF THE REQUIREMENTS FOR ACCEPTANCE OF THE PLAN AND OF THE CRITERIA FOR CONFIRMATION, SEE SECTION XX HEREIN, ENTITLED "ACCEPTANCE AND CONFIRMATION OF THE PLAN."

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE COURT AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE HOLDERS OF CLAIMS AND INTERESTS TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO VOTING TO ACCEPT OR REJECT THE PLAN.  HOWEVER, THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION OR DETERMINATION BY THE COURT WITH RESPECT TO THE MERITS OF THE PLAN.

NO PARTY IS AUTHORIZED BY THE DEBTORS TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  NO REPRESENTATIONS OR INFORMATION CONCERNING THE DEBTORS, THEIR FUTURE BUSINESS OPERATIONS OR THE VALUE OF THEIR PROPERTIES HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAWS.  ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THE DEBTORS INTEND TO RELY ON SECTION 1145(a)(1) OF THE BANKRUPTCY CODE TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT THE OFFER OR SALE OF THE SECURITIES IN CONNECTION WITH THE SOLICITATION.

IF THE REQUISITE ACCEPTANCES OF THE PLAN ARE RECEIVED, THE PLAN IS CONFIRMED BY THE COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE WHO DO NOT SUBMIT BALLOTS OR MASTER BALLOTS TO ACCEPT OR TO REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY) WILL BE BOUND BY THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT AND THE PLAN DESCRIBED HEREIN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE COMMISSION OR ANY STATE SECURITIES COMMISSION AND NEITHER THE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON OR WILL PASS UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN OR THEREIN.    ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY DISTRIBUTION OF PROPERTY HEREUNDER PURSUANT TO THE PLAN WILL UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF OR THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN OR IN THE AFFAIRS OF THE DEBTORS SINCE THE DATE HEREOF.

EACH CREDITOR AND INTEREST HOLDER OF THE DEBTORS SHOULD CONSULT WITH SUCH PARTY'S LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY MATTERS CONCERNING THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

## ARTICLE I.
## INTRODUCTION AND SUMMARY

This Disclosure Statement is being furnished by the Debtors, pursuant to Section 1125 of the Bankruptcy Code, in connection with the solicitation of votes to accept or reject the Plan, as it may be altered, amended, modified or supplemented as described herein, from holders of (i) Class 3 Pre-Petition Senior Note Claims, (ii) Class 4 General Unsecured Claims, (iii) Class 6 Old Preferred Stock Interests and (iv) Class 7 Old Common Stock Interests.  All capitalized terms used in this Disclosure Statement have the meanings ascribed to such terms in the section below entitled "Definitions" of this Disclosure Statement, except as otherwise indicated.  The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement.

1.01    The Solicitation

On the Petition Date, each of the Debtors filed separate petitions under chapter 11 of the Bankruptcy Code.  On March 31, 2004, the Debtors filed their initial Plan and related Disclosure Statement with the Court pursuant to Section 1125 of the Bankruptcy Code and in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation").  On April 26, 2004, the Debtors filed their First Amended Plan and related Disclosure Statement.  On May 10, 2004, the Debtors filed their Second Amended Plan and this Disclosure Statement.

On May 13, 2004, the Court determined that this Disclosure Statement contains "adequate information" in accordance with Section 1125 of the Bankruptcy Code.  Pursuant to

Section 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the Debtors' books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . ."  11 U.S.C. § 1125(a)(1).

**The Court has scheduled a hearing to consider confirmation of the Plan for June 18, 2004 at 10:00 a.m. Eastern Time before the Honorable Joan N. Feeney, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Massachusetts.  The hearing may be adjourned from time to time without further notice other than by announcement in the Court on the scheduled date of such hearing.   Any objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Court and served on the counsel listed below to ensure RECEIPT by them on or before 12:00 Noon (Eastern Time), June 15, 2004.  Counsel on whom objections must be served are:**

Co-Counsel to the Debtors

FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
Attn:  Vivek Melwani, Esq.
       Gary Kaplan, Esq.
       (212) 859-8000

Co-Counsel to the Debtors

GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, Massachusetts  02110
Attn:  Douglas B. Rosner, Esq.
       Christine D. Lynch, Esq.
       (617) 482-1776

Co-Counsel to the Creditors' Committee

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038-4982
Attn:   Michael J. Sage, Esq.
        Eric M. Kay, Esq.
        (212) 806-5400

Co-Counsel to the Creditors' Committee

CRAIG AND MACAULEY PC
Federal Reserve Plaza
600 Atlantic Avenue, 29th Floor
Boston, Massachusetts  02210
Attn:   Christopher J. Panos, Esq.
        Daniel C. Reiser, Esq.
        (617) 367-9500

Counsel to the DIP Lenders and the Unofficial
Committee of Noteholders

ROPES & GRAY LLP
One International Place
Boston, Massachusetts  02110-2624
Attn:  Don S. DeAmicis, Esq.
       Gregory O. Kaden, Esq.
       (617) 951-7000

Office of the United States Trustee
10 Causeway Street, Room 1184
Boston, Massachusetts  02222-1043
Attn:  Paula Bachtell, Esq.
       (617) 788-0400

1.02    The Plan

If the reorganization contemplated by the Plan (the "Reorganization") is confirmed by the Court, as soon as practicable after its confirmation by the Court and subject to the conditions contained in the Plan, the following transactions, among others, will occur:

(i)     On the Effective Date, the Pre-Petition Senior Note Claims will be extinguished and each holder of an Allowed Pre-Petition Senior Note Claim will receive its *pro rata* share of 97% of the common stock of the Reorganized Debtors, subject to dilution by the issuance of options pursuant to the Management Incentive Plan and the warrants issued under the Plan.  Each holder of an Allowed Pre-Petition Senior Note Claim receiving New Common Stock pursuant to the Plan will be deemed to be bound by the Shareholders Agreement whether or not such holder executes the Shareholders Agreement.

(ii)    Each holder of an Allowed General Unsecured Claim will receive (a) Cash equal to the full amount of such holder's Allowed General Unsecured Claim within ninety (90) days of the Effective Date, provided that such holder will receive Cash equal to at least:  (i) one-third (1/3) of such holder's Allowed General Unsecured Claim on or prior to the 30th day following the Effective Date, (ii) an incremental one-third (1/3) of such holder's Allowed General Unsecured Claim on or prior to the 60th day following the Effective Date, and (iii) an incremental one-third (1/3) of such holder's Allowed General Unsecured Claim on or prior to the 90th day following the Effective Date; or (b) such other treatment agreed to in writing between the Debtors and such holder;  provided,  however,  that

General Unsecured Claims arising from claims of employees of the Debtors for wages, salaries or commissions, including vacation, severance, sick leave pay and contributions to employee benefit plans will be satisfied in the ordinary course of business consistent with Section 8.04 of the Plan. The holder of the CP Claim will not be entitled to the treatment set forth in the preceding sentence but will instead, (i) receive the New Common Stock portion of the CP Distribution on the Effective Date, and (ii) receive the Cash portion of the CP Distribution at the same time, and in the same manner, as distributions to holders of other Allowed General Unsecured Claims are received. The treatment being provided to the holder of the CP Claim is being provided in accordance with the terms of the Restructuring Agreement. The holder of the CP Claim will be subject to the Shareholders Agreement with respect to the New Common Stock he receives.

(iii)    On the Effective Date, all Old Preferred Stock Interests will be extinguished. With the consent of Class 3 (Pre-Petition Senior Note Claims) (which will be evidenced by Class 3's acceptance of the Plan), the holders of Old Preferred Stock Interests will receive their pro rata share of the New Class A Warrants issued pursuant to the Plan, which will (i) be exercisable to purchase, in the aggregate, 5.0% of the New Common Stock issued and outstanding on the Effective Date, subject to dilution by stock options granted to management of Reorganized HVE under the Management Incentive Plan and the New Class B Warrants, (ii) have a term of 7 years from the Effective Date, and (iii) have an exercise price based on an equity value for the common stock of the Reorganized Debtors of $135.8 million, in accordance with the New Warrant Agreement; provided, however, that the New Class A Warrants that would have been distributed to any of the Debtors as holders of Old Preferred Stock Interests will be distributed directly to holders of Old Common Stock Interests in accordance with Section 6.07 of the Plan. The New Class A Warrants will provide that any holder thereof will become a party to the Shareholders Agreement upon the exercise of such New Class A Warrants.

(iv)    On the Effective Date, all Old Common Stock Interests will be extinguished. With the consent of Class 3 (Pre-Petition Senior Note Claims) (which will be evidenced by Class 3's acceptance of the Plan), the holders of Old Common Stock Interests will receive their pro rata share of, in the aggregate, (A) the New Class A Warrants issued pursuant to the Plan, which will (i) be exercisable to purchase, in the aggregate, 5% of the fully-diluted common stock of Reorganized HVE issued and outstanding on the Effective Date, subject to dilution by stock options granted to management of Reorganized HVE under the Management Incentive Plan and the New Class B Warrants, (ii) have a term of 7 years from the Effective Date, and (iii) have an exercise price based on an equity value for the common stock of the Reorganized Debtors of $135.8 million, in accordance with the New Warrant Agreement, and which were received

by any of the Debtors as holders of Old Preferred Stock Interests; and (B) the New Class B Warrants issued pursuant to the Plan, which will (i) be exercisable to purchase, in the aggregate, 5% of the fully-diluted common stock of Reorganized HVE issued and outstanding on the Effective Date, subject to dilution by stock options granted to management of Reorganized HVE under the Management Incentive Plan and the New Class A Warrants, (ii) have a term of 7 years from the Effective Date, and (iii) have an exercise price based on an equity value for the common stock of the Reorganized Debtors of $161.1 million, in accordance with the New Warrant Agreement. The New Class B Warrants received in the Old Common Stock Distribution will provide that any holder thereof will become a party to the Shareholders Agreement upon the exercise of such New Class B Warrants.

(v)    Other Interests will be extinguished and no distributions will be made to holders of Other Interests.

(vi)   Holders of Class 1 Priority Claims, Class 2 Miscellaneous Secured Claims, Class 5 Intercompany Claims and Class 8 Subsidiary Common Stock Interests will be Unimpaired by the Plan and their treatment is summarized in Section 1.04 below. Administrative Expenses, Priority Tax Claims and Other Interests will be treated as summarized in Section 1.04 below.

In order for the Plan to be confirmed by the Court pursuant to Section 1129(b) of the Bankruptcy Code, at least one class of Impaired Claims must accept the Plan, determined without including votes to accept the Plan cast by insiders (*i.e.*, Affiliates of the Debtors). A class of claims has accepted a plan if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors that have accepted or rejected such plan.

The Debtors will also solicit holders of Old Preferred Stock Interests and Old Common Stock Interests. A class of interests has accepted a plan if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests that have accepted or rejected such plan. If a class entitled to vote does not accept the Plan, the Debtors may seek to confirm the Plan under Section 1129(b) of the Bankruptcy Code notwithstanding the rejection by such class. However, even if the requisite classes accept the Plan, the Plan will be confirmed by the Court only if all other requirements to confirmation are satisfied. See § 16.01(ii) "Certain Factors—Certain Bankruptcy Law Considerations—Risk of Non-Confirmation of the Plan" and § 16.01(iii) "— The Debtors May Not Be Able to Secure Confirmation of the Plan."

1.03    Conditions of Consummation of Plan

Consummation of the Plan is subject to satisfaction of certain conditions (which may be waived by the Debtors or the Reorganized Debtors, as the case may be, with the consent of the Creditors' Committee and the Unofficial Committee of Noteholders, which will not be unreasonably withheld), including (i) the Documents being in a form and substance satisfactory

to the Debtors or the Reorganized Debtors, as the case may be, the Creditors' Committee and the Unofficial Committee of Noteholders, (ii) receipt of all required authorizations, consents and regulatory approvals, (iii) the conditions to the New Credit Facility Documents other than the occurrence of the Effective Date of the Plan, must have been satisfied or waived pursuant to the terms thereof, and (iv) the Effective Date occurring on or before seventy-five (75) days after the Court enters the Confirmation Order, or such later date as the Debtors, the Creditors' Committee and the Unofficial Committee of Noteholders may have mutually agreed.

    1.04    Summary of Classifications and Treatment of Claims and Interests

    The Plan categorizes the Claims against and Interests in the Debtors into nine classes.  The Plan also provides that expenses incurred by the Debtors during the Chapter 11 Cases will be paid in full and specifies the manner in which the Claims and Interests in each class are to be treated.  To the extent that the terms of this Disclosure Statement vary with the terms of the Plan, the terms of the Plan will be controlling.  The table below provides a summary of the classification, treatment and distributions to be made in respect of Claims and Interests in each class under the Plan:

| Class | Type of Claim or Interest | Treatment |
| --- | --- | --- |
| Not Applicable | Administrative Expenses | To be paid, to the extent Allowed, in full, in Cash on, at the Reorganized Debtors' option, the later of (a) the Effective Date (or as soon thereafter as is practicable) or (b) such other date to which the Reorganized Debtors and the holder of the Allowed Administrative Expense otherwise agree; provided, however, that Allowed Administrative Expenses representing (x) obligations incurred under or pursuant to the DIP Agreement will be paid in full in Cash on the Effective Date, (y) obligations incurred in the ordinary course of business or assumed by the Debtors or the Reorganized Debtors, as the case may be, will be paid in full or performed by the Debtors or the Reorganized Debtors, as the case may be, in the ordinary course of business, consistent with past practice, and (z) obligations incurred to Professionals for services provided through the Effective Date will be paid in accordance with Court order approving the fees and expenses of each such Professional; provided further, however, that Allowed Administrative Expenses incurred by the Debtors or the |

|  |  | Reorganized Debtors, as the case may be, after the Effective Date, including, without limitation, claims for Professionals' fees and expenses, will not be subject to application and may be paid by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business and without further Court approval. |
| Not Applicable | Priority Tax Claims (approximately $0) | At the sole option of the Debtors, each holder of an Allowed Priority Tax Claim will be entitled to receive from the Reorganized Debtors on account of such Claim: (a) Cash payments made in equal annual installments beginning on or before the first anniversary following the Effective Date with the final installment being payable no later than the sixth anniversary of the date of the assessment of such Allowed Priority Tax Claim, together with interest on the unpaid balance of such Allowed Priority Tax Claim from the Effective Date calculated at the Market Rate; or (b) such other treatment agreed to by each holder of such Allowed Priority Tax Claim and the Debtors or Reorganized Debtors, as the case may be. |
| Class 1 | Priority Claims (other than Administrative Expenses and Priority Tax Claims) (approximately $770,000.00) | Unimpaired.  To be paid on the latest of (a) the Effective Date, (b) the date on which such Priority Claim becomes an Allowed Priority Claim, and (c) the date on which the Debtors or the Reorganized Debtors and the holder of such Allowed Priority Claim otherwise agree, each holder of an Allowed Priority Claim will be entitled to receive from the Reorganized Debtors Cash in an amount sufficient to render such Allowed Priority Claim Unimpaired under Section 1124 of the Bankruptcy Code; provided, however, that Allowed Priority Claims representing obligations incurred in the ordinary course will be paid in full or performed by the Debtors or Reorganized Debtors, consistent with past practice. |

| Class 2 | Miscellaneous Secured Claims (approximately $5.8 million) | Unimpaired. On the Effective Date, at the sole option of the Debtors, (a) the legal, equitable and contractual rights to which the Miscellaneous Secured Claim entitles the holder of such Claim will remain unaltered, and the holder of such Claim will retain any Liens and/or security interests securing such Claim or (b) the Debtors will provide other treatment that will render such Miscellaneous Secured Claim Unimpaired under Section 1124 of the Bankruptcy Code. |
|---|---|---|
| Class 3 | Pre-Petition Senior Note Claims (Allowed in the aggregate amount of $172.8 million) | Impaired. On the Effective Date, all Pre-Petition Senior Note Claims will be extinguished, and each holder of an Allowed Pre-Petition Senior Note Claim will be entitled to receive its pro rata share of the Senior Note Distribution. Such pro rata shares will be determined by the ratio between the amount of such holder's Allowed Pre-Petition Senior Note Claim and the aggregate amount of all Allowed Pre-Petition Senior Note Claims. Each holder of an Allowed Pre-Petition Senior Note Claim receiving New Common Stock pursuant to the Plan will be deemed to be bound by the Shareholders Agreement whether or not such holder executes the Shareholders Agreement. |
| Class 4 | General Unsecured Claims (approximately $12.5 - $15.0 million) | Impaired. Each holder of an Allowed General Unsecured Claim will receive (a) Cash equal to the full amount of such holder's Allowed General Unsecured Claim within ninety (90) days of the Effective Date, provided that such holder will receive Cash equal to at least: (i) one-third (1/3) of such holder's Allowed General Unsecured Claim on or prior to the 30th day following the Effective Date, (ii) an incremental one-third (1/3) of such holder's Allowed General Unsecured Claim on or prior to the 60th day following the Effective Date, and (iii) an incremental one-third (1/3) of such holder's Allowed General Unsecured Claim on or prior to the 90th day |

following the Effective Date; or (b) such other treatment agreed to in writing between the Debtors and such holder; provided, however, that General Unsecured Claims arising from claims of employees of the Debtors for wages, salaries or commissions, including vacation, severance, sick leave pay and contributions to employee benefit plans will be satisfied in the ordinary course of business consistent with Section 8.04 of the Plan. The holder of the CP Claim will not be entitled to the treatment set forth in the preceding sentence but will instead, (i) receive the New Common Stock portion of the CP Distribution on the Effective Date, and (ii) receive the Cash portion of the CP Distribution at the same time, and in the same manner, as distributions to holders of other Allowed General Unsecured Claims are received. The treatment being provided to the holder of the CP Claim is being provided in accordance with the terms of the Restructuring Agreement. The holder of the CP Claim will be subject to the Shareholders Agreement with respect to the New Common Stock he receives. A condition to the confirmation of the Plan is that the Maximum Potential Claim Amount not exceed $16 million.

| | | |
|---|---|---|
| Class 5 | Intercompany Claims | Unimpaired. On the Effective Date each holder of an Allowed Intercompany Claim will receive the following treatment: (i) the legal, equitable and contractual rights of each holder's Allowed Intercompany Claim will remain unaltered by the Plan, or (ii) each holder of an Allowed Intercompany Claim will receive such other treatment agreed to in writing between such holder and the Debtors or Reorganized Debtors, as the case may be; provided that any such agreements occurring prior to the Effective Date will be subject to the consent of the Creditors' Committee and |

| | | the Unofficial Committee of Noteholders, which consent will not be unreasonably withheld. |
|---|---|---|
| Class 6 | Old Preferred Stock Interests | <u>Impaired</u>.  On the Effective Date, all Old Preferred Stock Interests will be extinguished.  The holders of Class 6 Old Preferred Stock Interests are not entitled to receive any distribution under the Plan.  However, in order to facilitate a consensual Plan, with the consent of Class 3 (which will be evidenced by Class 3's acceptance of the Plan) the Debtors will distribute to each holder of an Old Preferred Stock Interest, in exchange for such holder's Old Preferred Stock Interest, such holder's pro rata share of New Class A Warrants for 5.00% of the New Common Stock issued and outstanding on the Effective Date, subject to dilution from options issued under the Management Incentive Plan and the New Class B Warrants; <u>provided</u>, <u>however</u>, that the New Class A Warrants that would have been distributed to any of the Debtors as holders of Old Preferred Stock Interests will be distributed directly to holders of Old Common Stock Interests in accordance with Section 6.07 of the Plan.  Such pro rata shares will be determined by the ratio between the amount of such holder's Allowed Old Preferred Stock Interest and the aggregate amount of all Allowed Preferred Stock Interests.  The New Class A Warrants will provide that any holder thereof will become a party to the Shareholders Agreement upon the exercise of such New Class A Warrants. |
| Class 7 | Old Common Stock Interests | <u>Impaired</u>.  On the Effective Date, all Old Common Stock Interests will be extinguished.  The holders of Class 7 Old Common Stock Interests are not entitled to receive any distribution under the Plan.  However, in order to facilitate a consensual Plan, with the consent of Class 3 (which will be evidenced by Class 3's acceptance of the Plan) the Debtors will distribute to each holder of an Old |

Common Stock Interest, in exchange for such holder's Old Common Stock Interest, such holder's pro rata share of the Old Common Stock Distribution, which will be comprised of (i) New Class A Warrants received by any of the Debtors as holders of Old Preferred Stock Interests and (ii) New Class B Warrants for 5% of the New Common Stock issued and outstanding on the Effective Date, subject to dilution from options issued under the Management Incentive Plan and the New Class A Warrants. Such pro rata shares will be determined by the ratio between the amount of such holder's Allowed Old Common Stock Interest and the aggregate amount of all Allowed Old Common Stock Interests. The New Class B Warrants received in the Old Common Stock Distribution will provide that any holder thereof will become a party to the Shareholders Agreement upon the exercise of such New Class B Warrants.

| Class 8 | Subsidiary Common Stock Interests | Unimpaired. On the Effective Date, each holder of an Allowed Subsidiary Common Stock Interest will retain such Interest and its respective share or shares of Subsidiary Common Stock of the Debtors representing such Interest. |
| Class 9 | Other Interests | Impaired. On the Effective Date, all Other Interests will be extinguished and no distributions will be made to holders of Other Interests. |

**For a more detailed description of the treatment of the foregoing classes of Claims and Interests, see § 7.03 "Summary of the Plan—Classification and Treatment of Claims and Interests Under the Plan."**

**IF THE REQUISITE ACCEPTANCES ARE RECEIVED, THE PLAN IS SUBSEQUENTLY CONFIRMED BY THE COURT AND THE PLAN IS CONSUMMATED, ALL HOLDERS OF CLAIMS AND INTERESTS (WHETHER OR NOT SUCH HOLDERS SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TREATMENT AFFORDED SUCH HOLDERS THEREUNDER.**

## ARTICLE II.
## DEFINITIONS

Whenever from the context it appears appropriate, each term stated in either the singular or the plural will include the singular and the plural and pronouns stated in the masculine, feminine or neuter gender will include the masculine, the feminine and the neuter. Unless the context requires otherwise, the following words and phrases will have the meanings set forth below when used in initially-capitalized form in this Disclosure Statement.

Administrative Expense:  Collectively, (a) any cost or expense of administration of the Chapter 11 Cases allowed under Section 503(b) of the Bankruptcy Code and (b) any fees or charges assessed against the Debtors' estates under Section 1930 of title 28 of the United States Code.

Affiliates:  As defined in Section 101 of the Bankruptcy Code.

Allowed:  With respect to Claims and Interests, (a) any Claim against or Interest in a Debtor, proof of which is timely filed, or by order of the Court or pursuant to the Plan is not or will not be required to be filed, (b) any Claim or Interest that has been or is hereafter listed in the Schedules as neither disputed, contingent or unliquidated, and for which no timely proof of claim has been filed, or (c) any Claim or Interest allowed pursuant to the Plan; provided, however, that with respect to any Claim or Interest described in clauses (a) or (b) above, such Claim or Interest will be allowed only if (i) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Court or (ii) such an objection is so interposed and the Claim or Interest will have been allowed by a Final Order (but only if such allowance was not solely for the purpose of voting to accept or reject the Plan).  Except as otherwise specified in the Plan or a Final Order of the Court, the amount of an allowed Claim shall not include interest on such Claim from and after the Petition Date.

Amended and Restated By-Laws:  The by-laws for the Reorganized Debtors, as amended and restated pursuant to the Plan and in form and substance reasonably acceptable to the Creditors' Committee and the Unofficial Committee of Noteholders, to be filed with the Court no later than ten (10) days prior to the Confirmation Hearing.

Amended and Restated Certificates of Incorporation:  The certificates of incorporation and/or articles of organization for the Reorganized Debtors, as amended and restated pursuant to the Plan and in form and substance reasonably acceptable to the Creditors' Committee and the Unofficial Committee of Noteholders, to be filed with the Court no later than ten (10) days prior to the Confirmation Hearing.

ASI:  ASIRobicon, S.p.A. and its subsidiaries, a non-debtor foreign subsidiary of HVE.

Ballot:  The ballot distributed, together with the Disclosure Statement, to holders of Pre-Petition Senior Note Claims, General Unsecured Claims, Old Common Stock Interests and Old Preferred Stock Interests for the purpose of acceptance or rejection of the Plan.

BankruptcyCode:  Title 11 of the United States Code, as amended from time to time, as applicable during the Chapter 11 Cases.

Bankruptcy Rules:  The Federal Rules of Bankruptcy Procedure, as amended from time to time, promulgated under Section 2075 of title 28 of the United States Code and the local rules for the United States District Court and the United States Bankruptcy Court for the District of Massachusetts, as applicable during the Chapter 11 Cases.

Bar Date:  The date designated by the Court as the last day for filing a Proof of Claim or Proof of Interest against the Debtors.

Business Day:  Any day other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

Cash:  Legal tender of the United States of America.

Causes of Action:   Any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

Chapter 11 Cases:  The respective cases under chapter 11 of the Bankruptcy Code concerning the Debtors commenced on the Petition Date.

Claim:  Any right to (a) payment from the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (b) an equitable remedy for breach of performance of the Debtors if such breach gives rise to a right to payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

Committee:   Any committee appointed pursuant to Section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases, including the Creditors' Committee.

Confirmation Date:  The date on which the Confirmation Order is entered on the docket maintained by the clerk of the Court with respect to the Chapter 11 Cases.

Confirmation Hearing:  The hearing held by the Court pursuant to Section 1128(a) of the Bankruptcy Code regarding the confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

Confirmation Order:   The order of the Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

Court:  The United States Bankruptcy Court for the District of Massachusetts, or any other court having jurisdiction over the Chapter 11 Cases.

CP Benefits:  Clifford Press's claims to the extent unpaid, for post-petition salary through the Effective Date at his annual rate (not to exceed $450,000), customary and reasonable post-petition employee benefits through the Effective Date, including health benefits, the

quarterly retention payment of $50,000 due on June 1, 2004, reasonable business expenses incurred from the Petition Date through the Effective Date and Court approved rental payments for office space in New York.

CP Claim:    All Claims of Clifford Press, including, without limitation, all retention and severance obligations and any other actual or alleged obligations of the Debtors to Clifford Press. The "CP Claim" shall not include the CP Benefits.

CP Distribution:   Collectively, (i) 30,000 shares of New Common Stock (which will represent, in the aggregate, 3% of the New Common Stock issued and outstanding on the Effective Date, subject to dilution by the Management Incentive Plan and New Warrants), and (ii) $300,000.

Creditor:   Any Entity that is the holder of a Claim against any of the Debtors that arose on or before the Petition Date or a Claim against any of the Debtors' estates of the kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code.

Creditors' Committee:  The official committee of unsecured Creditors appointed in these Chapter 11 Cases pursuant to Section 1102(a) of the Bankruptcy Code on March 11, 2004, as the same may be constituted from time to time.

Debtors:   Collectively, HVE, Ross Hill, Carolyn, CAC, HV-FC, HIVEC, HV-AC, HVEC, Inc., Nicole, Robicon and TTS.

DIP Agent:   The Bank of New York, as agent for the DIP Lenders.

DIP Agreement:  The debtor in possession credit agreement, dated as of February 27, 2004 (and as amended from time to time), by and among HVE, as the borrower, its Subsidiaries from time to time a party thereto, the DIP Lenders, and the DIP Agent, together with any of the documents and instruments relating thereto, as approved by the DIP Orders.

DIP Lenders:   The lenders under the DIP Agreement.

DIP Orders:    The Interim Order (I) Authorizing Secured and Super-Priority Post-Petition Financing and Use of Cash Collateral Pursuant to 11 U.S.C. §§ 363, 364 and 507(b), (II) Modifying Automatic Stay Under 11 U.S.C. § 362, (III) Granting Other Related Relief, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 entered by the Court on March 3, 2004 and the Final Order (I) Authorizing Secured and Super-Priority Post-Petition Financing and Use of Cash Collateral Pursuant to 11 U.S.C. §§ 363, 364 and 507(b), (II) Modifying Automatic Stay Under 11 U.S.C. § 362, and (III) Granting Other Related Relief entered by the Court on March 29, 2004.

Disclosure Statement:   The disclosure statement that relates to the Plan, as amended, supplemented or modified from time to time, and has been approved by the Court as containing adequate information as required by Section 1125 of the Bankruptcy Code.

Disputed:   With respect to Claims or Interests, any Claim or Interest that is not Allowed.

Distribution Record Date:  The date established in the Confirmation Order for determining the identity of holders of Allowed Claims and Allowed Interests entitled to distributions under the Plan.

Documents:   The Plan and all documents necessary to consummate the transactions contemplated by the Plan, including, but not limited to, the New Credit Facility Documents, the Amended and Restated Certificates of Incorporation, the Amended and Restated By-Laws, the Shareholders Agreement, the New Warrant Agreement, the Management Incentive Plan, Senior Executive Employment Agreement and the agreements, instruments and documents (including collateral agreements) ancillary thereto.

Effective Date:   The first Business Day immediately following the date upon which all conditions to the Effective Date set forth in Section 13.02 of the Plan have been satisfied or waived by the Debtors or the Reorganized Debtors, as the case may be, with the consent of the Creditors' Committee and the Unofficial Committee of Noteholders, which will not be unreasonably withheld; provided, however, that if a stay of the Confirmation Order is in effect on such date, the Effective Date will be the first Business Day after such stay is no longer in effect.

Entity:   Any individual, corporation, limited or general partnership, limited liability company, joint venture, association, joint stock company, estate, entity, trust, trustee, United States Trustee, unincorporated organization, government, governmental unit (as defined in the Bankruptcy Code), agency or political subdivision thereof.

Final Order:   An order, ruling or judgment of the Court or any other court of competent jurisdiction, which has not been reversed, vacated or stayed and as to which the time to appeal, petition for *certiorari*, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending, or as to which any right to appeal, petition for *certiorari*, reargue, or rehear will have been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of *certiorari*, or reargument or rehearing thereof has been sought, such order of the Court or other court of competent jurisdiction will have been determined by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing will have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order will not cause such order not to be a Final Order.

General Unsecured Claim:   Any Claim other than an Administrative Expense, Miscellaneous Secured Claim, a Pre-Petition Senior Note Claim, an Intercompany Claim, a Priority Claim, or a Priority Tax Claim.

Impaired:  Any Claim or Interest that is "impaired" within the meaning of Section 1124 of the Bankruptcy Code.

<u>Indenture Trustee</u>:  U.S. Bank and National Association, as successor indenture trustee to State Street Bank and Trust Company as indenture trustee under the Pre-Petition Indenture, together with its duly appointed successors and assigns, if any.

<u>Indenture Trustee Charging Lien</u>:  Any Lien or other priority in payment or right available to the Indenture Trustee pursuant to the Pre-Petition Indenture or otherwise available to the Indenture Trustee under applicable law, for the payment of reasonable fees, costs and expenses (including, without limitation, the reasonable fees and expenses of the Indenture Trustee's attorneys and other professionals).

<u>Indenture Trustee's Fees and Expenses</u>:  Any and all reasonable compensation, fees, costs and expenses (including, without limitation, reasonable legal fees, costs and expenses) incurred by the Indenture Trustee prior to the Effective Date.

<u>Instrument</u>:  Any share of stock, security, promissory note or other "Instrument" within the meaning of that term as defined in Section 9-102(47) of the UCC.

<u>Intercompany Claim</u>:  Any Claims between and among the Debtors and any Claims of any Subsidiaries against the Debtors.

<u>Interests</u>:  The equity interests in the Debtors including, but not limited to, those represented by shares of capital stock of any Debtor and any options, warrants, calls, subscriptions or other similar rights or other agreements, commitments or outstanding securities obligating any Debtor to issue, transfer or sell any shares of capital stock of such Debtor.

<u>Letitia</u>:  Letitia Corporation.

<u>Letitia Subsidiary</u>:  All direct and indirect subsidiaries of Letitia that are not also HVE or direct or indirect subsidiaries of HVE.

<u>Lien</u>:  The meaning set forth in Section 101(37) of the Bankruptcy Code; except that a Lien that has been avoided in accordance with a provision of the Bankruptcy Code, including without limitation, Sections 544, 545, 546, 547, 548 or 549, will not constitute a Lien.

<u>Management Incentive Plan</u>:  The management incentive plan, in form and substance reasonably acceptable to the Creditors' Committee and the Unofficial Committee of Noteholders, pursuant to which options for 10% of the New Common Stock will be issued.  Such plan will be substantially in the form filed with the Court no later than ten (10) days prior to the Confirmation Hearing.

<u>Market Rate</u>:  The rate of interest per annum (rounded upward, if necessary, to the nearest whole 1/100 of 1%) equal to the yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of one-year United States Treasury bills settled at least fifteen (15) days prior to the Effective Date.

<u>Maximum Potential Claim Amount</u>:  For all General Unsecured Claims, (a) to the extent not scheduled as contingent or Disputed, the scheduled amount of the Claim, unless a Proof of Claim was timely filed, in which case the Proof of Claim amount supersedes the scheduled amount, and (b) the amount asserted in timely filed Proofs of Claim for which there

are no corresponding scheduled amounts; <u>provided</u>, <u>however</u>, claims of employees of the Debtors for wages, salaries or commissions, including vacation, severance, sick leave pay and contributions to employee benefit plans, which Claims shall be assumed by the Reorganized Debtors, shall not be included in the Maximum Potential Claim Amount; <u>provided</u>, <u>further</u>, <u>however</u>, that the Debtors with the consent of the Creditors' Committee and the Unofficial Committee of Noteholders (which consent will not be unreasonably withheld) may elect to exclude from the Maximum Potential Claim Amount, General Unsecured Claims covered by insurance to the extent of such coverage.  In all events, if the amount of a Claim is determined or estimated for all purposes by Final Order or stipulation, then that amount will be the Maximum Potential Claim Amount for that Claim.

<u>Miscellaneous Secured Claim</u>:  Any Claim that is a "secured" claim within the meaning of, and to the extent allowable as a secured claim under, Section 506 of the Bankruptcy Code.

<u>New Board of Directors</u>:  The new board of directors of Reorganized HVE, initially consisting of five (5) members, a list of which will be filed with the Court no later than ten (10) days prior to the Confirmation Hearing.

<u>New Class A Warrants</u>:  The warrants issued pursuant to the Plan which will (i) be exercisable to purchase, in the aggregate, 5% of the fully-diluted New Common Stock issued and outstanding on the Effective Date (subject to dilution by stock options granted to management of Reorganized HVE under the Management Incentive Plan and the New Class B Warrants), (ii) have a term of 7 years from the Effective Date, and (iii) have an exercise price based on an equity value for the New Common Stock of $135.8 million, in accordance with the New Warrant Agreement.

<u>New Class B Warrants</u>:  The warrants issued pursuant to the Plan which will (i) be exercisable to purchase, in the aggregate, 5% of the fully-diluted New Common Stock issued and outstanding on the Effective Date (subject to dilution by stock options granted to management of Reorganized HVE under the Management Incentive Plan and the New Class A Warrants), (ii) have a term of 7 years from the Effective Date, and (iii) have an exercise price based on an equity value for the New Common Stock of $161.1 million, in accordance with the New Warrant Agreement.

<u>New Common Stock</u>:  The shares of common stock of Reorganized HVE to be issued by Reorganized HVE on and after the Effective Date pursuant to the Plan or otherwise, and having the relative rights set forth in the Reorganized HVE Amended and Restated Certificate of Incorporation.

<u>New Credit Facility Documents</u>:  The New Revolving Credit Agreement and the New Term Loan Credit Agreement, or such other credit agreement(s) which provide better terms or and conditions (as determined by the Debtors and the Creditors' Committee), in an aggregate amount of $35 million.

<u>New Revolving Credit Agreement</u>:  The $10 million secured revolving credit agreement to be executed by the Debtors with a financial institution on the Effective Date, which will be secured by a first priority lien on the accounts receivable and inventory of Reorganized

HVE and its domestic wholly-owned subsidiaries and a second priority lien on all other assets which secure the obligations of Reorganized HVE under the New Term Loan Credit Agreement. The terms and conditions of the New Revolving Credit Agreement will be subject to the prior approval of the Creditors' Committee and the Unofficial Committee of Noteholders, which approval shall not be unreasonably withheld.   The terms of the New Revolving Credit Agreement will be filed with the Court no later than ten (10) days prior to the Confirmation Hearing.

New Term Loan Credit Agreement:  The $25 million secured term loan credit agreement between the Reorganized Debtors and the New Term Loan Lenders to be effective as of the Effective Date.  A term sheet setting forth the material terms of the New Term Loan Credit Agreement is attached as Exhibit A to this Disclosure Statement.  The terms and conditions of the New Term Loan Credit Agreement will be subject to the prior approval of the Creditors' Committee and the Unofficial Committee of Noteholders, which approval shall not be unreasonably withheld (not including those members which may be DIP Lenders or proposed exit lenders).

New Term Loan Lenders:  The lenders that are parties to the New Term Loan Credit Agreement as of the Effective Date.

New Warrants:  The New Class A Warrants and the New Class B Warrants.

New Warrant Agreement:  That certain agreement among the holders of New Warrants and Reorganized HVE, which shall be in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee, and the Unofficial Committee of Noteholders, to be filed with the Court no later than ten (10) days prior to the Confirmation Hearing

Old Common Stock:  HVE's common stock, par value $.01 per share, issued and outstanding as of the Petition Date.

Old Common Stock Distribution:  Collectively, (i) the New Class A Warrants that would have been received by any of the Debtors as holders of Old Preferred Stock Interests pursuant to Section 6.06 of the Plan and (ii) the New Class B Warrants.

Old Common Stock Interests:  The Interests represented by the shares of Old Common Stock.

Old Preferred Stock:  HVE's Series A Exchange Redeemable Preferred Stock, par value $1.00 per share, issued and outstanding as of the Petition Date.

Old Preferred Stock Interests:  The Interests represented by the shares of Old Preferred Stock.

Other Interests:  All (a) Interests in the Debtors (including, without limitation, Phantom Stock Grants), other than Old Common Stock Interests, Old Preferred Stock Interests and Subsidiary Common Stock Interests, and (b) Claims of the type described in, and subject to subordination under, Section 510(b) of the Bankruptcy Code.

Petition Date:  March 1, 2004, the date on which the Debtors filed with the Court their petitions commencing the Chapter 11 Cases.

Phantom Stock Grants:  All rights granted under (i) the ASIRobicon Appreciation Rights Plan, dated May 8, 2001 and (ii) the Physical Electronics, Inc. Appreciation Rights Plan, dated July 19, 2000.

Plan:  The Third Amended Joint Chapter 11 Plan of Reorganization dated May 13, 2004, together with all exhibits thereto, as the same may be amended or modified from time to time.

Plan Supplement:  The supplemental appendix to the Plan to be filed with the Court no later than ten (10) days prior to the initial date set for the Confirmation Hearing that will contain draft forms of the Documents and certain other documents relevant to the implementation of the Plan.

Pre-Petition Indenture:  That certain indenture, dated as of August 8, 1997, as amended, by and between HVE, as issuer, and State Street Bank and Trust Company, as indenture trustee, pursuant to which, among other things, the Pre-Petition Senior Notes were issued.

Pre-Petition Senior Note Claims:  Any and all Claims in respect of, or in connection with, all or any portion of the aggregate outstanding and unpaid amount of principal and interest due and owing under the Pre-Petition Senior Notes.

Pre-Petition Senior Notes:  The 10-3/4% Senior Notes due 2004 which were issued pursuant to the Pre-Petition Indenture.

Priority Claim:  Any Claim, other than a Priority Tax Claim or an Administrative Expense, which is entitled to priority in payment under Section 507(a) of the Bankruptcy Code.

Priority Tax Claim:  Any Claim which is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

Professional:  Any professional employed in the Chapter 11 Cases pursuant to Section 327, 328 or 1103 of the Bankruptcy Code and any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Section 503(b)(4) of the Bankruptcy Code.

Proof of Claim:  As defined in Bankruptcy Rule 3001.

Proof of Interest:  A written statement setting forth a creditor's Interest in the Debtors.

Reorganized Debtors:  Collectively, the Debtors from and after the Effective Date, other than those Debtors listed on Exhibit A to the Plan which will be dissolved pursuant to Section 9.07 of the Plan.

Reorganized HVE:  HVE from and after the Effective Date.

Schedules:  The schedules of assets and liabilities and the statements of financial affairs filed or to be filed, as the case may be, in the Chapter 11 Cases by the Debtors, as such schedules or statements may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Court.

Senior Executive Employment Agreements:  The Senior Executive Employment Agreements between the Reorganized Debtors and Russell L. Shade, Jr. and Joseph W. McHugh, Jr. in form and substance reasonably satisfactory to the Creditors' Committee and the Unofficial Committee of Noteholders.  A term sheet setting forth the material terms of the Senior Executive Employment Agreement of Russell L. Shade, Jr. will be filed with the Court no later than ten (10) days prior to the Confirmation Hearing.  The employment agreement of Joseph W. McHugh, Jr. as it exists on the Effective Date will be assumed pursuant to the Plan and will constitute the Senior Executive Employment Agreement between the Reorganized Debtors and Joseph W. McHugh, Jr.

Senior Note Distribution:  970,000 shares of New Common Stock (which will represent, in the aggregate, 97% of the New Common Stock issued and outstanding on the Effective Date, subject to dilution from options issued pursuant to the Management Incentive Plan and New Warrants).

Shareholders Agreement:  That certain agreement among the holders of New Common Stock, which will be in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee and the Unofficial Committee of Noteholders.  The material terms of the Shareholders Agreement are set forth in Exhibit B to this Disclosure Statement and the Shareholders Agreement will be filed with the Court no later than ten (10) days prior to the Confirmation Hearing.

Subsidiaries:  All direct and indirect subsidiaries of HVE and the Debtors.

Subsidiary Common Stock:  Collectively, any and all authorized, issued and outstanding Interests in each of the Debtors other than HVE.

Subsidiary Common Stock Interests:  The Interests represented by the shares of Subsidiary Common Stock.

Tax:  "Tax" and "Taxes" include all taxes, charges, fees, duties, levies, imposts, rates or other assessments imposed by any federal, state, local or foreign Governmental Unit, including, but not limited to, income, gross receipts, excise, property, sales, stamp, use, license, capital stock, transfer, franchise, payroll, withholding, social security, value added and other taxes, and any interest, penalties, fines, losses, damages, costs or additions attributable thereto.

Tax Asset:  "Tax Asset" means any tax item that, directly or indirectly could reduce a Tax in any taxable period (or portion thereof), including a net operating loss, net operating loss carryforward, net capital loss, net capital loss carryforward, basis investment tax credit, foreign tax credit, charitable deduction, credit related to alternative minimum tax and any other Tax credit or Tax attribute.

Tax Code:  The Internal Revenue Code of 1986, as amended.

Tax Return:  "Tax Return" means any return, report, certificate, form or similar statement or document (including any related or supporting information or schedule attached thereto and any information return, amended tax return, claim for refund or declaration of estimated tax) required to be supplied to, or filed with, a taxing authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

Unimpaired:  Any Claim or Interest that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

Unofficial Committee of Noteholders:  The ad hoc committee of holders of the Pre-Petition Senior Notes that was formed prior to the Petition Date.

# ARTICLE III.
# BACKGROUND

3.01    High Voltage Engineering Corporation

HVE and its Debtor and non-debtor subsidiaries are a diversified group of industrial and technology based manufacturing businesses.  HVE's headquarters are located in Wakefield, Massachusetts and the Debtors' major operating and manufacturing facilities, including those owned or leased by the Debtors' non-debtor subsidiaries, are located in California, Massachusetts, Minnesota, Pennsylvania, Italy, The Netherlands, the United Kingdom and other foreign countries.  Worldwide, the Debtors and non-debtor subsidiaries employ over 1800 people, including temporary employees.  The Debtors' products and services are sold to a broad range of domestic and foreign original equipment manufacturers and end-users in a variety of industries including process automation, metal and steel, water and wastewater treatment, petrochemicals, pulp and paper, marine and cable, power generation, oil and gas extraction and transportation, semiconductor fabrication, chemicals, construction, and for scientific and educational research.  The Debtors' products and services are divided into the "Industrial Power Control" and "Advanced Surface Analysis" segments.

(i)    Industrial Power Control

The Industrial Power Control segment includes Robicon, a Debtor in these Chapter 11 cases, and certain non-debtor foreign subsidiaries of HVE, including ASI.  Robicon operates primarily out of a manufacturing facility in New Kensington, Pennsylvania and employs approximately 368 people.  Robicon is a leading designer and manufacturer of high power conversion products, which are used to regulate electric power, reduce energy costs and improve process control in a wide variety of industrial applications.  Robicon's products include variable frequency drives ("VFDs") for large electric motors and power control systems for other applications.  These products are used in process automation, water and wastewater treatment, electric utility power generation, oil and gas extraction and transportation, petrochemical processing, silicon processing, glass manufacturing, cement production and other general industrial applications.

Robicon markets and sells  VFDs primarily in North and South America, the United Kingdom and Southeast Asia.  The market for VFDs is comprised primarily of three customer segments:   industrial, energy and municipal.  The industrial market for VFDs is

comprised of large power users such as metals smelting plants, cement plants, pulp and paper mills, chemical processing plants and power generation facilities. The energy market consists of oil and gas extraction, transportation and power generation. The municipal market for VFDs is comprised primarily of municipalities which operate water and wastewater treatment facilities.

Demand for power control systems is driven by the construction of new, or the upgrading of existing, steel mills or smelting facilities, polysilicon extraction facilities, glass and fiberglass furnaces and other large electrical process manufacturing facilities. As a result of the long lead time required to design, permit and build such facilities, demand for power systems does not necessarily correlate to general economic cycles. Robicon sells its VFDs and power control systems through its direct sales force, ASI's sales channels and by independent manufacturers' representatives. Robicon targets large industrial users in select markets and segments and applications engineers in both industrial and commercial projects. Bids for large municipal VFD contracts are typically conducted through a "request for proposal" process and handled by Robicon's independent manufacturers' representatives.

For fiscal year ended April 26, 2003, Robicon had net sales of approximately $120 million. However, during the current fiscal year, Robicon has a significant backlog of orders (approximately $70 million) that exceeds levels from previous years.

ASI, a non-debtor subsidiary with its headquarters in Milan, Italy, is one of the leading manufacturers of electrical and automation systems, power electronics, motors and generators for various applications and industrial sectors, such as iron and steel, non-ferrous metals, pulp and paper, rubber and plastics, power generation, cement, marine and offshore, chemical and petrochemical, cable transport, glass, textile, food and water treatment. ASI's products are sold in Europe, Asia, the Middle East and North America through a direct sales force and by independent representatives. For fiscal year ended April 26, 2003, ASI had net sales of approximately $180 million. However, during the current fiscal year, ASI has a significant backlog of orders (approximately $180 million) that exceeds levels from previous years.

Prior to the Petition Date, Robicon and ASI had begun to integrate their sales marketing and operation capabilities to offer a broader range of products. The Debtors believe that ASI's market channels, products and industrial credibility provide Robicon with significant incremental orders, cashflow, and value, as evidenced by the execution of a letter of intent for a $35 million contract from the Exxon Mobil Corporation. Together, the companies are commonly known as "ASIRobicon;" however, the companies remain separate legal entities, with separate books, records, lenders, creditors, assets and liabilities.

(ii)    Advanced Surface Analysis

The Advanced Surface Analysis segment has two main components, equipment sales and analytical services. The companies in this business segment include the Evans Analytical Group ("EAG"), a division of HVE, and High Voltage Engineering Europa, B.V. ("HVE Europa"), a non-debtor, indirect foreign subsidiary located in The Netherlands.

EAG, headquartered in Sunnyvale, California, provides analytical services using beams of ions, electrons or x-rays to probe the surface and micro-regions of high-technology

materials in order to provide data on the composition and chemistry of such materials. EAG's services are used in industrial markets where there is a high value-added in a high-technology product. Customers are typically high technology companies' engineers or scientists. EAG's services are used primarily by the following industries: semiconductors (manufacturers of integrated circuits and their suppliers of capital equipment and materials), optoelectronics, data storage and biomedical devices. These services are used by customers in their research and development, manufacturing yield improvements and failure analysis, and in technical sales of their products. For fiscal year ended April 26, 2003, EAG had net sales of approximately $19 million.

HVE Europa is the world's leading designer and manufacturer of particle accelerator systems, which are used primarily for materials science, semiconductor research and carbon dating. In addition to its core research markets, HVE Europa is a supplier of ion accelerator subsystems to a major equipment manufacturer in the high energy ion implantation market that supplies complete systems to leading semiconductor manufacturers. HVE Europa employs 83 people and for fiscal year ended April 26, 2003, HVE Europa had net sales of approximately $10 million.

3.02     Pre-Petition Financing

Prior to the Petition Date, the Debtors financed their growth and development using a variety of means, including obtaining a secured credit facility and issuing debt securities. An important source of financing was a revolving credit facility pursuant to the Financing Agreement, dated November 30, 2000, as amended and restated from time to time (the "Pre-Petition Credit Agreement"), by and among HVE (and certain of its affiliates that were since sold or merged into HVE), as borrowers, HIVEC, as guarantor, the financial institutions from time to time party thereto, as lenders and Ableco Finance LLC as collateral and administrative Agent ("Ableco"). The Pre-Petition Credit Agreement provided for a revolving credit facility of $25 million. As of the Petition Date, there was approximately $15.5 million in aggregate principal amount of indebtedness and accrued and unpaid interest outstanding under the Pre-Petition Credit Agreement. The Pre-Petition Credit Agreement was secured by, among other things, the inventory and accounts receivables of the Debtors. As discussed in more detail below, the Pre-Petition Credit Agreement matured on March 1, 2004 and was repaid with the proceeds from the DIP Agreement.

On August 8, 1997, HVE, pursuant to the Pre-Petition Indenture, issued $155 million of 10½% Senior Notes due 2004. On December 22, 1999, HVE received the consent (the "Consent Solicitation") of the holders of the outstanding notes (collectively, the "Noteholders") for the waiver of, and amendment to, certain provisions of the Indenture. In consideration of the Consent Solicitation, HVE, among other things, paid a consent fee and increased the amount of interest payable on the notes by 25 basis points, to 10¾%, until such a time as HVE is able to incur additional indebtedness under the Pre-Petition Indenture. The Pre-Petition Senior Notes are secured by pledges of certain intercompany notes issued by Robicon, Nicole and HIVEC in favor of HVE and stock of ASIRobicon, Ltd., a foreign subsidiary of Robicon, and rank senior to any subordinated indebtedness and are subordinate to all existing and future secured indebtedness. The unsecured deficiency of the Claims of the holders of the Pre-Petition Senior Notes places them among the largest twenty unsecured creditors of the Debtors. Interest is payable semiannually on February 15 and August 15. As

discussed in greater detail below, HVE did not make its August 15, 2003 and February 15, 2004 semi-annual interest payments.

3.03    Events Preceding Commencement of the Chapter 11 Cases

During the course of fiscal 2000-2003, HVE's operating performance declined substantially due to weakness in its former Physical Electronics unit of the Advanced Surface Analysis segment.  This decline was driven by poor economic conditions and delayed capital investment within the semiconductor and laboratory instrument markets, as well as weak markets in Japan.  Because of this performance decline, to create liquidity and pay indebtedness, over the last three years HVE has disposed of certain non-core business assets, including (i) Maxima Technologies, Inc. and its subsidiaries ("Maxima"), (ii) Physical Electronics, Inc., and (iii) the Anderson Power Products division.  After making certain payments on secured loans and receivables and on receivable securitization financing, the sale of these assets generated aggregate net cash after tax proceeds of approximately $90 million.  Some of these proceeds were used in 2003 to reduce the Debtors' indebtedness under the Pre-Petition Credit Agreement and a prior securitized receivables financing arrangement.  The balance of the proceeds from the sale of HVE's non-core assets were insufficient to (i) significantly reduce the Debtors' long term indebtedness, (ii) stem the continuing decline resulting from Physical Electronics' performance, or (iii) fund the working capital needs of HVE and its subsidiaries, including ASI.

In August 2003, the Debtors commenced discussions with the Unofficial Committee of Noteholders.  The Unofficial Committee of Noteholders retained Jefferies and Company, Inc. as its financial advisor and Ropes & Gray LLP as counsel to facilitate discussions on the restructuring of the Pre-Petition Senior Notes.  The Debtors retained Evercore Restructuring L.P. ("Evercore") as their financial advisor and Goulston & Storrs PC ("G&S") and also Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") as restructuring counsel.

While continuing their discussions with the Unofficial Committee of Noteholders, HVE did not make its semi-annual interest payment of approximately $8.33 million on the Pre-Petition Senior Notes which was due on August 15, 2003.  On September 14, 2003, the 30-day grace period within which HVE had to make the August 15, 2003, interest payment expired thereby causing an event of default to occur under the Pre-Petition Indenture.  Throughout the course of the Debtors' negotiations with the Unofficial Committee of Noteholders, the Debtors and their advisors undertook a comprehensive search for additional equity and/or debt financing from numerous potential investors.  Despite these efforts, the Debtors did not receive any proposals that would both provide sufficient liquidity and that were acceptable to the Debtors and the Unofficial Committee of Noteholders.

Concurrently with the negotiations with the Unofficial Committee of Noteholders, the Debtors were also engaged in negotiations with Ableco to extend the October 31, 2003 maturity date under the Pre-Petition Credit Agreement until the Debtors' proposed restructuring could be completed.  As a result of these negotiations, Ableco granted the Debtors an extension of the maturity date until January 31, 2004, in exchange for the Debtors' payment of $500,000 in Cash. Subsequently, Ableco agreed to extend the maturity date until February 17, 2004, at no additional fee.  Ableco agreed to grant the Debtors a further extension of the maturity date until March 1, 2004, subject to other conditions, including the Debtors' payment of $50,000.  In addition to negotiating the restructuring of the Debtors' domestic businesses, the Debtors have

also undertaken to restructure the debt of ASI (their Italian non-debtor subsidiary).  Like the Debtors' domestic businesses, ASI has been unable to improve its market position because of debt maintenance obligations.  ASI is a borrower, among other receivables financing arrangements, under a credit facility with Banca Carige (the "Carige Loan").  As of December 1, 2003, there was 20.6 million  Euros in aggregate principal amount of indebtedness outstanding under the Carige Loan.  Prior to the commencement of the Debtors' restructuring negotiations, the debt amortization schedule for the Carige Loan required ASI to pay 8.3 million Euros for the fiscal year ending April 2004.  After extensive negotiations with Banca Carige, the Debtors succeeded in rescheduling ASI's debt amortization payments.  Pursuant to the new amortization schedule, ASI was required to pay (and did pay) approximately 4.1 million Euros on December 22, 2003 and must also pay the following amortization payments:  (i) 2.1 million Euros on December 22, 2004 and (ii) 2.1 million Euros to be paid semi-annually, on June 22 and December 22, every year from June 22, 2005 through and until June 22, 2008.  On or about February 26, 2004, ASI disposed of certain real estate, subject to a sixty (60) day waiting period under Italian law, and applied the proceeds towards the payment that is due on December 22, 2004, and the payment on June 22, 2008 resulting in a reduction of  ASI's indebtedness of approximately 3.7 million Euros.

The pre-petition negotiations among the Debtors and the Unofficial Committee ultimately culminated in the execution of a restructuring agreement (the "Restructuring Agreement"), dated February 18, 2004 (which was amended and restated on February 27, 2004), amongst Clifford Press, HVE's current President and Chairman, holders of in excess of 53% of the Pre-Petition Senior Notes (collectively, the "Consenting Noteholders"), and HVE.  The Plan is based on the terms set forth in the Restructuring Agreement.  The Debtors and the Creditors' Committee believe the Restructuring Agreement and the Plan maximize value for all parties in interest.  The Unofficial Committee of  Noteholders also believes the Restructuring Agreement and the Plan maximizes value for the holders of the Pre-Petition Senior Notes.   Under the Restructuring Agreement, the Consenting Noteholders and Clifford Press agreed to support the Plan and to vote their Claims and Interests, as the case may be, in favor of the Plan.

## ARTICLE IV.
## RECOMMENDATION

**IN LIGHT OF THE BENEFITS TO BE ATTAINED BY HOLDERS OF PRE-PETITION SENIOR NOTE CLAIMS, GENERAL UNSECURED CLAIMS, OLD PREFERRED STOCK INTERESTS AND OLD COMMON STOCK INTERESTS AS A RESULT OF THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE DEBTORS RECOMMEND THAT HOLDERS OF PRE-PETITION SENIOR NOTE CLAIMS, GENERAL UNSECURED CLAIMS, OLD PREFERRED STOCK INTERESTS AND OLD COMMON STOCK INTERESTS VOTE TO ACCEPT THE PLAN.**

## ARTICLE V.
## SUPPORT OF THE PLAN BY PARTIES IN INTEREST

The Creditors' Committee has informed the Debtors that, based on its familiarity with the provisions of the Plan and this Disclosure Statement, which familiarity has been obtained through its participation in the negotiation and formulation of these documents, it

supports and intends to recommend that holders of Pre-Petition Senior Note Claims, General Unsecured Claims, Old Preferred Stock Interests, and Old Common Stock Interests vote in favor of the Plan. In addition, the Unofficial Committee of Noteholders has informed the Debtors that based on its familiarity with the provisions of the Plan and this Disclosure Statement, which familiarity has been obtained through its participation in the negotiation and formulation of these documents, it supports and intends to recommend that holders of Pre-Petition Senior Note Claims vote in favor of the Plan. If holders of Claims in the class of Pre-Petition Senior Note Claims or General Unsecured Creditors that hold at least two-thirds in amount and more than one-half in number of the Allowed Claims of such class of Pre-Petition Senior Note Claims or General Unsecured Claims that vote to accept or reject the Plan, vote to accept the Plan, the requirement of the Bankruptcy Code that at least one class of Impaired Claims (without including any acceptance of the Plan by an "insider," *i.e.*, the Affiliates of the Debtors) accepts the Plan would be satisfied.

## ARTICLE VI.
## DESCRIPTION OF CHAPTER 11 CASES

On the Petition Date, the Debtors commenced the Chapter 11 Cases. Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Court. Transactions out of the ordinary course of business have required Court approval. In addition, the Court has supervised the Debtors' employment of attorneys, accountants and other professionals.

An immediate effect of the filing of the bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against the Debtors and litigation against the Debtors. This injunction remains in effect, unless modified or lifted by order of the Court, until a plan of reorganization is confirmed and becomes effective.

6.01    First Day Orders

The Debtors have submitted a number of applications requesting so-called "first day orders." On March 2, 2004, the Court entered the following first day orders, among others: (i) an order authorizing the retention of Donlin, Recano & Company Inc. (the "Voting Agent") as claims, notice and balloting agent; (ii) an order authorizing the Debtors to pay pre-petition salaries, commissions, employee wages, other compensation, reimbursable expenses and benefits and directing the Debtors' banks to honor pre-petition employee wage and expense checks; (iii) an order authorizing the Debtors to pay various pre-petition creditors in the ordinary course of business and authorizing the Debtors' banks to honor pre-petition checks to such creditors; (iv) an order authorizing the Debtors to maintain their pre-petition bank accounts, business forms, stationery and checks and to continue using their cash management system; (v) an order authorizing the Debtors to pay certain pre-petition tax liabilities; and (vi) an order authorizing the Debtors to enter into the DIP Agreement, on an interim basis and scheduling a final hearing on the DIP Agreement. Thereafter, on March 12, 2004, the Court entered orders authorizing, among other things, the retention of Fried Frank and Goulston & Storrs as co-counsel to the Debtors. For additional details regarding the first day motions filed

on the Petition Date, see the Declaration of Russell L. Shade, Jr. in support of Chapter 11 Petitions and First Day Motions and Applications, dated March 1, 2004.

6.02   Schedules & Statement of Financial Affairs

Pursuant to Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, unless otherwise ordered by the Court, the Debtors must file certain schedules of claims, assets, liabilities, executory contracts and unexpired leases and other information (the "Schedules") and a Statement of Financial Affairs (the "Statements") within fifteen (15) days of the Petition Date. This information is designed to provide creditors and other interested parties with material information to enable each creditor to evaluate its proposed treatment under any plan.  On the Petition Date, the Debtors requested, and were granted, an extension of time to file their Schedules and Statements.  The Schedules and Statements were filed with the Court on April 5, 2004 and Amended Schedules were filed with the Court on April 20, 2004.

6.03   Appointment of Creditors' Committee

On March 11, 2004, the United States Trustee appointed the Creditors' Committee, which consists of 7 members.  The members of, and the counsel and advisors retained by the Creditors' Committee are set forth below.

(i)   Members of the Creditors' Committee

DLJ CBO Limited
466 Lexington Avenue, 17th Floor
New York, NY 10017
Co-Chair

Hitran Corporation
362 Highway 31
Flemington, NJ 08822
Co-Chair

U.S. Bank National Association
(As Indenture Trustee for the Pre-Petition Senior Notes)
100 Wall Street, Suite 1600
New York, NY 10005

Smoky River CDO L.P.
c/o RBC Capital Partners
One Liberty Plaza, 5th Floor
New York, NY 10006

Taconic Capital Advisors LLC
as Investment Advisor
450 Park Avenue, 8th Floor
New York, NY 10022

Powerex, Inc.
200 East Hillis Street
Youngwood, PA 15697

Koester Metals, Inc.
1441 Quality Drive
Defiance, OH 43512

> (ii)    <u>Professionals retained by the Creditors' Committee</u>

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York  10038-4982
Attn:  Michael J. Sage, Esq.
      Eric M. Kay, Esq.                 Attorneys for the Creditors' Committee

Craig and MaCauley PC
Federal Reserve Plaza
600 Atlantic Avenue, 29th Floor
Boston, Massachusetts  02210
Attn:  Christopher J. Panos, Esq.
      Daniel C. Reiser, Esq.           Attorneys for the Creditors' Committee

Jefferies & Company, Inc.
520 Madison Avenue
New York, New York  10022
Attn:  Thane Carlston
      Andrew R. Booth
      Barak Klein                 Financial Advisors to the Creditors' Committee

      6.04    The DIP Agreement

          On February 27, 2004, the Debtors executed the DIP Agreement with Credit Suisse First Boston International, The Debt Strategies Fund, Inc., The Floating Rate Income Strategies Fund, Inc. and The Royal Bank of Canada.  Each of the foregoing DIP Lenders, other than The Floating Rate Income Strategies Fund, Inc., is a holder of the Pre-Petition Senior Notes. On the Petition Date, the Debtors filed a Motion seeking authority of the Court to, among other things, enter into the DIP Agreement.  On March 2, 2004, the Court approved the DIP Agreement on an interim basis (the "Interim Order").  After a hearing held before the Court on March 29, 2004, the Court entered the Final DIP Order approving the DIP Agreement.

          The DIP Agreement provides for a $25 million senior secured term loan (the "DIP Loan").  In accordance with the DIP Agreement and the Interim Order, the Debtors used $15,649,333.29 of the DIP Loan to repay in full the amounts outstanding under the Pre-Petition Credit Agreement.  Subject to certain conditions set forth in the DIP Agreement, the remaining balance of $9,350,666.71, is being used to provide working capital to the Debtors and the Debtors' foreign subsidiaries, including ASI.  The maturity date of the DIP Agreement will be the earlier of the Effective Date and July 15, 2004.  However, as contemplated by the

Restructuring Agreement, and subject to the terms and conditions set forth therein, the DIP Lenders have agreed that on the Effective Date, they, and the other lenders yet to be determined, will provide the New Term Loan Credit Agreement to refinance the Debtors' obligations under the DIP Agreement.

Prior to the first anniversary of the first date on which the DIP Lenders fund any portion of the post-petition financing (the "Closing Date"), the post-petition financing will bear interest at the rate of 14% per annum, of which 12% will be payable in cash and 2% will be payable in kind.  On and after the first anniversary of the Closing Date, the post-petition financing will bear interest at the rate of 15% per annum, of which 12% will be payable in cash and 3% will be payable in kind.  Upon the occurrence and during the continuance of an event of default, the interest rate on the post-petition financing will increase by 2% per annum, which additional interest will be payable in cash.  In addition, in accordance with the DIP Agreement the Debtors have paid (i) a commitment fee of $250,000 to the DIP Agent for the account of the DIP Lenders on the Closing Date (as defined in the DIP Agreement); and (ii) a fee of $8500 to the DIP Agent.  The Debtors are also required to pay all expenses of the DIP Lenders and the DIP Agent (including fees, expenses and charges of counsel to the DIP Lenders and the DIP Agent).

6.05    Rejection of Employment Agreement with Laurence S. Levy, *Nunc Pro Tunc* to the Petition Date

On March 29, 2004, the Debtors filed a motion seeking authority to reject the employment contract of Laurence S. Levy ("Levy"), the former Chairman and Chief Executive Officer of HVE.  Levy is also a current officer and director of Letitia Corporation, which owns 91% of HVE's outstanding common stock.

On or about May 10, 2001, HVE and Levy entered into an Employment Agreement (the "Levy Agreement"), pursuant to which Levy would continue to be employed as Vice President of HVE and serve on HVE's Board of Directors.  On or about January 31, 2003, Levy elected to resign from the Board of Directors of HVE and the boards of each of its subsidiaries, effective immediately.  Since at least that time, Levy has not provided any meaningful services to HVE.  HVE stopped paying Levy's salary, effective October 31, 2003.[1]

To the extent that the Levy Agreement remains an executory contract, the Debtors' motion sought authority to reject the agreement with Levy *nunc pro tunc* to the Petition Date.  On April 5, 2004, however, the Debtors and Levy entered into a stipulation pursuant to which the Debtors and Levy agreed to the rejection of the Levy Agreement, effective as of a date to be agreed to by the parties, but which effective date will in no event be later than April 12, 2004.  On April 12, 2004, the Court entered an order approving the stipulation.[2]

6.06    Bar Dates

---

[1]    In response, by letter dated November 5, 2003, Levy requested "that HVE fulfill all of its contractual obligations" under the Levy Agreement.

[2]    The statements in this Disclosure Statement are without prejudice to any and all rights, remedies, claims, defenses, and causes of action of the Debtors.

On March 29, 2004, the Debtors filed a motion seeking an order establishing bar dates by which creditors must file Proofs of Claim in the Debtors' Chapter 11 Cases, and approving the forms and manner of notice thereof. The Debtors requested that the Court set May 13, 2004 (the "General Bar Date"), as the bar date for all Creditors holding Claims against the Debtors, and August 30, 2004 (the "Governmental Unit Bar Date"), as the bar date for all governmental entities, to file Proofs of Claim in the Debtors' cases or be forever barred from asserting such Claims against the Debtors. The Debtors' motion also sought to establish the bar date by which Creditors must file claims arising out of the rejection of executory contracts or unexpired leases as the later of (a) the General Bar Date or (b) thirty (30) days after the entry of an order authorizing the rejection of such executory contract or unexpired lease. On April 12, 2004, the Court entered an order setting the foregoing bar dates.

6.07    Notice of Request to Cure Under Restructuring Agreement by Clifford Press

On May 6, 2004, the Debtors received a letter from Clifford Press in which Mr. Press asserts that the Plan materially and adversely affects the rights provided to him under the "Clifford Press", "Releases and Exculpation", and "Old Equity" sections of the Restructuring Agreement (the "CP Notice"). Mr. Press has informed the Debtors that if the alleged offending provisions are not cured by May 21, 2004, his obligations under the Restructuring Agreement may terminate.

The Debtors, the Creditors' Committee and the Unofficial Committee of Noteholders have continued to negotiate the terms of the Plan with Mr. Press. In the event that Mr. Press' obligations under the Restructuring Agreement terminate, the Plan may be amended. The amendments to the Plan, if any, will not materially adversely affect the treatment of holders of Class 1 Priority Claims, Class 2 Miscellaneous Secured Claims, Class 3 Pre-Petition Senior Note Claims and Class 4 General Unsecured Claims. Therefore, the Debtors believe that any such amendments will not require the resolicitation of the Plan.

## ARTICLE VII.
## SUMMARY OF THE PLAN

**THE FOLLOWING IS A SUMMARY OF CERTAIN SIGNIFICANT PROVISIONS OF THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS APPENDIX A. TO THE EXTENT THAT THE TERMS OF THIS DISCLOSURE STATEMENT VARY WITH THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL BE CONTROLLING.**

The Debtors believe that under the Plan, holders of Claims and Interests will obtain a recovery with a value substantially in excess of what otherwise would be recovered by such holders if the assets of the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. See § 20.07 "Acceptance and Confirmation of the Plan—Best Interests Test."

7.01    General

Chapter 11 of the Bankruptcy Code is the principal business reorganization chapter of the Bankruptcy Code.   Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and stockholders.  Upon the filing of a petition for relief under Chapter 11 of the Bankruptcy Code, Section 362 of the Bankruptcy Code generally provides for an automatic stay of all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's case under Chapter 11 of the Bankruptcy Code or that otherwise interfere with the debtor's property or business.

Formulation of a plan of reorganization is the principal objective of a case under Chapter 11 of the Bankruptcy Code.  In general, a plan of reorganization under Chapter 11 of the Bankruptcy Code (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan and (iii) contains other provisions necessary to the reorganization of the debtor.   Chapter 11 of the Bankruptcy Code does not require each holder of a claim or interest to vote in favor of the plan of reorganization in order for the court to confirm the plan.   However, a plan of reorganization must be accepted by the holders of at least one impaired class of claims without considering the votes of "insiders" within the meaning of the Bankruptcy Code.   Generally, a claim or interest is "impaired," if its legal, equitable or contractual rights are altered.   A holder of an impaired claim or interest that will receive a distribution under the plan of reorganization is entitled to vote to accept or reject the plan.

Distributions made under the Plan will be made on the Effective Date, as soon thereafter as is practicable or at such other time or times specified in the Plan.

7.02    Voting on the Plan

(i)    <u>Holders of Claims and Interests Entitled to Vote</u>

As more fully described below, the Plan designates nine separate classes of Claims and Interests.  See § 7.03 "Summary of the Plan—Classification and Treatment of Claims and Interests Under the Plan."   The holders of Claims in Class 3 (Pre-Petition Senior Note Claims) and Class 4 (General Unsecured Claims) and the Interests in Class 6 (Old Preferred Stock Interests) and Class 7 (Old Common Stock Interests) are Impaired under the Plan and will be entitled to vote to accept or reject the Plan.   Class 9 (Other Interests) will not receive any distribution under the Plan and is therefore deemed to reject the Plan and votes of Class 9 will therefore not be solicited.  The holders of Claims and Interests, as the case may be, in Class 1 (Priority Claims), Class 2 (Miscellaneous Secured Claims), Class 5 (Intercompany Claims) and Class 8 (Subsidiary Common Stock Interests) are Unimpaired and are conclusively presumed to accept the Plan.

(ii)    <u>Votes Required for Class Acceptance</u>

The Court will determine whether sufficient acceptances have been received to confirm the Plan.  In order for the Plan to be confirmed under Section 1129(b) of the Bankruptcy Code, among other requirements, at least one class of Impaired Claims must have accepted the Plan which acceptance will be determined without including any acceptances of the Plan by any "insider," as defined in the Bankruptcy Code.   The class of Pre-Petition Senior Note Claims or General Unsecured Claims, as the case may be, has accepted the Plan if the Plan has been

accepted by holders of Pre-Petition Senior Note Claims or General Unsecured Claims, as the case may be, that hold at least two-thirds in amount and more than one-half in number of the Allowed Pre-Petition Senior Note Claims or Allowed General Unsecured Claims, as the case may be, of such class held by holders of Pre-Petition Senior Note Claims or General Unsecured Claims, as the case may be, that have accepted or rejected the Plan. The class of Old Common Stock Interests or the class of Old Preferred Stock Interests, as the case may be, has accepted the Plan if the Plan has been accepted by holders of Old Preferred Stock Interests or Old Common Stock Interests, as the case may be, that hold at least two-thirds in amount of the Allowed Old Preferred Stock Interests or Allowed Old Common Stock Interests, as the case may be, of such class held by holders of Old Preferred Stock Interests or Old Common Stock Interests, as the case may be, that have accepted or rejected such plan. Because Class 9 (Other Interests) will not receive any distribution under the Plan and, therefore, will be conclusively presumed to reject the Plan as a matter of law, the Debtors, therefore, must request that the Court confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code.

(iii)    <u>Counting of Ballots for Determining Acceptance of the Plan</u>

The Debtors intend to count all validly executed Ballots received prior to the Voting Deadline for purposes of determining whether each voting class of Impaired Claims and Impaired Interests has accepted or rejected the Plan. This Disclosure Statement and the Plan, together with all of the accompanying materials, are being transmitted to all known holders of Impaired Claims and Impaired Interests who are not conclusively presumed to have accepted or rejected the Plan as a matter of law. Accordingly, the Debtors are soliciting votes from the holders of Pre-Petition Senior Note Claims, the holders of General Unsecured Claims, the holders of Old Preferred Stock Interests and the holders of Old Common Stock Interests. Subject to the approval of the Court, it is expected that the solicitation period for voting on the Plan will be 20 Business Days, subject to extension by the Debtors.

7.03    Classification and Treatment of Claims and Interests Under the Plan

The Bankruptcy Code requires that a plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim or interest of a creditor or equity holder in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Plan places Pre-Petition Senior Note Claims and General Unsecured Claims in separate classes because it is necessary for the Debtors to (i) reduce their long term debt in order to continue as a going concern (see impairment of Pre-Petition Senior Note Claims under the Plan) while maintaining good relations with trade vendors (see Impaired General Unsecured Claims under the Plan). The Consenting Noteholders understood the importance of separately classifying Pre-Petition Senior Note Claims and General Unsecured Claims, and accordingly, the Restructuring Agreement contemplates the separate classification of these Claims. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

**Except to the extent that modification of classification in the Plan adversely affects the treatment of a holder of a Claim or Interest and requires resolicitation, acceptance of the Plan by any holder of a Claim or Interest pursuant to the Solicitation will**

**be deemed to be a consent to the Plan's treatment of such holder regardless of the class as to which such holder is ultimately deemed to be a member.**

The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Debtors believe that they have complied with this standard of equal treatment. To the extent that the Court finds that the Plan does not satisfy such standard, the Court could deny confirmation if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

Only classes that are Impaired under the Plan, but that are not deemed to have rejected the Plan as a matter of law, are entitled to vote to accept or reject the Plan. Generally, a class of claims or interests is considered to be "unimpaired" under a plan of reorganization if such plan does not alter the legal, equitable and contractual rights of the holders of such claims or interests. Under the Bankruptcy Code, holders of claims and interests in an Unimpaired class are conclusively presumed to have accepted a plan and are not entitled to vote to accept or reject a plan.

As indicated below, two classes of unsecured Claims (Class 1 – Priority Claims and Class 5 – Intercompany Claims), one class of secured Claims (Class 2 – Miscellaneous Secured Claims) and one class of Interests (Class 8 – Subsidiary Common Stock Interests) are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan. Two classes of unsecured Claims (Class 3 – Pre-Petition Senior Note Claims and Class 4 – General Unsecured Claims) and two classes of Interests (Class 6 – Old Preferred Stock Interests and Class 7 – Old Common Stock Interests) are Impaired and entitled to vote on the Plan. The remaining class of Interests (Class 9 – Other Interests) will receive no distribution under the Plan and the Interests in such class will be extinguished. As a result, Class 9 is deemed to have rejected the Plan.

Only Allowed Claims and Interests in Classes 1, 2, 3, 4, 5, 6, 7 and 8 are entitled to receive distributions under the Plan.

(i)    <u>Treatment of Administrative Expenses and Certain Priority Claims</u>

(a) <u>Administrative Expenses</u>. Administrative Expenses consist of the actual and necessary expenses incurred during the Chapter 11 Cases. Such expenses include costs incurred in the operation of the Debtors' and Reorganized Debtors' businesses after the commencement of the Chapter 11 Cases, the actual, reasonable fees and expenses of professionals that they retain and any committee appointed in the Chapter 11 Cases, post-petition taxes, if any, and certain other obligations arising after the commencement of the Chapter 11 Cases.

The Reorganized Debtors will pay each Allowed Administrative Expense in full, in cash, on the later of (a) the Effective Date (or as soon thereafter as is practicable) or (b) such other date to which the Reorganized Debtors and the holder of the Allowed Administrative Expense otherwise agree; <u>provided</u>, <u>however</u>, that Allowed Administrative Expenses representing (a) obligations incurred under or pursuant to the DIP Agreement will be paid in full in Cash on the Effective Date, (b) obligations incurred in the ordinary course of business or

assumed by the Debtors or the Reorganized Debtors, as the case may be, will be paid in full or performed by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business, consistent with past practice, and (c) obligations incurred to Professionals for services provided through the Effective Date will be paid in accordance with Court order approving the fees and expenses of each such Professional; provided further, however, that Allowed Administrative Expenses incurred by the Debtors or the Reorganized Debtors, as the case may be, after the Effective Date, including, without limitation, claims for Professionals' fees and expenses, will not be subject to application and may be paid by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business and without further Court approval.

(b) Priority Tax Claims. A "Priority Tax Claim" is any Claim against the Debtors of the type specified in Section 507(a)(8) of the Bankruptcy Code. These Claims consist of certain unsecured Claims of governmental units for taxes.

The Debtors estimate that Priority Tax Claims were, in the aggregate, approximately $0.

Treatment of Priority Tax Claims. Under the Plan, with respect to each Allowed Priority Tax Claim, at the sole option of the Debtors, each holder of an Allowed Priority Tax Claim will be entitled to receive from the Reorganized Debtors on account of such Claim:

Cash payments made in equal annual installments beginning on or before the first anniversary following the Effective Date with the final installment being payable no later than the sixth anniversary of the date of the assessment of such Allowed Priority Tax Claim, together with interest on the unpaid balance of such Allowed Priority Tax Claim from the Effective Date calculated at the Market Rate; or

Such other treatment agreed to by each holder of such Allowed Priority Tax Claim and the Debtors or Reorganized Debtors, as the case may be.

Full Settlement. As more specifically set forth in, and without in any way limiting, Section 12.01 of the Plan, the distributions provided for in Section 3.01 of the Plan are in full settlement, release and discharge of all Priority Tax Claims.

(ii)    Class 1 − Priority Claims

Class 1 consists of all Allowed Claims arising on or prior to the Petition Date which are entitled to priority status in accordance with Section 507(a) of the Bankruptcy Code, other than Administrative Expenses and Priority Tax Claims. Priority Claims include Claims for wages, salaries and contributions to employee benefit plans to the extent that such Claims are entitled to priority under Section 507(a) of the Bankruptcy Code.

The Debtors estimate that Allowed Priority Claims are, in the aggregate, approximately $770,000.00.

Treatment of Priority Claims. On the latest of (a) the Effective Date, (b) the date on which such Priority Claim becomes an Allowed Priority Claim, and (c) the date on which the Debtors or the Reorganized Debtors and the holder of such Allowed Priority Claim otherwise

agree, each holder of an Allowed Priority Claim will be entitled to receive from the Reorganized Debtors Cash in an amount sufficient to render such Allowed Priority Claim Unimpaired under Section 1124 of the Bankruptcy Code; provided, however, that Allowed Priority Claims representing obligations incurred in the ordinary course will be paid in full or performed by the Debtors or Reorganized Debtors, consistent with past practice.

Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 12.01 of the Plan, the distributions provided in Section 6.01 of the Plan are in full settlement, release and discharge of each holder's Priority Claim and all other Claims against any and all of the Debtors and their Subsidiaries, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Priority Claim was based.  Class 1 is not Impaired.

(iii)    Class 2 – Miscellaneous Secured Claims

Class 2 consists of all Miscellaneous Secured Claims, which include, without limitation, the secured claims of Citizens Bank of Massachusetts ("Citizens") under that certain Continuing Agreement for Letters of Credit, dated May 17, 2002 (the "L/C Agreement") and that certain Pledge and Security Agreement, dated May 17, 2002 (the "Pledge Agreement"), between Citizens and HVE, pursuant to which Citizens holds security interests in certain collateral (as specified in the L/C Agreement and Pledge Agreement).

The Debtors estimate that Allowed Miscellaneous Secured Claims are, in the aggregate, approximately $5.8 million.  This estimated amount does not include equipment leases, which may be determined to be secured Claims or may be treated as executory contracts in accordance with Article 8 of the Plan.

Treatment of Miscellaneous Secured Claims.  On the Effective Date, at the sole option of the Debtors, (a) the legal, equitable and contractual rights to which the Miscellaneous Secured Claim entitles the holder of such Claim will remain unaltered, and the holder of such Claim will retain any Liens and/or security interests securing such Claim or (b) the Debtors will provide other treatment that will render such Miscellaneous Secured Claim Unimpaired under Section 1124 of the Bankruptcy Code.  With respect to the treatment of the secured Claim of Citizens, the Debtors have elected to leave the legal, equitable, and contractual rights arising thereunder, unaltered.  Class 2 is not Impaired.

(iv)    Class 3 – Pre-Petition Senior Note Claims

Class 3 consists of all Pre-Petition Senior Note Claims.

The Pre-Petition Senior Note Claims will be Allowed under the Plan, in the aggregate amount of $172.8 million.

Treatment of Pre-Petition Senior Note Claims.  On the Effective Date, all Pre-Petition Senior Note Claims will be extinguished, and each holder of an Allowed Pre-Petition Senior Note Claim will be entitled to receive its pro rata share of the Senior Note Distribution. Such pro rata shares will be determined by the ratio between the amount of such holder's Allowed Pre-Petition Senior Note Claim and the aggregate amount of all Allowed Pre-Petition Senior Note Claims.  Each holder of an Allowed Pre-Petition Senior Note Claim receiving New

Common Stock pursuant to the Plan will be deemed to be bound by the Shareholders Agreement whether or not such holder executes the Shareholders Agreement.

Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 12.01 of the Plan, the distributions provided in Section 6.03 of the Plan are in full settlement, release and discharge of each holder's Pre-Petition Senior Note Claim and all other Claims against any and all of the Debtors and their Subsidiaries, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Pre-Petition Senior Note Claim was based.  Class 3 is Impaired.

(v)     Class 4 – General Unsecured Claims

Class 4 consists of all General Unsecured Claims.

The Debtors estimate that the General Unsecured Claims are, in the aggregate, approximately between $12.5 million and $15.0 million.  This estimate does not include rejection Claims arising from the rejection of executory contracts or leases.

Treatment of General Unsecured Claims.  Each holder of an Allowed General Unsecured Claim will receive Cash equal to the full amount of such holder's Allowed General Unsecured Claim within ninety (90) days of the Effective Date, provided that such holder will receive (a) Cash equal to at least: (i) one-third (1/3) of such holder's Allowed General Unsecured Claim on or prior to the 30th day following the Effective Date, (ii) an incremental one-third (1/3) of such holder's Allowed General Unsecured Claim on or prior to the 60th day following the Effective Date, and (iii) an incremental one-third (1/3) of such holder's Allowed General Unsecured Claim on or prior to the 90th day following the Effective Date; or (b) such other treatment agreed to in writing between the Debtors and such holder; provided, however, that General Unsecured Claims arising from claims of employees of the Debtors for wages, salaries or commissions, including vacation, severance, sick leave pay and contributions to employee benefit plans will be satisfied in the ordinary course of business consistent with Section 8.04 of the Plan.  The holder of the CP Claim will not be entitled to the treatment set forth in the preceding sentence but will instead, (i) receive the New Common Stock portion of the CP Distribution on the Effective Date, and (ii) receive the Cash portion of the CP Distribution at the same time, and in the same manner, as distributions to holders of other Allowed General Unsecured Claims are received.  The treatment being provided to the holder of the CP Claim is being provided in accordance with the terms of the Restructuring Agreement.  The holder of the CP Claim will be subject to the Shareholders Agreement with respect to the New Common Stock he receives.

Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 12.01 of the Plan, the distributions provided in Section 6.04 of the Plan are in full settlement, release and discharge of each holder's General Unsecured Claim (including the CP Claim but not the CP Benefits) and all other Claims against any and all of the Debtors and their Subsidiaries, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such General Unsecured Claim was based; provided, however, the foregoing shall not operate to release any independent, unrelated and separate claim that a creditor has against a non-Debtor Affiliate.  Class 4 is Impaired.

(vi)    <u>Class 5 – Intercompany Claims</u>

Class 5 consists of all Intercompany Claims.

<u>Treatment of Intercompany Claims</u>.  On the Effective Date each holder of an Allowed Intercompany Claim will receive the following treatment: (i) the legal, equitable and contractual rights of each holder's of Allowed Intercompany Claim will remain unaltered by the Plan, or (ii) each holder of an Allowed Intercompany Claim will receive such other treatment agreed to in writing between such holder and the Debtors or Reorganized Debtors, as the case may be; provided that any such agreements occurring prior to the Effective Date will be subject to the consent of the Creditors' Committee and the Unofficial Committee of Noteholders, which consent will not be unreasonably withheld.

<u>Full Settlement</u>.  As more specifically set forth in, and without in any way limiting, Section 12.01 of the Plan, the distributions provided in Section 6.05 of the Plan are in full settlement, release and discharge of each holder's Priority Claim and all other Claims against any and all of the Debtors and their Subsidiaries, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Priority Claim was based.  Class 5 is not Impaired.

(vii)    <u>Class 6 – Old Preferred Stock Interests</u>

Class 6 consists of all Old Preferred Stock Interests.

<u>Treatment of Old Preferred Stock Interests</u>.  On the Effective Date, all Old Preferred Stock Interests will be extinguished.  The holders of Class 6 Old Preferred Stock Interests are not entitled to receive any distribution under the Plan.  However, in order to facilitate a consensual Plan, with the consent of Class 3 (which will be evidenced by Class 3's acceptance of the Plan) the Debtors shall distribute to each holder of an Old Preferred Stock Interest, in exchange for such holder's Old Preferred Stock Interest, such holder's pro rata share of New Class A Warrants for 5.00% of the New Common Stock issued and outstanding on the Effective Date, subject to dilution from options issued under the Management Incentive Plan and the New Class B Warrants; <u>provided</u>, <u>however</u>, that the New Class A Warrants that would have been distributed to any of the Debtors as holders of Old Preferred Stock Interests will be distributed directly to holders of Old Common Stock Interests in accordance with Section 6.07 of the Plan.  Such pro rata shares will be determined by the ratio between the amount of such holder's Allowed Old Preferred Stock Interest and the aggregate amount of all Allowed Preferred Stock Interests.  The New Class A Warrants will provide that any holder thereof will become a party to the Shareholders Agreement upon the exercise of such New Class A Warrants.

The distributions being provided to holders of Class 6 Old Preferred Stock Interests are being provided to facilitate a consensual Plan.  The Creditors' Committee and the Unofficial Committee of Noteholders have advised the Debtors that if the Plan is not consensual (i.e., the holders of Class 6 Old Preferred Stock Interests object to the Plan or vote to reject the Plan), the Creditors' Committee and the Unofficial Committee of Noteholders may request that the Debtors modify the Plan to comply with the absolute priority rule.

Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 12.01 of the Plan, the distributions provided in Section 6.06 of the Plan are in full settlement, release and discharge of each holder's Old Preferred Stock Interest and all other Claims against any and all of the Debtors and their Subsidiaries, if any, of such holders directly or indirectly related to or arising out of the transaction, agreements or instruments upon which such Old Preferred Stock Interest was based.  Class 6 is Impaired.

(viii)    Class 7 – Old Common Stock Interests

Class 7 consists of all Old Common Stock Interests.

Treatment of Old Common Stock Interests.  On the Effective Date, all Old Common Stock Interests will be extinguished.  The holders of Class 7 Old Common Stock Interests are not entitled to receive any distribution under the Plan.  However, in order to facilitate a consensual Plan, with the consent of Class 3 (which will be evidenced by Class 3's acceptance of the Plan) the Debtors will distribute to each holder of an Old Common Stock Interest, in exchange for such holder's Old Common Stock Interest, such holder's pro rata share of the Old Common Stock Distribution.  Such pro rata shares will be determined by the ratio between the amount of such holder's Allowed Old Common Stock Interest and the aggregate amount of all Allowed Old Common Stock Interests.  The New Class B Warrants received in the Old Common Stock Distribution will provide that any holder thereof will become a party to the Shareholders Agreement upon the exercise of such New Class B Warrants.

The distributions being provided to holders of Class 7 Old Common Stock Interests are being provided to facilitate a consensual Plan.  The Creditors' Committee and the Unofficial Committee of Noteholders have advised the Debtors that if the Plan is not consensual (i.e., the holders of Class 7 Old Common Stock Interests object to the Plan or vote to reject the Plan), the Creditors' Committee and the Unofficial Committee of Noteholders may request that the Debtors modify the Plan to comply with the absolute priority rule.

Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 12.01 of the Plan, the distributions provided in Section 6.07 of the Plan to the holders of Old Common Stock Interests are in full settlement, release and discharge of each holder's Old Common Stock Interest and all other Claims against any and all of the Debtors and their Subsidiaries, if any, of such holders directly or indirectly related to or arising out of the transaction, agreements or instruments upon which such Old Common Stock Interest was based. Class 7 is Impaired.

(ix)    Class 8 – Subsidiary Common Stock Interests

Class 8 consists of all Subsidiary Common Stock Interests.

Treatment of Subsidiary Common Stock Interests.  On the Effective Date, each holder of an Allowed Subsidiary Common Stock Interest will retain such Interest and its respective share or shares of Subsidiary Common Stock of the Debtors representing such Interest.

Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 12.01 of the Plan, the treatment provided in Section 6.08 of the Plan is in full

settlement of each holder's Subsidiary Common Stock Interests and all other Claims against any and all of the Debtors of such holder directly or indirectly related to or arising out of the transactions, agreements, or instruments upon which such Subsidiary Common Stock Interest was based.  Class 8 is not Impaired.

(x)    Class 9 − Other Interests

Class 9 consists of all Other Interests.

Treatment of Other Interests.  On the Effective Date, all Other Interests will be extinguished and no distributions will be made to holders of Other Interests.  Class 9 is Impaired.

7.04    Securities to be Issued Under the Plan

(i)    The New Common Stock

Under Reorganized HVE's Amended and Restated Certificate of Incorporation, Reorganized HVE's authorized capital stock will consist of 2,000,000 shares of New Common Stock, of which approximately 1,000,000 shares will be issued and outstanding and 100,000 shares will be reserved for the Management Incentive Plan, in each case, as of the Effective Date.  All shares of the New Common Stock, when issued pursuant to the Plan, will be fully paid and nonassessable.  Pursuant to the terms of the Plan, as of the Effective Date (i) approximately 970,000 shares of the New Common Stock will be issued to holders of Allowed Pre-Petition Senior Note Claims, and (ii) approximately 30,000 shares of the New Common Stock will be issued to the holder of the CP Claim.

(a)  Shareholders Agreements

The parties who receive shares of New Common Stock pursuant to the Plan will be deemed to be a party to and subject to the Shareholders Agreement whether or not such holder executes the Shareholders Agreement.

(ii)    The New Warrants

The New Warrants that will be issued pursuant to the Plan will be exercisable to purchase, in the aggregate, 10% of the fully-diluted New Common Stock issued and outstanding on the Effective Date, subject to dilution from options issued under the Management Incentive Plan.  In order to facilitate a consensual Plan, on the Effective Date, (i) holders of Old Preferred Stock Interests will receive a pro rata share of the New Class A Warrants exercisable to purchase, in the aggregate, 5% of the New Common Stock issued and outstanding on the Effective Date, subject to dilution from the stock options granted to management of Reorganized HVE under the Management Incentive Plan and the New Class B Warrants and (ii) holders of Old Common Stock Interests will receive (1) a pro rata share of the New Class A Warrants received by any of the Debtors as holders of Old Preferred Stock Interests and (2) a pro rata share of the New Class B warrants exercisable to purchase, in the aggregate, 5% of the New Common Stock issued and outstanding on the Effective Date, subject to dilution from stock options granted to management of Reorganized HVE under the Management Incentive Plan and the New Class A Warrants.  The New Warrants will provide that any holder thereof will become a party to the Shareholders Agreement upon the exercise of such New Warrants.

(a)  New Class A Warrants

On the Effective Date, the Reorganized Debtors will issue New Class A Warrants to purchase, in the aggregate, 5% of the fully-diluted New Common Stock issued and outstanding on the Effective Date, subject to dilution from stock options granted to management of Reorganized HVE under the Management Incentive Plan and the New Class B Warrants.  The New Class A Warrants will have a term of 7 years from the Effective Date and will have an exercise price based on an equity value for the New Common Stock of $135.8 million, in accordance with the New Warrant Agreement.

(b)  New Class B Warrants

On the Effective Date, the Reorganized Debtors will issue New Class B Warrants to purchase, in the aggregate, 5% of the fully-diluted New Common Stock issued and outstanding on the Effective Date, subject to dilution from stock options granted to management of Reorganized HVE under the Management Incentive Plan and the New Class A Warrants.  The New Class B Warrants will have a term of 7 years from the Effective Date, and will have an exercise price based on an equity value for the New Common Stock of $161.1 million, in accordance with the New Warrant Agreement.

## ARTICLE VIII.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Subject to the approval of the Court, the Bankruptcy Code empowers a debtor in possession to assume or reject executory contracts and unexpired leases.  Generally, an "executory contract" is a contract under which material performance is due from both parties.  If an executory contract or unexpired lease is rejected by a debtor in possession, the other parties to the agreement may file a claim for damages incurred by reason of the rejection, which claim is treated as a pre-petition date claim.  If an executory contract or unexpired lease is assumed by a debtor in possession, the debtor in possession has the obligation to perform its obligations thereunder in accordance with the terms of such agreement and failure to perform such obligations would result in a claim for damages which may be entitled to administrative expense status.

8.01    Assumption and Rejection of Executory Contracts and Unexpired Leases

The Debtors and Reorganized Debtors will have until the Confirmation Date to file a motion to assume or reject executory contracts and unexpired leases that have not been previously assumed or rejected.  Each executory contract or unexpired lease that has not been expressly assumed or rejected with approval by order of the Court on or prior to the Confirmation Date will, as of the Effective Date, be deemed to have been assumed by the Debtors unless, as of the Confirmation Date there is pending before the Court a motion to reject such unexpired lease or executory contract.

8.02    Cure of Defaults

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 8.01 of the Plan, the Debtors will, pursuant to the provisions of Sections 1123(a)(5)(G) and

1123(b)(2) of the Bankruptcy Code and consistent with the requirements of Section 365 of the Bankruptcy Code, within 30 days after the Confirmation Date, file a pleading with the Court listing the cure amounts of all executory contracts and unexpired leases to be assumed. The parties to such executory contracts and unexpired leases to be assumed by the Debtors will have 30 days to object to the cure amounts listed by the Debtors. If there are any objections filed, the Court will hold a hearing. In the event the Court determines that the cure amount is greater than the cure amount listed by the Debtors, the Reorganized Debtors may elect to reject the contract or unexpired lease and not pay such greater cure amount.

8.03    Bar Date for Rejection Damages

Unless otherwise provided by an order of the Court entered prior to the Confirmation Date, a Proof of Claim with respect to any Claim against the Debtors arising from the rejection of any executory contract or unexpired lease pursuant to an order of the Court must be filed with the Court within (a) the time period established by the Court in an order of the Court approving such rejection, or (b) if no such time period is or was established, thirty (30) days from the date of entry of such order of the Court approving such rejection. Any Entity that fails to file a Proof of Claim with respect to its Claim arising from such a rejection within the period set forth above will be forever barred from asserting a Claim against the Debtors or the Reorganized Debtors or any of their Subsidiaries or their respective property or interests in property. All Allowed Claims arising from the rejection of executory contracts or unexpired leases will be classified as General Unsecured Claims (Class 4).

8.04    Employee Benefit Plans

As discussed above, the Debtors have been operating in the ordinary course of business since the Petition Date. In that regard, the Debtors have continued paying all post-petition employee salaries, retention payments and benefits (including those under their existing annual performance bonus plans). Subject to the occurrence of the Effective Date and Section 9.12 of the Plan, any and all employee benefit plans, policies, and programs of the Debtors, and the Debtors' obligations thereunder, shall survive confirmation of the Plan, remain unaffected thereby, not be discharged, and to the extent they are executory will be assumed pursuant to Section 8.01 thereof, except to the extent such plans, policies and programs held Old Preferred Stock Interests, Old Common Stock Interests or Other Interests (which Interests would be extinguished as set forth in Sections 6.06, 6.07, 6.09 and 9.06 of the Plan). As a result, the votes of holders of such claims with respect to the Plan will not be solicited. Other than a certain reimbursement obligation for a chauffeur, the Debtors' management is not currently aware of any amounts owed by officers, directors, or employees to the Debtors. All such employee benefit plans, policies, and programs include, without limitation, all savings plans, retention plans, retirement pension plans, health care plans, disability plans, severance benefit plans, life, accidental death, dismemberment insurance plans, vacation, and sick leave pay, but exclude all employee equity, or equity-based incentive plans.

## ARTICLE IX.
## IMPLEMENTATION OF THE PLAN

9.01    Vesting of Property

On the Effective Date, title to all property of the Debtors' estates will pass to and vest in the applicable Reorganized Debtor, free and clear of all Claims, Interests, Liens, security interests, charges and other encumbrances (except as otherwise provided in the Plan). Confirmation of the Plan (subject to the occurrence of the Effective Date) will be binding, and the Debtors' debts will, without in any way limiting Section 12.01 of the Plan, be discharged as provided in Section 1141 of the Bankruptcy Code.

9.02    Substantive Consolidation

(i)      The Plan contemplates and is predicated upon entry of the Confirmation Order effecting the substantive consolidation of the Chapter 11 Cases of the Debtors into a single Chapter 11 Case solely for the purposes of all actions associated with confirmation and consummation of the Plan.  On the Confirmation Date or such other date as may be set by a Final Order of the Court, but subject to the occurrence of the Effective Date:  (i) solely for the purposes of the Plan and the distributions and transactions contemplated thereby, all assets and liabilities of the Debtors will be treated as though they were merged; (ii) any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors will be deemed to be one obligation of the consolidated Debtors; (iii) any Claims filed or to be filed in connection with any such obligation and such guarantees will be deemed one Claim against the consolidated Debtors; (iv) each and every Claim filed in the individual Chapter 11 Case of any of the Debtors will be deemed filed against the consolidated Debtors in the consolidated Chapter 11 Case of the Debtors and will be deemed a single obligation of all of the Debtors under the Plan on and after the Confirmation Date; (v) all duplicative Claims (identical in both amount and subject matter) filed against more than one of the Debtors will be automatically expunged so that only one Claim survives against the consolidated Subsidiary Debtors but in no way will such Claim be deemed Allowed by reason of Section 9.02 of the Plan; and (vi) the consolidated Debtors will be deemed, for purposes of determining the availability of the right of set-off under Section 553 of the Bankruptcy Code, to be one entity, so that, subject to other provisions of Section 553 of the Bankruptcy Code, the debts due to a particular Debtor may be offset against Claims against such Debtor or another Debtor.  On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment or performance made by the Debtors as to the obligations of another Debtor or of any other Person will be discharged, released and of no further force and effect; provided, however, that Section 9.02 of the Plan will not affect the obligations of each of the Debtors under the Plan.  Notwithstanding the provisions of Section 9.02 of the Plan, but subject to Section 9.07 of the Plan, each of the Debtors will, as Reorganized Debtors, continue to exist after the Effective Date as separate legal entities.

9.03    Retention, Enforcement and Release of Causes of Action

Subject to Section 12.01 of the Plan, and pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors (as representatives of the chapter 11 estates of the Debtors) will retain the exclusive right to enforce, in their sole discretion, any and all Causes of Action of the Debtors, including all Causes of Action which may exist under Sections 510, 542, 544 through 550 and 553 of the Bankruptcy Code or under similar state laws, including, without limitation, fraudulent conveyance claims, if any, and all other Causes of Action of a trustee and debtor in possession under the Bankruptcy Code.  On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will release any and all Causes of Action arising under

Sections 510, 542, 544 through 550 and 553 of the Bankruptcy Code or under similar state laws, including, without limitation, fraudulent conveyance claims, if any, and all other Causes of Action of a trustee and debtor in possession under the Bankruptcy Code except with respect to Disputed Claims and/or against the holders thereof.

9.04     Implementation

Pursuant to the Confirmation Order and upon confirmation of the Plan, the Debtors or the Reorganized Debtors, as the case may be, will be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan.  On or before the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, may file with the Court the Documents and such other agreements and documents as may be necessary or appropriate to effectuate or further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as the case may be, are thereby authorized to execute the Documents and such other agreements and documents and take such other actions as are necessary to effectuate the transactions provided for in the Plan, including, without limitation, the New Credit Facility Documents, the Shareholders Agreement and the Senior Executive Employment Agreements, without the need for any required approvals, authorizations or consents.

9.05     Issuance of New Securities

The issuance and distribution of the New Common Stock by Reorganized HVE is authorized under the Plan and directed without the need for any further corporate action, under applicable law, regulation, order, rule or otherwise.  Section 1145 of the Bankruptcy Code applies with respect to the issuance of the New Common Stock under the Plan, and therefore, the New Common Stock and New Warrants issued pursuant to the Plan will be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act") and all rules and regulations promulgated thereunder.

9.06     Cancellation of Existing Securities and Agreements

On the Effective Date, the Pre-Petition Senior Notes, the Pre-Petition Senior Indenture, the Old Preferred Stock, the Old Common Stock, and Other Interests, as well as any and all securities or agreements relating to the Old Preferred Stock, the Old Common Stock, and Other Interests, will be deemed canceled, terminated and of no further force or effect; provided, however, that the Pre-Petition Indenture will continue in effect for the limited purpose of allowing the Indenture Trustee (a) to make any distributions on account of Pre-Petition Senior Notes pursuant to the Plan and to perform such other necessary administrative functions with respect thereto.

9.07     Dissolution

On the Effective Date, the Debtors listed on Exhibit A to the Plan will be deemed dissolved for all purposes, without further action.  Notwithstanding the foregoing, from and after the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, may execute such documents and take such other actions as they deem appropriate in connection with the dissolution of such entities.

9.08    Amended and Restated Certificates of Incorporation; Amended and Restated By-Laws

On the Effective Date, or as soon thereafter as practicable, the Reorganized Debtors will amend their certificates of incorporation by filing the Amended and Restated Certificates of Incorporation, and will be deemed to have adopted the Amended and Restated By-Laws.

9.09    Management Incentive Plan

On the Effective Date, the stockholders of Reorganized HVE will be deemed to have approved the Management Incentive Plan, and the Management Incentive Plan will be deemed to have been duly adopted.  The Management Incentive Plan will provide for allocations in amounts and at exercise prices and based upon performance criteria and vesting times to be determined by the New Board of Directors.  Notwithstanding the treatment of Other Interests under the Plan, the Phantom Stock Grants will be considered for conversion to the Management Incentive Plan, with such Phantom Stock Grants to dilute the Management Incentive Plan.

9.10    Directors of the Reorganized Debtors

On the Effective Date, the operations of the Reorganized Debtors will become the general responsibility of the boards of directors of the Reorganized Debtors, subject to, and in accordance with, the Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws of each of the Reorganized Debtors.  The New Board of Directors of Reorganized HVE will consist of five members, consisting of the Chief Executive Officer and four members selected by the members of the Unofficial Committee of Noteholders.  A list of the members of the New Board of Directors for each of the Reorganized Debtors will be filed with the Court prior to the Confirmation Hearing.  The members of the boards of directors of the Debtors and their subsidiaries serving immediately prior to the Effective Date will be deemed to have resigned and been removed on the Effective Date.

9.11    Officers of the Reorganized Debtors

On the Effective Date, the executive officers of each of the Reorganized Debtors as of the date of the Confirmation Order will be the officers of such Reorganized Debtors.

9.12    Management Agreements

(i)      The Senior Executive Employment Agreements.  The Senior Executive Employment Agreements will be effective as of the Effective Date and such Senior Executive Employment Agreements will supercede, govern and satisfy all agreements between the Debtors and Russell L. Shade, Jr. and Joseph W. McHugh, Jr. in effect prior to the Effective Date.

(ii)     Clifford Press.   Subject to execution of the non-compete agreement described in the next sentence, the CP Claim will receive the treatment set forth in Section 6.04 of the Plan.  Clifford Press will execute a two-year non-compete agreement with the Debtors. The New Board of Directors, in their sole discretion, may also authorize the Reorganized Debtors to retain Clifford Press as a consultant to the Reorganized Debtors after the Effective Date at an annual rate of $250,000.  All agreements in existence between the Debtors or their

Subsidiaries and Clifford Press as of the Effective Date will be terminated on the Effective Date without any further obligations by the Debtors and the Reorganized Debtors or the Subsidiaries. The CP Distribution will be in full satisfaction of all CP Claims and all claims (other than the CP Benefits which the Debtors anticipate will be paid during the pendency of their Chapter 11 Cases consistent with the Restructuring Agreement) against any of the Subsidiaries including, but not limited to, any Claims arising from or in connection with the termination of any agreements between the Debtors and their Subsidiaries on the one hand and Clifford Press on the other, and Clifford Press will be deemed to release all claims against the Debtors and any Subsidiaries of the Debtors.  Clifford Press will be subject to the Shareholders Agreement with respect to the New Common Stock that he receives under the Plan.

### 9.13    Transactions on Business Days

If the Effective Date or any other date on which a transaction may occur under the Plan will occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day will instead occur on the next succeeding Business Day.

### 9.14    Effectuating Documents; Further Transactions

The Reorganized Debtors will be authorized to execute, deliver, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 9.15    Termination of DIP Agreement

Upon the payment of all obligations incurred under or pursuant to the DIP Agreement as provided in Section 2.01 of the Plan, the DIP Agreement will be deemed terminated.  Upon payment or satisfaction in full of all obligations under or pursuant to the DIP Agreement in accordance with the terms thereof, all Liens and security interests granted to secure such obligations will be deemed terminated and will be of no further force and effect.

### 9.16    Indenture Trustee

As soon as practicable after the Effective Date, the Reorganized Debtors will pay the Indenture Trustee's Fees and Expenses in full and in Cash and the Indenture Trustee Charging Lien will automatically be deemed released.  Such payments will be in full and final satisfaction of all pre-petition and post-petition Claims of the Indenture Trustee.  Distributions to holders of the Pre-Petition Senior Notes pursuant to the Plan will not be reduced on account of payments made to the Indenture Trustee on account of the Indenture Trustee Charging Lien.

The Indenture Trustee may also seek compensation pursuant to the Plan for services performed in connection with distributions made to holders of the Pre-Petition Senior Notes.

### 9.17    Certain Tax Issues.

As discussed in Article XIX of this Disclosure Statement, the Debtors have historically filed consolidated federal income tax returns with Letitia.  Although such returns are