filed under Letitia's name, the income, gains, deductions and losses reflected on such returns have been generated by the Debtors, and the Debtors have paid the fees and expenses incurred in preparing such returns. As a result of the Debtors' prior losses, the Debtors have generated significant net operating losses ("NOLs"). Because the NOLs were generated by the Debtors, the Debtors believe that the NOLs are estate property. See Segal v. Rochelle, 382 U.S. 375, 88 S. Ct. 511, 15 L.Ed. 2d 428 (1966), Official Committee of Unsecured Creditors v. PSS Steamship Co., Inc. (In re Prudential Lines, Inc.), 928 F.2d 565 (2d cir. 1991), In re Cumberland Farms, Inc., 162 B.R. 62 (D. Mass. 1993).


                    Pursuant to the Plan and the Confirmation Order: (a) With respect to any and all Tax Returns (for all Tax years) that include both HVE and Letitia (or any of their assets, operations or income) ("Joint Returns"), (i) Reorganized HVE will provide Letitia with pro forma Tax Returns for HVE and its Subsidiaries and Letitia will file the Joint Returns in accordance with such pro forma Tax Returns; provided, however, that (x) all calculations necessary to implement Section 108(b) of the Tax Code will be determined by Reorganized HVE, and all elections pursuant to Treasury Regulation Section 1.1502-95 will be made as determined by Reorganized HVE (y) Letitia will be allowed to review and comment upon the pro forma Tax Returns and Section 108(b) calculations provided by HVE and HVE will be allowed to review and comment upon the Joint Returns, and (z) both Letitia and HVE's consent will be required prior to the filing of such Joint Returns, which consent will not be unreasonably withheld, (ii) Reorganized HVE will control any and all amended returns, claims for refund and similar claims or amendments, audits, administrative and judicial proceedings with respect to Joint Returns (provided that Reorganized HVE will only file an amended return, claim for refund, or similar claim or amendment with the consent of Letitia, which will not be unreasonably withheld, and that Reorganized HVE will keep Letitia informed of the conduct of any audit or proceeding, and will allow Letitia to participate in any audit or proceeding to the extent that such audit or proceeding relates to the separate items of Letitia or any Letitia Subsidiary), and (iii) Reorganized HVE will be entitled to any and all Tax refunds relating to such Tax Returns (other than refunds of Taxes which relate to income of Letitia (and not income of HVE or its Subsidiaries) and were paid by Letitia out of its own funds and not funds provided by the Debtors to Letitia for the purpose of payment of Taxes). (b) Reorganized HVE will be responsible for any Taxes properly allocable to HVE and any of its Subsidiaries (and any of their assets, operations or income) and Letitia will be responsible for any Taxes properly allocable to Letitia and any Letitia Subsidiaries (and any of Letitia and Letitia Subsidiaries' assets, operations or income). (c) Reorganized HVE will compensate Letitia for any diminution of (x) any capital loss generated for tax purposes by Letitia with respect to its HVE stock and (y) any other Tax Asset up to the amount of $100,000, where such capital loss or Tax Asset is (i) used to offset HVE income or gain (including income or gain of any HVE Subsidiary), or (ii) reduced as a result of attribute reduction caused by cancellation of debt income of HVE or its Subsidiaries, and Letitia will compensate Reorganized HVE for any diminution of any Tax Asset properly attributable to HVE or any of its Subsidiaries (including the diminution of Tax Assets attributable to HVE or any of its Subsidiaries under Treasury Regulation Section 1.1502-21T) where such Tax Asset is (i) used to offset Letitia income or gain (including income or gain of any Letitia Subsidiary) or (ii) reduced as a result of attribute reduction caused by cancellation of debt income of Letitia or Letitia Subsidiaries. For purposes of this provision a diminution of a Tax Asset (including a capital loss generated for tax purposes by Letitia with respect to its HVE

Stock) will not be deemed to occur where (and to the extent that) the party whose Tax Asset is so diminished is not harmed by the diminution, including, but not limited to, where the Tax Asset would otherwise have been eliminated as a result of the operation of Section 108(b) of the Tax Code (and the diminution of the Tax Asset does not result in the reduction of other Tax Assets under Section 108(b) of the Tax Code) or where the item causing the diminution of a Tax Asset also causes an offsetting basis increase under Treasury Regulation Section 1.1502-32 which results in an allowable loss. (d) Neither Letitia nor any "50% Shareholder" of Letitia or HVE (within the meaning of Section 382(g)(4)(D) of the Tax Code) will claim a worthless stock deduction with respect to the stock of HVE or Letitia for any taxable year of the person claiming such deduction ending on or prior to the Effective Date. (e) Neither Letitia nor any shareholder of Letitia will take any action that could reduce or impair any Tax Assets of the Reorganized Debtors or that could result in the imposition of any Taxes upon the Reorganized Debtors.  For purposes of the preceding sentence, taking any action will include, without limitation, the amending of any Tax Return, the claiming of any refund or any similar claims or amendments, the settlement of any audit, administrative or judicial proceeding, or the making of any election, but will not include any action to the extent that such action would result in  Letitia being required to compensate Reorganized HVE pursuant to (c) above. (f) Letitia, on the one hand, and Reorganized HVE, on the other, will provide each other with such cooperation and information as either of them reasonably may request of the other in (i) filing any Tax Return, (ii) determining a liability for Taxes or a right to a refund of Taxes or (iii) participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information will include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules and related work papers.  Any information obtained under this Section 9.17 will be kept confidential, except as may be otherwise necessary in connection with the filing of returns or in the conduct of an audit or other proceeding.  Letitia will take all actions reasonably requested by Reorganized HVE to effectuate this provision, including but not limited to the execution of powers of attorney enabling Reorganized HVE to control audits and proceedings referred to in subsection (a).

Notwithstanding anything to the contrary contained in the Plan, the relief granted in that certain interim order (i) limiting certain transfers of, and trading in, equity interests of High Voltage Engineering Corporation and equity interests of Letitia Corporation and (ii) approving related notification procedures, and in any final order granted in connection therewith, will be effective until the Effective Date.

## ARTICLE X.
## DISTRIBUTIONS UNDER THE PLAN

10.01   Timing of Distributions Under the Plan

Except as otherwise provided in the Plan, without in any way limiting Section 9.06 and Article 11 of the Plan, and subject to Section 14.02 of the Plan, payments and distributions in respect of Allowed Claims and Allowed Interests will be made by the Reorganized Debtors (or their designee) on or as promptly as practicable after the Effective Date, provided, however, distributions in respect of Allowed Class 4 General Unsecured Claims, including the Cash portion of the CP Distribution, will be made in accordance with Section 6.04 of the Plan.

10.02   Allocation of Consideration

The aggregate consideration to be distributed to the holders of Allowed Claims in each Class under the Plan will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any.

10.03   Cash Payments

Cash payments made pursuant to the Plan will be in U.S. dollars.  Cash payments to foreign Creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.  Cash payments made pursuant to the Plan in the form of checks issued by the Reorganized Debtors will be null and void if not cashed within 120 days of the date of the issuance thereof.  Requests for reissuance of any check must be made directly to the Reorganized Debtors or their designee as set forth in Section 10.11 of the Plan.  Cash necessary for the Reorganized Debtors to make payments to holders of Allowed Class 4 General Unsecured Claims pursuant to the Plan will be funded from Cash on hand or collections.

10.04   Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 as determined by the Court at the Confirmation Hearing will be paid by the Debtors on or before the Effective Date, or by the Reorganized Debtors as soon as practicable thereafter.

10.05   No Interest

Except with respect to holders of Unimpaired Claims entitled to interest under applicable non-bankruptcy law or as otherwise expressly provided in the Plan, no holder of an Allowed Claim or Interest will receive interest on the distribution to which such holder is entitled hereunder, regardless of whether such distribution is made on the Effective Date or thereafter.

10.06   Special Provision Regarding Unimpaired Claims

Except as otherwise provided in the Plan, the Confirmation Order, any other order of the Court, or any document or agreement entered into and enforceable pursuant to the terms of the Plan, nothing will affect the Debtors' or Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims or to request disallowance or subordination of any such Claim.  In addition, notwithstanding anything to the contrary, Unimpaired Claims are subject to all applicable provisions of the Bankruptcy Code, including, without limitation, Section 502(b) of the Bankruptcy Code.

10.07   Fractional Securities

Pursuant to the Plan, and notwithstanding any other provision of the Plan, only whole numbers of shares of New Common Stock, New Class A Warrants and New Class B Warrants will be issued or transferred, as the case may be, pursuant to the Plan.  The Reorganized Debtors will not distribute any fractional shares of New Common Stock, New Class

A Warrants or New Class B Warrants.  For purposes of distribution, fractional shares of New Common Stock, New Class A Warrants and New Class B Warrants will be rounded up or down to the nearest share of New Common Stock, New Class A Warrants and New Class B Warrants, as applicable.

10.08    Compliance with Tax Requirements

In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) and/or withholding is required, the Reorganized Debtors will file such information return with the Internal Revenue Service, provide any required statements in connection therewith to the recipients of such distribution and/or effect any such withholding and deposit all moneys so withheld as required by law.  With respect to any Entity from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by the Reorganized Debtors, the Reorganized Debtors will withhold the amount required and distribute the balance to such Entity.

10.09    Persons Deemed Holders of Registered Securities; Distribution Record Date

As of the close of business on the Distribution Record Date, the claims register will be closed, and there will be no further changes in the record holders of any Claims or Interests.  The Debtors, the Reorganized Debtors or their designees will not have an obligation to recognize any transfer of any Claims or Interests occurring after the close of business on the Distribution Record Date, and will instead be entitled to recognize and deal for the purposes under the Plan (except as to voting to accept or reject the Plan) with only those holders of record as of the close of business on the Distribution Record Date.  In the event of any dispute regarding the identity of any party entitled to any payment or distribution in respect of any Claim under the Plan, no payments or distributions will be made in respect of such Claim until the Court resolves that dispute pursuant to a Final Order.

10.10    Surrender of Existing Securities

As a condition to receiving any distribution under the Plan, and except as otherwise provided in Section 10.12 of the Plan, each holder of an Instrument evidencing a Claim must surrender such Instrument to the Reorganized Debtors or their designee.  Any holder of a Claim that fails to (a) surrender such Instrument or (b) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Reorganized Debtors or their designee before the later to occur of (i) the second anniversary of the Effective Date and (ii) six months following the date such holder's Claim becomes an Allowed Claim, will be deemed to have forfeited all rights, Claims, and/or Interests and may not participate in any distribution under the Plan.  Upon compliance with Section 10.10 of the Plan, the holder of a Claim or Interest evidenced by any such lost, stolen, mutilated or destroyed Instrument will, for all purposes under the Plan, be deemed to have surrendered such Instrument.

10.11    Undeliverable or Unclaimed Distributions

(i)    Any Entity that is entitled to receive a Cash distribution under the Plan but that fails to cash a check within 120 days of its issuance will be entitled to receive a reissued check from the Reorganized Debtors for the amount of the original check, without any interest, if

such Entity requests in writing the Reorganized Debtors or their designee to reissue such check and provides the Reorganized Debtors or their designee, as the case may be, with such documentation as the Reorganized Debtors or their designee request to verify in their reasonable discretion that such Entity is entitled to such check, prior to the second anniversary of the Effective Date.  If an Entity fails to cash a check within 120 days of its issuance and fails to request reissuance of such check prior to the later to occur of (i) the second anniversary of the Effective Date and (ii) six months following the date such holder's Claim becomes an Allowed Claim, such Entity will not be entitled to receive any distribution under the Plan.  If the distribution to any holder of an Allowed Claim is returned to the Reorganized Debtors or their designee as undeliverable, no further distributions will be made to such holder unless and until the Reorganized Debtors or their designee are notified in writing of such holder's then-current address.  Undeliverable distributions will remain in the possession of the Reorganized Debtors or their designee pursuant to Section 9.01 of the Plan until such time as a distribution becomes deliverable.

(ii)    All claims for undeliverable distributions must be made on or before the later to occur of (i) the second anniversary of the Effective Date and (ii) six months following the date such holder's Claim becomes an Allowed Claim.  After such date, all unclaimed property will revert to the Reorganized Debtors and the Claim of any holder or successor to such holder with respect to such property will be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

10.12    Distributions on Account of Pre-Petition Senior Notes

All distributions, if any, on account of Pre-Petition Senior Note Claims will be made to the Indenture Trustee, who will serve as the Reorganized Debtors' designee for purposes of making distributions under the Plan to holders of Pre-Petition Senior Note Claims.  The Reorganized Debtors will pay the Indenture Trustee its reasonable fees and expenses for making distributions under the Plan to holders of Pre-Petition Senior Note Claims.

10.13    Exemption From Certain Transfer Taxes

Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer from a Debtor to a Reorganized Debtor or any other person or entity pursuant to the Plan, including, without limitation, the granting or recording of any Lien or mortgage on any property under the New Credit Facility Documents, will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## ARTICLE XI.
## PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS

11.01    Objections to Claims; Disputed Claims

Except to the extent that the Reorganized Debtors consent, or with respect to the fee Claims of Professionals, only the Debtors and the Reorganized Debtors will have the authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims after the Effective Date. Subject to an order of the Court providing otherwise, the Debtors and the Reorganized Debtors may object to Administrative Expenses and Claims by filing an objection with the Court and serving such objection upon the holder of such Administrative Expense or Claim not later than one hundred and twenty (120) days after the Effective Date or one hundred and twenty (120) days after the filing of a request for payment of an Administrative Expense or the proof of such Claim, whichever is later, or such other date determined by the Court upon motion to the Court, which motion may be made without further notice or hearing.

11.02   Estimation of Claims

The Debtors may, at any time, request that the Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Court has ruled on any such objection, and the Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism. On and after the Effective Date, except to the extent that the Reorganized Debtors consent, or with respect to the fee Claims of Professionals, only the Reorganized Debtors will have the authority to file, settle, compromise, withdraw, or litigate to judgment objections to, and requests for estimation of, Administrative Expenses and Claims.

11.03   Payments and Distributions With Respect to Disputed Claims and Disputed Interests

No payments or distributions will be made in respect of a Disputed Claim or a Disputed Interest until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest.

11.04   Timing of Payments and Distributions With Respect to Disputed Claims and Disputed Interests

Subject to the provisions of the Plan, payments and distributions with respect to each Disputed Claim or Disputed Interest that becomes an Allowed Claim or Allowed Interest, that would have otherwise been made had such Claim or Interest been an Allowed Claim or Allowed Interest on the Effective Date, will be made promptly after the date that such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest. Holders of Disputed Claims or Disputed Interests, regardless of whether such Disputed Claims or Disputed Interests become Allowed Claims or Allowed Interests, will be bound, obligated and governed in all respects by the provisions of the Plan.

11.05   Setoffs

The Debtors, the Reorganized Debtors or their designees as instructed by them may (but will not be required), pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim or Allowed Interest, and the distributions to be made pursuant to the Plan on account of such Claim or Interest, claims of any nature whatsoever that the Debtors or the Reorganized Debtors or their successors may hold against the holder of such Allowed Claim or Allowed Interest; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim or Interest under the Plan will constitute a waiver or release by the Debtors or the Reorganized Debtors or their successors of any such claims that the Debtors or the Reorganized Debtors or their successors may possess against such holders, unless an order allowing such Claim or Interest otherwise so provides.

11.06   Prosecution of Objections

After the Confirmation Date, the Reorganized Debtors will have the authority to file objections, settle, compromise, withdraw, or litigate to judgment objections to Claims or Interests.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Interest without approval of the Court.

## ARTICLE XII.
## DISCHARGE, INJUNCTIONS, RELEASES AND SETTLEMENT OF CLAIMS

### 12.01   Discharge of all Claims and Interests and Releases

As discussed below, the Plan provides for various releases which are to become effective as of the Confirmation Date but subject to the occurrence of the Effective Date.  The releases being provided under the Plan are in consideration of, among other things, the services provided to the Debtors by their present and former shareholders, directors, officers, employees, affiliates, agents, advisors, financial advisors, accountants, investment bankers, attorneys, and representatives of the Debtors, as well as the efforts expended by the Unofficial Committee of Noteholders, the Creditors' Committee, the present and former holders of the Pre-Petition Senior Notes, the DIP Agent and DIP Lenders, and their respective present and former members affiliates, officers, directors, shareholders, attorneys, accountants, financial advisors, investment bankers, advisory affiliates, employees, agents, successors and assigns, which resulted in a pre-negotiated consensual Plan that (a) maximizes the value of the Debtors' businesses, (b) provides distributions to out-of-the-money constituencies and (c) provides for an expedient emergence from chapter 11.

**(a) Except as otherwise expressly provided in the Plan, the confirmation of the Plan (subject to the occurrence of the Effective Date) will discharge the Debtors and the Reorganized Debtors from any debt that arose before the Confirmation Date and any debt of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a proof of Claim is filed or is deemed filed, whether or not such Claim is Allowed and whether or not the holder of such Claim has voted on the Plan.**

**(b) Furthermore, but in no way limiting the generality of the foregoing, except as otherwise specifically provided by the Plan, the distributions and**

rights that are provided in the Plan will be in complete satisfaction, discharge and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of all Claims and Causes of Action against, liabilities of, liens on, obligations of and Interests in the Debtors or the Reorganized Debtors or the direct or indirect assets and properties of the Debtors or the Reorganized Debtors, whether known or unknown, regardless of whether a proof of Claim or Interest was filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on the Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on the Plan.

(c)  In addition, but in no way limiting the generality of the foregoing, any Entity receiving any distribution pursuant to the Plan will be presumed conclusively to have released the Debtors, the Reorganized Debtors, the Subsidiaries, the Unofficial Committee of Noteholders, the Creditors' Committee, the DIP Lenders, the DIP Agent and the Committees, the present and former members of any of the foregoing (together with the advisory affiliates and advised affiliates of such members), their respective successors, assigns, and each of their respective present and former directors, shareholders, officers, agents, attorneys, advisors, accountants, financial advisors, investment bankers and employees and any Entity claimed to be liable derivatively through any of the foregoing, from any Cause of Action based on the same subject matter as the Claim or Interest on which the distribution is received; provided, however, unless otherwise agreed to by the Debtors, the Creditors' Committee and the Unofficial Committee of Noteholders, Mr. Levy will not be released pursuant to Section 12.01(c) of the Plan.  The release described in the preceding sentence will be enforceable as a matter of contract against any Entity that accepts any distribution pursuant to the Plan.

(d)  Additionally, except as otherwise specifically provided by the Plan or the Confirmation Order, the confirmation of the Plan (subject to the occurrence of the Effective Date) will act as a discharge and release of all Causes of Action (including without limitation, Causes of Action of a trustee and debtor in possession under the Bankruptcy Code) of the Debtors and Reorganized Debtors, whether known or unknown, against: (i) their present and former directors, shareholders, officers and employees (other than for money borrowed from the Debtors or the Reorganized Debtors by such shareholders, directors, officers or employees or any money owed to the Debtors or Reorganized Debtors by such shareholders, officers, directors or employees that is evidenced by a note, debenture or other instrument), agents, attorneys, advisors, accountants, financial advisors, investment bankers; (ii) the Unofficial Committee of Noteholders, the Creditors' Committee, each in such capacity, and their respective present and former members of the present and former affiliates, officers, directors, shareholders, attorneys, accountants, financial advisors, investment bankers, advisory affiliates, employees, agents, successors and assigns of each of the Unofficial Committee of Noteholders, the Creditors' Committee and their respective present and former members; (iii) the present and former holders of the Pre-Petition Senior Notes, each in such capacity, and their respective present and former affiliates, officers, directors, shareholders, attorneys, accountants, financial advisors, investment bankers, advisory affiliates, employees, agents, successors and assigns;

**(iv) the DIP Agent and DIP Lenders and their respective present and former affiliates, officers, directors, shareholders, attorneys, accountants, financial advisors, investment bankers, advisory affiliates, employees, agents successors and assigns; and (v) any Entity claimed to be liable derivatively through any of the foregoing; provided, however, unless otherwise agreed to by the Debtors, the Creditors' Committee and the Unofficial Committee of Creditors, the Debtors will not release the Causes of Action with respect to Mr. Levy.  Notwithstanding the generality of the foregoing, nothing in the Plan will release any claims of any of the Debtors or Reorganized Debtors, as the case may be, against any Subsidiaries that are not Debtors or Reorganized Debtors, as the case may be.**

12.02   **Exculpation**

**The Debtors, the Reorganized Debtors, the Unofficial Committee of Noteholders and its members, the Creditors' Committee and its members, the DIP Lenders, the DIP Agent, and each of the respective present and former officers, directors, members, employees, and agents of the foregoing (including any professionals retained by such persons or entities) will have no liability for any act or omission in connection with, or arising out of, the pursuit of approval of the Disclosure Statement or the Plan or the solicitation of votes for or confirmation of the Plan, or the consummation of the Plan, or the transactions contemplated and effectuated by the Plan or the administration of the Plan or the property to be distributed under the Plan, or any other act or omission during the administration of the Debtors' estates or in contemplation of the Chapter 11 Cases except for gross negligence or willful misconduct as determined by a Final Order of the Court, and in all respects, will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

12.03   **Injunction**

**Sections 12.01, 12.02 and 12.04 of the Plan (and described in Section 12.02, 12.03, and 12.05 of this Disclosure Statement) will also act as an injunction against any Entity commencing or continuing any action, employment of process, or act to collect, offset or recover any Claim, Interest or Cause of Action satisfied, released or discharged under the Plan.**

12.04   Guarantees and Claims of Subordination.

(i)   <u>Guarantees</u>.  The classification and the manner of satisfying all Claims under the Plan takes into consideration (i) the possible existence of any alleged guarantees by the Debtors of obligations of any Entity or Entities, and (ii) that the Debtors may be joint obligors with another Entity or Entities with respect to the same obligation.  The holders of Claims will be entitled to only one distribution with respect to any given obligation of the Debtors and their Subsidiaries.

(ii)   <u>Claims of Subordination</u>.  To the fullest extent permitted by applicable law, all Claims and Interests in the Debtors, and all rights and claims between or among holders of Claims or Interests relating in any manner whatsoever to Claims or Interests, based on any contractual, legal or equitable subordination rights, will be terminated on the Effective Date and discharged in the manner provided in the Plan, and all such Claims, Interests and rights so based

and all such contractual, legal and equitable subordination rights to which any Entity may be entitled will be irrevocably waived by the acceptance by such Entity (or, unless the Confirmation Order provides otherwise, the class of which such Entity is a member) of the Plan or of any distribution pursuant to the Plan.  Except as otherwise provided in the Plan and to the fullest extent permitted by applicable law, the rights afforded and the distributions that are made in respect of any Claims or Interests under the Plan will not be subject to levy, garnishment, attachment or like legal process by any holder of a Claim or Interest by reason of any contractual, legal or equitable subordination rights, so that, notwithstanding any such contractual, legal or equitable subordination rights, each holder of a Claim or Interest will have and receive the benefit of the rights and distributions set forth in the Plan.

Pursuant to Bankruptcy Rule 9019, and any applicable state law, and as consideration for the distributions and other benefits provided under the Plan, the provisions of Section 12.04(b) of the Plan will constitute a good faith compromise and settlement of any Causes of Action relating to the matters described in the Section 12.04(b) of the Plan which could be brought by any holder of a Claim or Interest against or involving another holder of a Claim or Interest, which compromise and settlement is in the best interests of Creditors and holders of Interests and is fair, equitable and reasonable.  Pursuant to the Confirmation Order, this settlement will be approved by the Court as a settlement of all such Causes of Action.  The Court's approval of this settlement pursuant to Bankruptcy Rule 9019 and its finding that this is a good faith settlement pursuant to any applicable state law, given and made after due notice and opportunity for hearing, will bar any such Cause of Action relating to the matters described in Section 12.04(b) of the Plan which could be brought by any holder of a Claim or Interest against or involving another holder of a Claim or Interest.

12.05    <u>Survival of Indemnification Obligations</u>.

Notwithstanding anything to the contrary contained in the Plan, the obligations of the Debtors to indemnify their present or former directors, officers, agents, employees and representatives (other than (i) Clifford Press (whose claims are being satisfied pursuant to Section 9.12 of the Plan), and (ii) Laurence Levy) pursuant to their respective certificates of incorporation, by-laws, contractual obligations or any applicable laws in respect of all past, present and future actions, suits and proceedings against any of such directors, officers, agents, employees and representatives based upon any act or omission related to service with, for, or on behalf of the Debtors will not be discharged or impaired by confirmation or consummation of the Plan, but will survive unaffected by the reorganization contemplated by the Plan regardless of whether a Proof of Claim has been filed or allowed in respect of such indemnity obligations and will be performed and honored in full pursuant to the Debtors' or the Reorganized Debtors' by-laws, certificates of incorporation, contractual obligations or applicable laws by the Reorganized Debtors regardless of such confirmation, consummation and reorganization.

**ARTICLE XIII.**
**CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE**

13.01   Conditions to Confirmation

The following conditions must occur and be satisfied or waived in accordance with Section 13.03 of the Plan by the Debtors with the consent of the Creditors' Committee and the Unofficial Committee of Noteholders, which consent may not be unreasonably withheld, on or prior to the Confirmation Date:

(i)        Confirmation Order

The Confirmation Order will:  (a) be in form and substance satisfactory to the Debtors, the Creditors' Committee and the Unofficial Committee of Noteholders; (b) approve all provisions, terms and conditions of the Plan; and (c) include a finding of fact that the Debtors, the Reorganized Debtors, the Creditors' Committee and its members, the Unofficial Committee of Noteholders and its members, and their respective present and former members, officers, directors, employees, advisors, attorneys, and agents acted in good faith within the meaning of and with respect to all of the actions described in Section 1125(e) of the Bankruptcy Code and therefore not liable for the violation of any applicable law, rule, or regulation governing such action;

(ii)       New Credit Facility Documents

The Debtors must have received a firm written commitment for the New Credit Facility Documents that is in form and substance reasonably acceptable to the Creditors' Committee and the Unofficial Committee of Noteholders (not including those members which may be DIP Lenders or proposed exit lenders);

(iii)      Plan Supplement

All Documents included in the Plan Supplement will be in form and substance reasonably acceptable to the Debtors, the Creditors' Committee and the Unofficial Committee of Noteholders; and

(iv)      Maximum Potential Claim Amount

The Maximum Potential Claim Amount is no greater than $16 million.

13.02   Conditions to Effective Date

The following conditions must occur and be satisfied or waived in accordance with Section 13.03 of the Plan by on or before the Effective Date for the Plan to be effective on the Effective Date:

(i)        Entry of Confirmation Order

The Confirmation Order shall have become a Final Order;

(ii)     <u>Authorizations, Consents and Approvals</u>

All authorizations, consents and regulatory approvals in connection with the consummation of the Plan have been obtained and not revoked;

(iii)     <u>New Credit Facility Documents</u>

All conditions to the New Credit Facility Documents, other than the occurrence of the Effective Date of the Plan, must have been satisfied or waived pursuant to the terms thereof;

(iv)     <u>Documents</u>

Each of the Documents will be in a form and substance that is reasonably satisfactory to the Debtors or the Reorganized Debtors, as the case may be, the Creditors' Committee, and the Unofficial Committee of Noteholders and all conditions thereto will have been satisfied or waived as provided therein; and

(v)     <u>Effective Date</u>

The Effective Date will have occurred on or before 75 days after the Court enters the Confirmation Order, or such later date as the Debtors, the Creditors' Committee and the Unofficial Committee of Noteholders may have mutually agreed.

(vi)     <u>Professionals' Fees</u>

Subject to the requirements of the Bankruptcy Code and the Order establishing administrative procedures for compensation and reimbursement of professionals and committee members, dated March 11, 2004, (i) all due and unpaid fees and expenses of Professionals retained by the Debtors, the Creditors' Committee, the Unofficial Committee of Noteholders and the DIP Lenders, shall have been paid in full and (ii) all fees and expenses not yet due and owing shall have been reserved for in an amount estimated by each Professional in a separate account maintained by the Debtors or Reorganized Debtors, as applicable, for the payment of such fees and expenses upon final approval by the Court.

13.03     Waiver of Conditions

The Debtors or the Reorganized Debtors, as the case may be, with the consent of the Creditors' Committee, which will not be unreasonably withheld, may waive one or more of the conditions precedent to the confirmation or effectiveness of the Plan set forth in Sections 13.01 and 13.02 of the Plan, without any other notice to parties in interest or the Court and without a hearing.

13.04     Effect of Failure of Conditions

If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 75 days after the date the Court enters the Confirmation Order, or by such later date as is proposed by the Debtors, agreed to by the Creditors' Committee and the Unofficial Committee of Noteholders, and approved, after notice and a hearing, by the Court, then upon motion by the Debtors made

before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions to consummation is either satisfied or duly waived before the Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to Section 13.04 of the Plan, the Plan will be null and void in all respects, and nothing contained in the Plan will (a) constitute a waiver or release of any Claims against or equity Interests in the Debtors or (b) prejudice in any manner the rights of the holder of any Claim or equity Interest in the Debtors.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS OF THE PLAN

14.01   Retention of Jurisdiction

        The business and assets of the Debtors will remain subject to the jurisdiction of the Court until the Effective Date.  From and after the Effective Date, the Court will retain and have exclusive jurisdiction of all matters arising out of, and related to the Chapter 11 Cases or the Plan pursuant to, and for purposes of, subsection 105(a) and Section 1142 of the Bankruptcy Code and for, among other things, the following purposes:  (a) to determine any and all disputes relating to Administrative Expenses, Claims and Interests and the allowance and amount thereof; (b) to determine any and all disputes among Creditors with respect to their Claims; (c) to hear and determine any and all Causes of Action, including, without limitation, any right to setoff; (d) to consider and allow any and all applications for compensation for professional services rendered and disbursements incurred up to and including the Confirmation Date in connection therewith; (e) to determine any and all applications, motions, adversary proceedings and contested or litigated matters pending on the Effective Date and arising in or related to the Chapter 11 Cases or the Plan; (f) to remedy any defect or omission or reconcile any inconsistency in the Confirmation Order; (g) to enforce the provisions of the Plan relating to the distributions to be made thereunder; (h) to issue such orders, consistent with Section 1142 of the Bankruptcy Code, as may be necessary to effectuate the consummation and full and complete implementation of the Plan; (i) to enforce and interpret any provisions of the Plan; (j) to determine such other matters as may be set forth in the Confirmation Order or that may arise in connection with the implementation of the Plan; (k) to determine the amounts allowable as Administrative Expenses pursuant to Section 503(b) of the Bankruptcy Code; (l) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and the Documents; (m) to hear and determine any disputes arising in connection with the Senior Executive Employment Agreements and the terms of employment set forth in Section 9.12 of the Plan; (n) to hear and determine any issue for which the Plan or any Related Document requires a Final Order of the Court; (o) to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code; (p) to hear and determine any issue related to the composition of the New Board of Directors of the Reorganized Debtors; (q) to hear and determine any issue relating to Taxes and the proper allocation of Tax Assets as and between the Debtors and Reorganized Debtors, on the one hand, and Letitia, on the other hand, as contemplated by Section 9.17 of the Plan; (r) to hear any other matter not inconsistent with the Bankruptcy Code; and (s) to enter a Final Decree closing the Chapter 11 Cases.

14.02   Binding Effect

The provisions of the Plan will be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, any holder of a Claim or Interest, their respective predecessors, successors, assigns, agents, officers and directors and any other Entity affected by the Plan. Except as expressly set forth therein, nothing in the Plan is intended to affect or will affect any rights or interests of the DIP Lenders or the DIP Agent under the DIP Agreement or the DIP Orders.

### 14.03   Authorization of Corporate Action

The entry of the Confirmation Order will constitute a direction and authorization to and of the Debtors or the Reorganized Debtors, as the case may be, to take or cause to be taken any corporate action necessary or appropriate to consummate the provisions of the Plan prior to and through the Effective Date (including, without limitation, the filing of the Amended and Restated Certificates of Incorporation and dissolution of those Debtors listed on Exhibit A to the Plan which will be dissolved pursuant to Section 9.07 of the Plan), and all such actions taken or caused to be taken will be deemed to have been authorized and approved by the Court. Any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, including the approval of Reorganized HVE's Amended and Restated Certificate of Incorporation and the Management Incentive Plan by the requisite number of stockholders of Reorganized HVE, will, as of the Effective Date, be deemed to have occurred and will be effective as provided in the Plan and will be authorized and approved in all respects without any requirement of further action under applicable law, regulation, order, or rule, including without limitation, any action by the security holders or directors of the Debtors or the Reorganized Debtors.

### 14.04   Modification of the Plan

The Debtors or the Reorganized Debtors, as the case may be, with the consent of the Creditors' Committee and the Unofficial Committee of Noteholders, may alter, amend, or modify the Plan under Section 1127 of the Bankruptcy Code at any time before or after the Confirmation Date.

### 14.05   Withdrawal of the Plan

The Debtors reserve the right, with the consent of the Creditors' Committee and the Unofficial Committee of Noteholders (which will not be unreasonably withheld), at any time prior to the entry of the Confirmation Order, to revoke or withdraw the Plan. If the Debtors revoke or withdraw the Plan, then the Plan will be deemed null and void. In such event, nothing contained herein will constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other person, or an admission against interests of the Debtors, nor will it prejudice in any manner the rights of the Debtors or any person in any further proceeding involving the Debtors.

### 14.06   Nonvoting Stock

In accordance with Section 1123(a)(6) of the Bankruptcy Code, the Amended and Restated Certificates of Incorporation will contain a provision prohibiting the issuance of nonvoting equity securities by each of the Reorganized Debtors, subject to further amendment of such Amended and Restated Certificates of Incorporation as permitted by applicable law.

14.07    Retiree Benefits

The Plan provides for the continuation after the Effective Date of payment of all retiree benefits, as that term is defined in Section 1114 of the Bankruptcy Code, at the level established pursuant to Section 1114, at any time prior to the Confirmation Date, for the duration of the period the Debtors have obligated themselves to provide such benefits.

14.08    Fees of the Unofficial Committee of Noteholders

The reasonable fees and expenses of the Unofficial Committee of Noteholders for services rendered from and after the Petition Date (including the reasonable fees and expenses of its counsel) will be Allowed as an Administrative Expense against the Debtors, pursuant to section 503(b) of the Bankruptcy Code and will, after notice and a hearing, be paid by the Reorganized Debtors.  The Bankruptcy Court will retain jurisdiction over any dispute regarding the reasonableness of such fees.

14.09    Dissolution of any Committee

On the Effective Date, any Committee will cease to exist and its members and employees or agents (including, without limitation, attorneys, investment bankers, financial advisors, accountants and other professionals) will be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases.

14.10    Section 1125(e) of the Bankruptcy Code

The Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon confirmation of the Plan will be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

The Debtors and each of the members of the Creditors' Committee and the Unofficial Committee of Noteholders (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon confirmation of the Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regards to the distributions of the New Common Stock under the Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

14.11    Post-Confirmation Obligations

The Reorganized Debtors will pay fees assessed against each of the Debtors' estates under 28 U.S.C. § 1930(a)(6) until entry of an order closing the respective Chapter 11 Cases.  In addition, after the Confirmation Date, each Debtor will serve the United States Trustee with a monthly financial report for each month (or portion thereof) its Chapter 11 Case remains open; provided, however, that the Debtors being dissolved pursuant to section 9.07 of the Plan will have no such reporting obligations.  The monthly financial report shall include the following:

(i)     A statement of all disbursements made during the course of the month, whether or not pursuant to the Plan;

(ii)    A summary, by class, of amounts distributed or property transferred to each recipient under the Plan, and an explanation of the failure to make any distributions or transfers of property under the Plan;

(iii)   Debtors' projections as to its continuing ability to comply with the terms of the Plan;

(iv)    A description of any other factors which may materially affect the Debtors' ability to consummate the Plan; and

(v)     An estimated date when an application for final decree will be filed with the Court (in the case of the final monthly report, the date the decree was filed).

14.12   Waiver of Bankruptcy Rules 3020(e) and 7062

        The Debtors may request that the Confirmation Order include:  (i) a finding that Bankruptcy Rules 3020(e) and 7062 shall not apply to the Confirmation Order, and (ii) authorization for the Debtors to consummate the Plan immediately after the entry of the Confirmation Order.

## ARTICLE XV.
## DESCRIPTION OF THE NEW CREDIT FACILITY DOCUMENTS

        On or prior to the Effective Date, the New Term Loan Lenders, Reorganized HVE and the Guarantors will execute and deliver the New Credit Facility Documents and certain other related documents in connection therewith.  The New Credit Facility Documents will provide the Reorganized Debtors with exit financing in the aggregate amount of $35 million.  It is contemplated that pursuant to the New Term Loan Credit Agreement, the New Term Loan Lenders will provide the Reorganized Debtors with a $25 million term loan facility, which will be secured by second priority liens on accounts receivables and inventory of Reorganized HVE and its domestic wholly-owned subsidiaries which secure the obligations of Reorganized HVE under the New Revolving Credit Agreement and first priority senior liens on all other assets of Reorganized HVE, its domestic subsidiaries and, to the extent permitted by applicable law, requested by the New Term Loan Lenders, and not resulting in material adverse tax consequences to Reorganized HVE, all foreign subsidiaries of Reorganized HVE.  The proceeds of the New Term Loan Credit Agreement will be used to refinance the DIP Agreement.

        The New Credit Facility Documents also allow for a $10 million revolving credit facility under the New Revolving Credit Agreement.  Reorganized HVE will enter into the New Revolving Credit Agreement with a yet to be determined third party, the proceeds of which will be used solely to provide working capital for Reorganized HVE and its domestic wholly-owned direct and indirect subsidiaries.  Under the terms of the New Term Loan Credit Agreement, however, the Reorganized Debtors' ability to transfer funds from the New Revolving Credit Agreement to ASI will remain subject to the discretion of the New Board of Directors and the

terms of the New Credit Facility Documents. Reorganized HVE's obligations under the New Revolving Credit Agreement will be secured by Liens on accounts receivables and inventory of Reorganized HVE and its domestic wholly-owned subsidiaries. The Liens on accounts receivable and inventory that secure Reorganized HVE's obligations under the New Revolving Credit Agreement will be senior to those securing Reorganized HVE's obligations under the New Term Loan Credit Agreement. It is possible that the Debtors may enter into alternate financing arrangements which provide for better terms and conditions (as determined by the Debtors, the Creditors' Committee and the Unofficial Committee of Noteholders (not including those members which may be DIP Lenders or proposed exit lenders)).

15.01   Description of New Term Loan Credit Agreement

Set forth below is a summary of the material terms of the New Term Loan Credit Agreement, which summary does not purport to be complete and is subject and qualified in its entirety by reference to all of the provisions of the New Term Loan Credit Agreement, a term sheet of which is attached hereto as Exhibit A.

| | |
|---|---|
| Borrower: | Reorganized HVE. |
| Guarantors: | All domestic subsidiaries of Reorganized HVE and, to the extent permitted by applicable law, requested by the New Term Loan Lenders, and not resulting in material adverse tax consequences to Reorganized HVE, all foreign subsidiaries of Reorganized HVE. |
| Lenders: | The DIP Lenders and certain additional lenders to be approved by the DIP Lenders and the Debtors (collectively, the "Lenders"). |
| Agent: | The DIP Agent or any other financial institution acceptable to the DIP Lenders. |
| Maximum Commitment: | U.S. $25,000,000. |
| Mandatory Prepayments: | The loan must be repaid with any proceeds received by Reorganized HVE or any of its subsidiaries from asset sales, debt issuances, equity issuances, insurance claims and condemnation awards. Upon any such prepayment Reorganized HVE will pay outstanding accrued interest on the amount prepaid |
| | The loan must be repaid with 75% of excess operating cash flow for each fiscal year. |
| | Upon the occurrence of a change of control of Reorganized HVE, Reorganized HVE will pay to the Lenders an amount equal to the par value of the loan, together with all accrued and unpaid interest and fees with respect thereto. |

| | |
|---|---|
| <u>Voluntary Prepayments</u>: | Reorganized HVE may prepay the amounts outstanding in whole or in part (a) at any time prior to March 4, 2005, together with a premium of 5% and (b) at any time on or after March 4, 2005 and prior to the Maturity Date, together with a premium of 3%. |
| <u>Maturity Date</u>: | March 4, 2006. |
| <u>Interest Rate</u>: | Prior to the first anniversary of the Closing Date, the loan will bear interest at the rate of 14% per annum, of which 12% will be payable in cash and 2% will be payable in kind.  On and after the first anniversary of the Closing Date, the loan will bear interest at the rate of 15% per annum, of which 12% will be payable in cash and 3% will be payable in kind.  Upon the occurrence and during the continuance of an Event of Default, the interest rate on the loan will increase by 2% per annum, which additional interest will be payable in cash. |
| <u>Collateral</u>: | First priority lien on substantially all assets of Reorganized HVE, its domestic subsidiaries and, to the extent permitted by applicable law, requested by the New Term Loan Lenders, and not resulting in material adverse tax consequences to Reorganized HVE, all foreign subsidiaries of Reorganized HVE, subject only to certain standard and customary permitted liens and the first priority liens on accounts receivables and inventory securing Reorganized HVE's obligations under the New Revolving Credit Agreement. |
| <u>Other Provisions</u>: | Arrangement fees, anniversary fees and other fees and expenses. Customary financial covenants, representations and warranties, and conditions to funding.  In addition to the financial covenants, there will be standard and customary affirmative and negative covenants and events of default, including upon a change of control. |

15.02   The New Revolving Credit Agreement

A condition to confirmation of the Plan is that the Debtors must have received a firm commitment for a $10 million revolving credit facility that is in form and substance reasonably acceptable to the Creditors' Committee and the Unofficial Committee of Noteholders (not including those members which may be DIP Lenders or proposed exit lenders).  The terms of the New Revolving Credit Agreement will be filed with the Court no later than ten (10) days prior to the Confirmation Hearing.

## ARTICLE XVI.
## CERTAIN FACTORS

**HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AND THE DOCUMENTS DELIVERED TOGETHER WITH THIS DISCLOSURE STATEMENT AND INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

16.01    Certain Bankruptcy Law Considerations

(i)    Parties in Interest May Object to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a class or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Court will reach the same conclusion.

(ii)    Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for its confirmation under the Bankruptcy Code, there can be no assurance that the Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for such confirmation or that such modifications would not necessitate the resolicitation of votes.

(iii)    The Debtors May Not be Able to Secure Confirmation of the Plan

There can be no assurance that the requisite acceptances of the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. The Court could decline to confirm the Plan if it found that any of the statutory requirements for its confirmation had not been met, including that the terms of the Plan are fair and equitable to a non-accepting class of Claims or Interests. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things, a finding by the Court that such plan (i) "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, (ii) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization and (iii) the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtors believe that the Plan will not be followed by a need for further financial reorganization and that non-accepting holders of Claims or Interests will receive distributions no less than would be received following a liquidation under Chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such case under Chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed by the Court, it is unclear whether a restructuring of the Debtors could be implemented and what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests.  If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that holders of Claims and Interests would receive substantially less favorable treatment than they would receive under the Plan.

Holders of Claims or Interests may assert, among other things, that the Debtors' valuation analysis set forth herein is incorrect or that the Plan is not "fair and equitable" and provides a greater than permitted recovery to certain classes of Claims or Interests.  Although the Debtors believe that any such assertions would be without merit, there can be no assurance that any such assertions by holders of Claims or Interests will not delay the Debtors' emergence from Chapter 11 of the Bankruptcy Code or prevent confirmation of the Plan.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms of the Plan as necessary for its confirmation.  Such modification could result in a less favorable treatment of any non-accepting class or classes, as well as of any classes junior to such non-accepting classes, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

(iv)    The Debtors May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest except any such Claims or Interests that are deemed Allowed under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any holder of a Claim or Interest that is subject to an objection may not receive its specified share of the estimated distributions described in this Disclosure Statement.

(v)    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur as soon as one (1) Business Day after the date upon which the Confirmation Order becomes a Final Order, there can be no assurance as to such timing.  Moreover, if the conditions precedent to the Effective Date (including the requirement that each of the Documents must be in a form and substance, that is reasonably satisfactory to the Debtors or the Reorganized Debtors, as the case may be, with the consent of the Creditors' Committee and the Unofficial Committee of Noteholders, which will not be unreasonably withheld) have not occurred and have not been waived as provided under the Plan, the Plan would be deemed null and void and the Debtors may propose and solicit votes on an alternative plan of reorganization that may not be as favorable to parties in interest as the Plan.

(vi)    Effect of the Chapter 11 Cases on the Debtors' Business

The impact, if any, that the Chapter 11 Cases may have on the operations of the Debtors or the Reorganized Debtors cannot be accurately predicted or quantified.  The

continuation of the Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, will adversely affect the Debtors' or the Reorganized Debtors' relationship with their customers, suppliers and employees and will, therefore, have a negative impact on their operations.  The Debtors believe that the Chapter 11 Cases and consummation of the Plan in an expeditious manner will have a minimal adverse long-term impact on relationships with customers, employees and suppliers of the Debtors or the Reorganized Debtors.

If confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases will result in, among other things, increased costs for professional fees and similar expenses.  In addition, prolonged Chapter 11 Cases may make it more difficult for the Debtors to retain and attract management and other key personnel and would require senior management to spend an excessive amount of time and effort dealing with the Debtors' financial problems instead of focusing on the operation of their businesses.

(vii)    Insurance Coverage

Certain insurance companies have reserved all of their rights, claims and defenses under their policies including, but not limited to, their rights to deny coverage if and/or when certain otherwise insured Claims are tendered if the Plan or Confirmation Order fails to require Debtors and/or Reorganized Debtors to satisfy all of the insureds' continuing obligations under the respective policies and otherwise prejudices the insurance companies' rights, claims and defenses.  Based on the foregoing, unless the Confirmation Order preserves all of their rights under their respective policies, certain insurance companies have indicated that they may object to confirmation of the Plan and/or seek a ruling that they are not obligated to provide coverage for Claims.

16.02    Risks related to the Debtors' Business

(i)    The Debtors Compete in Highly Competitive Markets

The Debtors operate in highly competitive and rapidly changing markets and some competitors have substantially greater sales and financial resources.  Entry into the market by new competition or the development of new technologies could adversely affect operating results.  Significant concentration of credit risk exists with trade receivables, which is somewhat mitigated due to the Debtors' diversity of regions and customers.

Financial instruments that potentially subject the Debtors to concentrations of credit risk consist primarily of billed and unbilled receivables.  Concentrations of credit risk with respect to billed and unbilled contracts receivable is mitigated by obtaining letters of credit to ensure payment from some international customers.  Generally, collateral is not required of customers who are located in countries where the Debtors have operations.

The Debtors have manufacturing operations in six foreign countries (Italy, Germany, France, the United Kingdom, The Netherlands, and China).  Spain and Mexico were discontinued in fiscal 2003.  Risks inherent in foreign operations include changes in social, political and economic conditions, changes in currency exchange rates, changes in the laws and policies that govern foreign investments in countries, changes in United States laws and regulations relating to foreign trade and investment.

The Debtors have made significant acquisitions that are inherently subject to risk. The successful integration of the acquired operations and the substantial demands on the attention of senior management may adversely impact their ability to manage the Debtors' existing businesses.

(ii)     The Projections set forth in this Disclosure Statement Assumes Continued Funding of ASI

Pursuant to the DIP Agreement, the Debtors provided ASI with $9,350,666.71, in working capital. In order to maintain ASI as a going concern and successfully accomplish the integration of ASIRobicon, the Debtors may need to continue providing ASI with additional funds in order for ASI to meet its working capital requirements. The Projections assume and are contingent upon the Reorganized Debtors being able to provide ASI with this additional financing, including funds from the New Revolving Credit Agreement. Under the terms of the New Term Loan Credit Agreement, however, the Reorganized Debtors' ability to provide additional financing to ASI is subject to the discretion of the New Board of Directors and the terms of the New Credit Facility Documents. There is a risk that the New Board of Directors will determine that it is not in the Reorganized Debtors' best interests to provide additional financing to ASI. In addition, there is a risk that such additional financing will not be available to the Reorganized Debtors. In such an event, the Reorganized Debtors may not be able to sustain operations at ASI, which may have a significant impact on the Projections.

(iii)     Environmental Matters

The Debtors are currently party to certain settlement agreements and consent orders with various state and federal environmental agencies and other third parties that require the Debtors to test and/or treat a number of their former manufacturing sites for environmental-related contamination. Additionally, the Debtors have received inquiries from environmental agencies regarding their involvement with third parties who are currently being investigated for environmental-related contamination. Set forth below is a brief summary of the Debtors' environmental matters (collectively, the "Environmental Matters").

The following are summary descriptions of the Debtors' known Environmental Matters. The Debtors do not admit liability with respect to any of the Environmental Matters and nothing herein should be construed as an admission. Where estimates of cost are made or current expectations or knowledge of the Debtors are disclosed, there can be no assurance that actual costs will not exceed such estimates or that the liability of the Debtor will not exceed such expectations or current knowledge.

(a) *Burlington, Massachusetts Cleanup*. In June 1989, HVE entered into a Consent Order (the "Burlington Consent Order") with the predecessor to the Massachusetts Department of Environmental Protection (the "MDEP") with respect to the remediation of alleged contamination at property formerly leased by HVE in Burlington, Massachusetts (the "Burlington Site"). Pursuant to the Burlington Consent Order and the remediation plan approved by the MDEP (the "Burlington Remediation Plan"), HVE has posted financial assurances currently consisting of a $100,000 letter of credit for the benefit of the State Street Bank and Trust Company, as Escrow Agent for the MDEP. The owners of several parcels of land adjoining or near the Burlington Site also asserted claims against or sought damages from HVE

in connection with waste allegedly originating from activities on the Burlington Site.  Prior to the Petition Date, HVE entered into a settlement agreement with the current owner of the Burlington Site and certain abutters under which, *inter alia*, HVE agreed to pay $200,000 with respect to one adjoining property, and the first $500,000 of future costs incurred plus two-thirds of any additional costs with respect to the cleanup of another (the "Burlington Settlement Agreement"). As of the Petition Date, HVE had expended approximately $2.0 million to complete the requisite investigation and implement the physical infrastructure of a groundwater treatment system. Pursuant to the Burlington Consent Order and the Burlington Remediation Plan, HVE has continued to maintain the MDEP-approved cleanup program, including pumping and treating contaminated groundwater.  Additionally, HVE continues to perform its quarterly monitoring and reporting obligations for the site.  The MDEP recently conducted an audit of the Burlington Site and made favorable findings with respect to HVE's remediation efforts.  HVE estimates that it will cost approximately $2.0 million to complete the necessary cleanup of the Burlington Site, which will be incurred by HVE over a number of years.  Reorganized HVE intends to continue performing its obligations under the Burlington Settlement Agreement and Burlington Consent Order after emerging from chapter 11.

(b) *Woodbridge Township, New Jersey Cleanup*.  HVE is conducting an environmental investigation and remediation of a former manufacturing site located in Woodbridge Township, New Jersey (the "New Jersey Site") under New Jersey law.  The investigation and remediation are being undertaken in accordance with an August 1989 agreement among HVE, the current owner of the site and the former owner of the site who had purchased the site from HVE (the "New Jersey Settlement Agreement"), and in accordance with an August 1989 Administrative Consent Order (the "New Jersey Consent Order") of the New Jersey Department of Environmental Protection ("NJDEP").  As part of the New Jersey Settlement Agreement and New Jersey Consent Order, HVE agreed prior to the Petition Date to assume full responsibility for the cleanup, and has been conducting an investigation and remediation of the New Jersey Site in accordance with the terms thereof and New Jersey law. HVE estimated, as of February 2004, that the costs necessary to complete the cleanup will be approximately $2.0 million, which will be incurred by HVE over a number of years.  In accordance with the terms of the New Jersey Settlement Agreement and the New Jersey Consent Order, HVE has posted financial assurances currently consisting of a $1.42 million letter of credit for the benefit of the NJDEP.  Reorganized HVE intends to continue performing its obligations under the New Jersey Settlement Agreement and New Jersey Consent Order after emerging from chapter 11.

(c) *Brighton, Massachusetts*.  In 2001, HVE entered into a sale agreement with New Balance pursuant to which HVE agreed to sell certain real property located in Brighton, Massachusetts (the "Brighton Property")  to New Balance (the "Brighton Sale Agreement").  Under the Brighton Sale Agreement, HVE agreed to conduct testing for certain chlorinated solvents for a period of 20 calendar quarters.  If the test results are within certain state law parameters, HVE's testing obligations will expire in 2007.  To date, the test results have been within acceptable parameters.  The annual cost of these testing obligations is between $10,000 and $20,000, per year.  In the event remediation becomes necessary, New Balance acquired insurance to cover the costs of such remediation.  Reorganized HVE intends to continue performing its obligations under the Brighton Sale Agreement with New Balance after emerging from chapter 11.

(d) *Administrative Proceeding initiated by Proceduria Federal de Proteccion al Ambiente (PROFEPA), Delegacion en el Estado de Chihuahua, No. CI0168VI2003.* In May of 2003, the Proceduria Federal de Proteccion al Ambiente (PROFEPA), a Mexican federal agency, conducted a detailed inspection of a facility owned and operated by HVE's former subsidiary, Instrumentos Stewart Warner de Mexico, S.A., de C.V ("Instrumentos Stewart Warner"), and located in Ciudad Juarez, Chihuahua, Mexico (the "Juarez Site"). As a result of that investigation, PROFEPA filed an administrative proceeding against Instrumentos Stewart Warner. (HVE may be responsible for liability in connection with this matter based on certain agreements and indemnities between it and the purchaser of Instrumentos Stewart Warner.) In connection with this matter, Instrumentos Stewart Warner has agreed to satisfy certain obligations ("Ordering Provisions") with respect to the facility and has paid an agreed fine of approximately $1,000 (US). With the exception of one remaining obligation, HVE has satisfied all of the Ordering Provisions. HVE expects to satisfy its remaining obligation within three months, at which time HVE expects that this matter will be fully resolved. HVE does not anticipate that PROFEPA will seek or impose any additional fines. In addition, HVE has learned that the United States EPA and its counterpart in Mexico have been conducting a criminal investigation into the hauler of certain waste from the Juarez Site. In connection with this investigation, HVE responded to an informational subpoena it received last year. Neither HVE nor its representatives have any knowledge as to whether the investigating agencies will make further inquiries relating to this matter. The Debtors do not have knowledge of any debt or claim arising from or relating to the Juarez Site and will consider any such debt or claim to be discharged upon confirmation of the Plan.

(e) *Whitney Barrel Company at the Wells G&H Superfund Site in Woburn, Massachusetts.* On December 15, 2003, the United States Environmental Protection Agency (the "EPA") served HVE with a Request for Information Pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") (the "104(e) Letter") relating to the Whitney Barrel Company at the Wells G&H Superfund Site in Woburn, Massachusetts (the "Woburn Site"). In the 104(e) Letter, the EPA indicated that it had information associating HVE with Whitney Barrel. The EPA requested extensive information for the period between 1950 and 1985 relating to the Wells G&H Superfund Site (the "Site"), Whitney Barrel, HVE and the past relationship between the entities. HVE, together with its legal environmental counsel and environmental consultant, conducted an extensive search of its corporate records, but was unable to identify any information indicating that HVE shipped waste or any other materials to the Whitney Barrel property at the Woburn Site. HVE submitted a timely response to the 104(e) Letter on February 13, 2004 (the "February Response"). The EPA has not made any contact with HVE or its representatives regarding this matter since the submittal of the February Response. Neither HVE nor its representatives have any knowledge as to whether the EPA will make further inquiries relating to this matter. The Debtors do not have knowledge of any debt or claim arising from or relating to the Woburn Site and will consider any such debt or claim to be discharged upon confirmation of the Plan.

16.03    Factors Affecting the Value of the Securities

(i)    The Projections set forth in this Disclosure Statement May Not be Achieved

The Projections cover the operations of Reorganized HVE through the period ending April 30, 2008. The Projections are based on numerous assumptions that are an integral part thereof, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized HVE, industry performance, general business and economic conditions, competition, adequate financing, absence of material claims, the ability to make necessary product development and capital expenditures, the ability to establish strength in new markets and to maintain, improve and strengthen existing markets, consumer purchasing trends and preferences, the ability to increase gross margins and control future operating expenses and other matters, many of which are beyond the control of Reorganized HVE and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the operations of Reorganized HVE. These variations may be material and adverse. Because the actual results achieved throughout the periods covered by the Projections will vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

   (ii)  <u>The New Revolving Credit Agreement and the New Term Loan Credit Agreement Impose Restrictions on Reorganized HVE's Businesses</u>

The New Revolving Credit Agreement and the New Term Loan Credit Agreement will contain a number of covenants imposing significant restrictions on Reorganized HVE's businesses. These restrictions may affect Reorganized HVE's ability to operate its businesses and may limit its ability to take advantage of potential business opportunities as they arise. The restrictions these covenants will place on Reorganized HVE include limitations with respect to working capital, payables, product development and capital expenditures. Reorganized HVE's ability to comply with these agreements may be affected by events beyond its control, including prevailing economic, financial and industry conditions, all of which are subject to the risks described in this section. The breach of any of these covenants or restrictions could result in a default under the New Revolving Credit Agreement and/or the New Term Loan Credit Agreement. An event of default under the New Revolving Credit Agreement and/or the New Term Loan Credit Agreement may permit some of Reorganized HVE's lenders to declare all amounts borrowed from them to be immediately due and payable. In such case, Reorganized HVE may be unable to pay such amounts. In addition, due to various business, financial, economic or other factors, Reorganized HVE may be unable to make payments required under the New Revolving Credit Agreement and/or the New Term Loan Credit Agreement as they become due, including repaying the principal amount thereof.

(iii)    There is No Public Market for the Securities and Reorganized HVE Will
Not Assure Any of the Holders of the Pre-Petition Senior Note Claims, the
Old Preferred Stock Interests or the Old Common Stock Interests That a
Market for Any of the Securities Will Develop

Holders of the Securities who are deemed to be "underwriters" as defined in Subsection 1145(b) of the Bankruptcy Code, or who are otherwise deemed to be "affiliates" or "control persons" of Reorganized HVE within the meaning of the Securities Act, will be unable to freely transfer or sell their Securities after the Effective Date, except pursuant to an available exemption from registration under the Securities Act and under equivalent state securities or "blue sky" laws or pursuant to an effective registration of such Securities under the Securities Act.

No established trading market exists for the Securities and no assurance can be given that such a trading market will develop following the Effective Date or, if the trading market for such Securities develops, no assurance can be given as to the liquidity of such a trading market.  Reorganized HVE does not intend to file a registration statement with respect to the initial issuance on the Effective Date of the Securities under the Securities Act.

(iv)    Reorganized HVE's Ability to Pay Any Dividends on the New Common
Stock will be Limited

Reorganized HVE cannot assure the holders of the New Common Stock that it will be able to pay dividends.  Its ability to pay any cash or noncash dividends on its stock is subject to the availability of adequate cash (or other consideration) to pay dividends, applicable provisions of state law and the terms of the New Revolving Credit Agreement and the New Term Loan Credit Agreement and any other credit facilities that it may enter into in the future. Furthermore, even if Reorganized HVE has such cash or non-cash property available and provisions and terms of its financing agreements would not be violated by the payment of dividends, the payment of any dividend is subject to the discretion of the board of directors of Reorganized HVE.

(v)    Reorganized HVE May Not be Able to Service its Obligations Under the
New Revolving Credit Agreement and the New Term Loan Credit
Agreement

Reorganized HVE's ability to pay or perform its obligations under the New Revolving Credit Agreement and the New Term Loan Credit Agreement will depend upon its future operating performance, which will be affected by general economic, financial, competitive, business and other factors beyond its control.

Reorganized HVE cannot assure any holder of a Claim or Interest that its business will generate sufficient cash flow from operations and that currently anticipated revenues and cost-saving efforts will be realized on schedule or at all in amounts sufficient to enable it to pay or perform its obligations under the New Revolving Credit Agreement and/or the New Term Loan Credit Agreement.

(vi)    <u>The Value of the Collateral May Not be Sufficient to Satisfy All Amounts
that Reorganized HVE Owes Under the New Revolving Credit Agreement
and the New Term Loan Credit Agreement</u>

Reorganized HVE, together with the Guarantors, will secure their obligations
under the New Revolving Credit Agreement and the New Term Loan Credit Agreement by
granting security interests in all of the assets of Reorganized HVE, its domestic subsidiaries and,
to the extent permitted by applicable law, requested by the New Term Loan Lenders, and not
resulting in material adverse tax consequences to Reorganized HVE, all foreign subsidiaries of
Reorganized HVE, including, among other things, inventory and accounts receivables (the
"Collateral").  The Collateral's value may not suffice to pay all amounts due under the New
Revolving Credit Agreement and the New Term Loan Credit Agreement (see Article XV
"Description of the New Credit Facility Documents").

The Debtors have not prepared any appraisals of the Collateral in connection with
the Solicitation.  The value of the Collateral in the event of a liquidation will depend upon
market and economic conditions, including the availability of buyers, and other factors.  By its
nature, some or all of the Collateral will be illiquid and may have no readily ascertainable market
value.  Likewise, the Collateral may not be saleable, or, if saleable, there could be substantial
delays in its liquidation.  Accordingly, the proceeds of any sale of the Collateral pursuant to the
New Revolving Credit Agreement and the New Term Loan Credit Agreement and any
agreements related to the Collateral following an event of default under such agreements may be
substantially less than amounts due under the New Revolving Credit Agreement and/or the New
Term Loan Credit Agreement.  If the proceeds from the sale of any of the Collateral were not
sufficient to repay all amounts due on the New Revolving Credit Agreement and/or the New
Term Loan Credit Agreement, a lender under the New Revolving Credit Agreement and/or the
New Term Loan Credit Agreement (to the extent not repaid from the proceeds of the sale of the
Collateral) would only have an unsecured claim against the remaining assets of Reorganized
HVE and the Guarantors.

Furthermore, the Collateral as well as the proceeds from the sale of the Collateral
are subject to the liens on all of the assets of Reorganized HVE, its domestic subsidiaries and, to
the extent permitted by applicable law, requested by the New Term Loan Lenders, and not
resulting in material adverse tax consequences to Reorganized HVE, all foreign subsidiaries of
Reorganized HVE, under the New Revolving Credit Agreement and the New Term Loan Credit
Agreement. Therefore, no proceeds from the sale of the Collateral may be paid to any creditor or
interest holder until such proceeds are paid, up to the amount drawn under the New Revolving
Credit Agreement and the New Term Loan Credit Agreement, plus any accrued and unpaid
interest (and any penalty), to the lenders under those agreements.  However, lenders under the
New Revolving Credit Agreement and the New Term Loan Credit Agreement might not be
repaid if Reorganized HVE has insufficient cash or access to other facilities to repay the facility
and the sale of the Collateral is also inadequate to repay the facility.

(vii)    <u>There May Be a Change in the Capital Structure of Reorganized HVE</u>

The New Board of Directors could decide to effect or propose a change in the
capital structure of Reorganized HVE, including a reverse stock split, which could have the
effect of eliminating minority stockholders.

**ALTHOUGH THE DEBTORS' MANAGEMENT HAS USED ITS REASONABLE BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, SOME OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED AND IS BASED UPON AN ANALYSIS OF DATA AVAILABLE AT THE TIME OF THE PREPARATION OF THE PLAN AND THIS DISCLOSURE STATEMENT. WHILE THE DEBTORS' MANAGEMENT BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS, THE DEBTORS' MANAGEMENT IS UNABLE TO REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN AND ATTACHED HERETO IS WITHOUT INACCURACIES.**

**THESE RISK FACTORS CONTAIN CERTAIN FORWARD-LOOKING STATEMENTS THAT ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING, AMONG OTHERS, CURRENCY EXCHANGE RATE FLUCTUATIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS AND HVE UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.**

### ARTICLE XVII.
### APPLICATION OF SECURITIES ACT

17.01    Issuance and Resale of New Securities Under the Plan

(i)    Section 1145 of the Bankruptcy Code

Section 1145 of the Bankruptcy Code generally exempts the issuance of a security (including, without limitation, the offer of a security through any warrant, option, or right to subscribe, or the sale of a security upon the exercise of such warrant, option, or right) from registration under the Securities Act (and any equivalent state securities or "blue sky" laws) if the following conditions are satisfied: (i) the security is issued by a debtor (or its successor) under a Chapter 11 plan, (ii) the recipient of the security holds a claim against, an interest in, or a claim for an administrative expense against, the debtor and (iii) the security is issued entirely in exchange for such claim or interest, or is issued "principally" in exchange for such claim or interest and "partly" for cash or property.

Securities exempt from registration under Section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(l) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in the Bankruptcy Code (see discussion below), an "affiliate" of the issuer of such securities or a "dealer". In addition, such

securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. **However, recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability**.

Section 1145(b) of the Bankruptcy Code defines "underwriter" under Section 2(11) of the Securities Act as an entity who (A) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest; (B) offers to sell securities offered or sold under a plan for the holders of such securities; (C) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities, and (ii) under an agreement made in connection with the plan, with the consummation of a plan, or with the offer or sale of securities under a plan; or (D) is an issuer, as used in section 2(11) of the Securities Act, with respect to such securities.  Although the definition of the term "issuer" appears in section 2(4) of the Securities Act, the reference (contained in Section 1145 (b)(1)(D) of the Bankruptcy Code) to section 2(11) of the Securities Act purports to include as "underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities, otherwise called "affiliates" under Section 2(11) of the Securities Act.  "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Under Section 2(12) of the Securities Act, a "dealer" is any person who engages either for all or part of his or her time, directly or indirectly as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in the securities of such issuer.

Notwithstanding the foregoing, statutory underwriters, affiliates and dealers may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act which, in effect, permits the resale of securities received by statutory underwriters, affiliates and dealers pursuant to a Chapter 11 plan, subject to applicable volume limitation, notice and manner of sale requirements, and certain other conditions.  Parties which believe they may be statutory underwriters, affiliates or dealers as defined in Section 1145 of the Bankruptcy Code are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144.

There can be no assurance that an active market for any of the securities to be distributed under the Plan will develop and no assurance can be given as to the prices at which they might be traded.

The holders of New Common Stock will be deemed to be bound by a Shareholders Agreement on the Effective Date whether or not such holder executes the Shareholder Agreement.  Under the Shareholders Agreement, certain holders of New Common Stock as of the Effective Date will be entitled, under certain circumstances, to require Reorganized HVE to register the resale of their New Common Stock under the Securities Act.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, AFFILIATE OR DEALER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.**

**MOREOVER, SUCH SECURITIES, OR THE DOCUMENTS THAT ESTABLISH THE TERMS AND PROVISIONS THEREOF, MAY CONTAIN TERMS AND LEGENDS THAT RESTRICT OR INDICATE THE EXISTENCE OF RESTRICTIONS ON THE TRANSFERABILITY OF SUCH SECURITIES.**

**THE DEBTORS RECOMMEND THAT RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT WITH LEGAL COUNSEL CONCERNING THE LIMITATIONS ON THEIR ABILITY TO DISPOSE OF SUCH SECURITIES.**

17.02   New Warrants and New Common Stock

The Plan provides that (i) all Old Preferred Stock and Old Common Stock will be cancelled as of the Effective Date, (ii) holders of Pre-Petition Senior Notes will receive the Senior Note Distribution, (iii) holders of Old Preferred Stock Interests and Old Common Stock Interests will receive New Warrants to purchase New Common Stock, and (iv) New Common Stock will be issued to the holders of the New Warrants who exercise such New Warrants.

The Debtors believe that the New Common Stock and New Warrants that are distributed will be exempt from the registration requirements of the Securities Act and equivalent state securities or "blue sky" laws pursuant to the exemption, and subject to exceptions and limitations, contained in Section 1145 of the Bankruptcy Code, as described in Section 17.01 of this Disclosure Statement.

## ARTICLE XVIII.
## FINANCIAL PROJECTIONS, VALUATION AND ASSUMPTIONS USED

The projected financial and valuation information set forth below (the "Projections") should be read in conjunction with the assumptions, qualifications, limitations and explanations set forth herein and the other information set forth herein.

18.01   Valuation of Consolidated HVE as of June 15, 2004

As described elsewhere in this Disclosure Statement and based on the analysis and assumptions described herein, including an assumed closing on June 15, 2004, under the Plan, Noteholders will receive approximately between 53% to 71% on account of their Claims for principal and interest accrued through and including June 15, 2004, at closing in shares of New Common Stock.

Estimates of the going concern enterprise value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were to be sold. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to parties-in-interest thereunder. Such estimates reflect the implied going concern enterprise value of Consolidated HVE based upon the terms of the Plan

and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different from the amounts set forth herein. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of going concern enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, the Debtors, their indirect and direct non-Debtor subsidiaries, their officers, directors and/or advisors assume no responsibility for their accuracy.

In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates; conditions in the financial markets; the anticipated initial securities holding of pre-petition creditors, some of whom may prefer to liquidate their investment rather than hold them on a long-term basis; the fact that the securities are unregistered and not listed on any securities exchange and other factors that generally influence the prices of securities. Actual prices of such securities may also be affected by the bankruptcy case or by other factors not possible to predict. Accordingly, the going concern enterprise value estimated by Consolidated HVE does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

As used in this section of the Disclosure Statement, (a) "Enterprise Value" means Evercore's estimate of the intrinsic value of Consolidated HVE at June 15, 2004, as determined as of March 31, 2004 and based solely upon the assumptions and data identified herein, Evercore's application of a discounted cash flow ("DCF") valuation based solely upon the assumptions and data identified herein, and Evercore's independent professional judgment; and (b) "Consolidated HVE" means the Debtors and their direct and indirect non-Debtor subsidiaries following consummation of the Plan.

Furthermore, in the event that the actual distributions to Claim holders in the bankruptcy case differ from those assumed by the Debtors in its recovery analysis, the actual recoveries realized by holders of Claims in the Impaired Classes could be significantly higher or lower than estimated by the Debtors.

In connection with delivering this analysis, Evercore has, among other things: (i) analyzed publicly available financial statements and other publicly available information relating to Consolidated HVE; (ii) analyzed certain internal financial statements and other non-public financial and operating data relating to Consolidated HVE; (iii) discussed appropriate capital structure requirements with Consolidated HVE management; (iv) discussed the past and current operations, financial projections and current financial condition of Consolidated HVE with Consolidated HVE management; (v) performed other examinations and analyses and considered other factors that we deemed appropriate.

In preparing its analysis, Evercore assumed and relied upon the accuracy and completeness of all of the financial and other information that was available to it from public sources and that was provided to Evercore by Consolidated HVE or its representatives and has not assumed any responsibility for independent verification of any such information.

With respect to the financial projections supplied to Evercore, Evercore assumed the accuracy thereof and assumed that such projections were reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of Consolidated HVE management as to the future operating and financial performance of Consolidated HVE.

Such projections assume Consolidated HVE will operate the business reflected in the business plan that it provided to Evercore and that such business will perform as expected in the business plan. To the extent that Consolidated HVE operates more or fewer businesses during the projection period and to the extent that all or a portion of the businesses perform at levels not consistent with those expected in the business plan, such adjustments may have a material impact on the operating projections and valuations as presented herein. Evercore did not make or obtain any independent evaluation of Consolidated HVE's assets, nor did Evercore verify any of the information it reviewed.

With respect to the valuation of Consolidated HVE, in addition to the foregoing, Evercore relied upon the following assumptions and/or methodologies:

- Consolidated HVE's enterprise valuation consists of the aggregate enterprise value of the Debtors and their indirect and direct non-Debtor subsidiaries, including their equity interests in other wholly owned subsidiaries, including without limitation, ASIRobicon SpA.

- The enterprise valuation range indicated assumes the pro forma debt levels (as set forth in the Pro Forma Financial Projections in Section 18.02 of this Disclosure Statement) to calculate a range of equity values.

- The Debtors will emerge from Chapter 11 on or about June 15, 2004.

- The Debtors will be able to obtain all necessary financing, as described elsewhere herein, and no asset sales will be required to meet Consolidated HVE's ongoing financial requirement. Evercore has not made and makes no representations as to whether Consolidated HVE will be able to obtain additional financing or as to the terms upon which such financing may be obtained.

- Present senior management of all of Consolidated HVE's businesses, including Russell Shade, will continue following consummation of the Plan and general financial and market conditions as of the assumed effective date of the Plan of Reorganization will not differ materially from those conditions prevailing as of the date of this Disclosure Statement.

As a result of such analyses, reviews, discussions, considerations and assumptions, Evercore estimates that the enterprise value of Consolidated HVE falls in a range between approximately $121 million and $154 million and the equity value falls in a range between approximately $97 million to $130 million. (Note: both the enterprise and equity value ranges include approximately $25 million of equity value attributable to ASI Robicon SpA). These estimated ranges of values represent hypothetical values, which reflect the estimated intrinsic value of Consolidated HVE derived through the application of a DCF valuation

methodology.  Furthermore, these estimated ranges of value reflect the Debtors' equity interest in other wholly owned subsidiaries, including, without limitation, ASIRobicon SpA.

SUCH ANALYSIS DOES NOT PURPORT TO REPRESENT VALUATION LEVELS, PURCHASE PRICES, OR TRADING LEVELS, WHICH WOULD BE ACHIEVED IN, OR ASSIGNED BY, THE CAPITAL MARKETS FOR DEBT AND EQUITY SECURITIES OR IN A SALE OF ALL OR SUBSTANTIALLY ALL OF CONSOLIDATED REORGANIZED HVE'S ASSETS OR OTHER CHANGE-OF-CONTROL TRANSACTIONS.

Evercore's estimate is necessarily based on economic, market, financial and other conditions as they exist on, and on the information made available to it as of, the date of this Disclosure Statement. It should be understood that, although subsequent developments may affect Evercore's conclusions, Evercore does not have any obligation to update, revise or reaffirm its estimate.

The following is a brief summary of the financial analysis performed by Evercore to arrive at its estimation of the enterprise value and equity value of Consolidated HVE. In addition to performing the financial analysis described below, Evercore reviewed with the management of Consolidated HVE the assumptions on which the analysis was based and other factors, including the projected financial results of Consolidated HVE.

*Discounted Cash Flow Analysis*. To provide information with regard to valuation in terms of the future potential cash flows of Consolidated HVE, Evercore determined a potential range of enterprise values based on estimated unlevered free cash flows and a terminal enterprise value achieved by applying an exit EBITDA[3] multiple to the projected Fiscal Year 2008 EBITDA. Using this approach, Evercore derived the present value of such cash flows by discounting the expected cash flows at a rate that reflects the riskyness of the cash flows.  For purposes of these cash flows, Evercore used full year Fiscal Year 2005 though Fiscal Year 2008 cash flows, including the stub period from May 1, 2004 through June 14, 2004.  The estimated discount rates are a function of the estimated cost of capital of Consolidated HVE, based on the estimated cost of capital for a number of selected public companies ("the Selected Companies") whose securities are publicly traded, and which Evercore believes have operating, market and trading valuations similar in certain respects to what might be expected of Consolidated HVE. The cost of capital obtained from these Selected Companies was adjusted to account for the expected capital structure of Consolidated HVE.  The estimated exit EBITDA multiple is based on the estimated Enterprise Value to 2005E EBITDA multiple of the Selected Companies.

As the estimated cash flows, estimated discount rates and expected capital structures of Consolidated HVE are used to derive a potential value, an analysis of the results of such an estimate is not purely mathematical, but instead involves complex considerations and judgments concerning potential variance in the projected financial and operating characteristics of Consolidated HVE and other factors that could affect the future prospects and cost of capital considerations of Consolidated HVE.

The summary set forth above does not purport to be a complete description of the analyses performed by Evercore. The preparation of an estimate involves various determinations

---

[3]    EBITDA means Earnings Before Interest, Taxes, Depreciation and Amortization.

as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. In performing its analyses, Evercore and Consolidated HVE made numerous assumptions with respect to industry performance, business and economic conditions and other matters. The analyses performed by Evercore are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses.

Evercore relied on the accuracy and reasonableness of the projections and the underlying assumptions as prepared by Consolidated HVE. Evercore's valuation assumes that operating results projected by Consolidated HVE will be achieved in all material respects, including, among others, revenue, operating margins, earnings, cash flow, working capital, expenses and other elements. To the extent that the valuation is dependent upon Consolidated HVE's achievement of the projections, the valuation must be considered speculative.

18.02    Financial Projections

The Projections set forth below reflect numerous assumptions, including various assumptions with respect to the anticipated future performance of the Debtors and certain indirect and direct non-Debtor subsidiaries after the restructuring contemplated under the Plan is consummated, industry performance, general business and economic conditions and other matters, some of which are beyond the control of the Debtors and certain indirect and direct non-Debtor subsidiaries. In addition, unanticipated events and circumstances may affect the actual financial results of the Debtors and certain indirect and direct non-Debtor subsidiaries in the future. THEREFORE, WHILE THE PROJECTIONS ARE NECESSARILY PRESENTED WITH NUMERICAL SPECIFICITY, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE FISCAL YEARS ENDING APRIL 2005-2008 (the "PROJECTED PERIOD") MAY VARY FROM THE PROJECTED RESULTS. THESE VARIATIONS MAY BE MATERIAL. ACCORDINGLY, NO REPRESENTATION CAN BE MADE OR IS MADE WITH RESPECT TO THE ACCURACY OF THE PROJECTIONS OR THE ABILITY OF THE DEBTORS AND CERTAIN INDIRECT AND DIRECT NON-DEBTOR SUBSIDIARIES TO ACHIEVE THE PROJECTED RESULTS. See Article XVI herein, entitled "CERTAIN FACTORS" for a discussion of certain factors that may affect the future financial performance of the Debtors and/or Consolidated HVE and of the various risks associated with the securities of Reorganized HVE to be issued pursuant to the Plan.

The Debtors do not, as a matter of course, make public projections of their anticipated financial position or results of operations. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections in the event that actual industry performance or the general economic or business climate differs from that upon which the Projections have been based. Further, the Debtors do not anticipate that they will include such information in documents required to be filed with the SEC, or otherwise make such information public.

The Projections have been prepared by the Debtors' management, and while they believe that the assumptions underlying the Projections for the Projected Period, when considered on an overall basis, are reasonable in light of current circumstances, no assurance can be given or is given that the Projections will be realized. The Projections were not prepared in

accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the Commission regarding projections or forecasts.  The Projections have not been audited, reviewed or compiled by the Debtors' independent public accountants.  Although presented with numerical specificity, the Projections are based upon a variety of assumptions, some of which have not been achieved to date and may not be realized in the future, and are subject to significant business, litigation, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors.  Consequently, the Projections should not be regarded as a representation or warranty by the Debtors, or any other person, that the Projections will be realized.

Neither the Debtors' independent public accountants, nor any other independent accountants or financial advisors, have compiled, examined or performed any procedures with respect to the projected consolidated financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for, and disclaim any association with, the projected financial information.

The projections included herein for ASIRobicon, Inc., Evans Analytical Group, High Voltage Engineering Europa B.V., and HVE are:

(i)    Projected Consolidated Statement of Operations as of April 30, 2005, April 30, 2006, April 30, 2007, and April 30, 2008.

(ii)    Projected Consolidated Balance Sheets as of April 30, 2005, April 30, 2006, April 30, 2007, and April 30, 2008.

(iii)    Projected Consolidated Statements of Cash Flows as of April 30, 2005, April 30, 2006, April 30, 2007, and April 30, 2008.

(a)  Statement of Operations Assumptions

Key assumptions underlying the Fiscal Year 2005 through Fiscal Year 2008 Projections include:

(i)    Sales: During the Projected Period, sales are assumed to grow at a compounded annual growth rate ("CAGR") of approximately 3.6% from Fiscal Year 2005 to Fiscal Year 2008.  Sales growth is driven primarily by continued leveraging of synergies between the Debtors and ASIRobicon SpA, growth in the services segment, a stronger balance sheet which would allow for long-term and large-scale projects, as well a strong presence in key market segments.

(ii)    Gross Margin: The projections assume that gross profit will increase from 26.0% of revenues in Fiscal Year 2005 to 29.6% in Fiscal Year 2008, as a result of increasing volumes and associated scale economies, cost reduction initiatives, and selective acceptance of higher margin orders.

(iii) <u>Selling, General & Administrative Expenses</u>:  SG&A expense as a percent of sales is assumed to remain relatively constant through the Projected Period, and reflects a slight improvement over historical performance.

(iv) <u>Interest Expense</u>:  Interest expense is calculated on the average debt balance during the year, multiplied by the applicable interest rate.  The applicable interest rate is based on the interest rate (both cash and Payment-in-Kind) in the credit agreement under the Debtors' debtor in possession financing.

(v) <u>Income Taxes</u>: For the purposes of the valuation analysis, the Projections assume the Reorganized Debtors will become a taxpayer after the Effective Date. The projections assume a marginal tax rate of approximately 41%.

FOR PURPOSES OF THE VALUATION ANALYSIS, EVERCORE RELIED ON THE ACCURACY AND REASONABLENESS OF THE TAX ANALYSIS PREPARED BY THE DEBTORS. TO THE EXTENT THAT ANY TAX ANALYSIS INDICATES THAT THE RESTRUCTURING OR FORGIVENESS OF DEBT WOULD HAVE A DIFFERENT IMPACT ON THE OPERATING PERFORMANCE OR CASH GENERATION OF HVE THAN THAT ASSUMED HEREIN, IT MAY HAVE A MATERIAL EFFECT ON THE VALUATION RANGE INCLUDED HEREIN.

(b) Balance Sheet Assumptions

(1)    <u>Working Capital</u>:  Working capital is estimated based on working capital performance metrics such as days sales outstanding, inventory turns, days payables, etc. and is consistent with historical experience.

(2)    <u>Exit Financing</u>:  The Projections assume that the Debtors' DIP financing will either convert into an exit facility, or that the Debtors will obtain exit financing at terms similar to the DIP facility.  In addition, the Projections assume that the Debtors will also obtain access to a $10 million revolving credit facility (the "Revolver") at market terms, which will be used for working capital needs and general corporate purposes.  The projections assume that the Revolver will be unfunded as of the Effective Date of the Plan.

Pursuant to the Plan, it is contemplated that Reorganized HVE will have total funded debt of approximately $25 million, excluding mortgages and capital leases of approximately $3.2 million, as of the Effective Date of the Plan, with access to an additional $10 million Revolver.

(3)    <u>Property, Plant & Equipment / Capital Expenditures</u>:  Capital expenditures reflect projected maintenance and new

capital expenditures that management believes is necessary to meet its business plan.   In addition, PP&E estimates assume that no significant asset sales will take place during the Projected Period.

HIGH VOLTAGE ENGINEERING CORPORATION
DISCLOSURE STATEMENT PROJECTIONS
($ IN MILLIONS)

CONSOLIDATED STATEMENT OF OPERATIONS[1]

|  | Projected Fiscal Year Ending, | | | |
|  | Apr-05 | Apr-06 | Apr-07 | Apr-08 |
|---|---|---|---|---|
| Sales | $185.7 | $197.1 | $201.4 | $206.4 |
| Cost of Goods Sold | 137.4 | 143.0 | 143.6 | 145.3 |
| **Gross Profit** | **$48.3** | **$54.0** | **$57.9** | **$61.1** |
| Selling, General & Administrative Expenses | 29.7 | 30.2 | 32.1 | 33.6 |
| Research & Development Expenses | 4.8 | 5.0 | 5.2 | 5.4 |
| Other Operating (Income)/Expense | 4.1 | 0.0 | 0.0 | 0.0 |
| **Income from Operations** | **$9.6** | **$18.9** | **$20.6** | **$22.1** |
| Interest Expense/(Income) | 3.9 | 4.5 | 4.6 | 4.1 |
| Gain/(Loss) on Debt Extinguishment | 0.0 | 0.0 | 0.0 | 0.0 |
| Discontinued Operations | 0.0 | 0.0 | 0.0 | 0.0 |
| Income Taxes | 2.3 | 5.8 | 6.4 | 7.2 |
| **Net Income** | **$3.5** | **$8.6** | **$9.6** | **$10.8** |

| EBITDA before Restructuring Expenses and Other Extraordinary Items | $19.4 | $24.6 | $26.4 | $28.0 |
|---|---|---|---|---|

---

(1)    Includes Robicon, High Voltage Engineering Europa B.V., and HVE expenses.  Does not include ASI.

HIGH VOLTAGE ENGINEERING CORPORATION
DISCLOSURE STATEMENT PROJECTIONS
($ IN MILLIONS)

CONSOLIDATED BALANCE SHEET[1]

|  | Projected Fiscal Year Ending, | | | |
|  | Apr-05 | Apr-06 | Apr-07 | Apr-08 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash & Cash Equivalents | $10.1 | $20.6 | $29.6 | $37.3 |
| Restricted Cash | 4.6 | 4.6 | 4.6 | 4.6 |
| Net Accounts Receivable | 38.5 | 40.8 | 41.6 | 42.5 |
| Net Inventories | 16.5 | 17.1 | 17.2 | 16.9 |
| Costs in Excess of Billings | 1.5 | 2.0 | 2.0 | 2.2 |
| Prepaids and Other Current Assets | 2.7 | 2.7 | 2.8 | 2.9 |
| **Total Current Assets** | **$73.8** | **$87.9** | **$97.8** | **$106.4** |
| Net Property Plant & Equipment | $25.8 | $25.6 | $26.0 | $26.8 |
| Discontinued Operations | 1.0 | 1.0 | 1.0 | 1.0 |
| Other Assets | 12.4 | 12.1 | 11.8 | 11.7 |
| Intercompany Accounts - Net | 34.1 | 34.1 | 34.1 | 34.1 |
| **Total Assets** | **$147.1** | **$160.5** | **$170.6** | **$179.8** |
| **Liabilities and Stockholders' Equity** | | | | |
| Accounts Payable | $16.8 | $18.9 | $18.9 | $18.0 |
| Accrued Interest Expense | 0.0 | 0.0 | 0.0 | 0.0 |
| Accrued Expense | 11.5 | 11.8 | 12.0 | 11.9 |
| Customer Advances | 13.2 | 14.2 | 14.7 | 14.2 |
| Billings in Excess of Costs | 1.5 | 2.0 | 2.0 | 1.5 |
| Income Taxes Payable | 0.4 | 0.4 | 0.4 | 0.4 |
| Deferred Income Taxes - Current | 6.5 | 9.0 | 9.6 | 9.8 |
| **Total Current Liabilities** | **$49.8** | **$56.2** | **$57.5** | **$55.8** |
| New Revolver | 0.7 | 1.6 | 0.2 | 0.0 |
| New Term Loan | 15.3 | 15.7 | 16.2 | 16.7 |
| ASI Facility | 10.2 | 10.5 | 10.8 | 11.1 |
| Mortgages & Capital Leases | $3.5 | $3.1 | $2.7 | $2.4 |
| **Total Debt** | **$29.6** | **$31.0** | **$29.9** | **$30.2** |
| Deferred Income Taxes - Long Term | $15.9 | $14.5 | $13.5 | $13.5 |
| Other Non-Current Liabilities | 21.7 | 21.1 | 20.9 | 20.7 |
| **Total Liabilities** | **$117.1** | **$122.9** | **$121.9** | **$120.2** |
| Stockholders' Equity | $30.1 | $37.7 | $48.7 | $59.7 |
| **Total Liabilities and Equity** | **$147.1** | **$160.5** | **$170.6** | **$179.8** |

---

(1)    Includes Robicon, High Voltage Engineering Europa B.V., and HVE expenses.  Does not include ASI.

HIGH VOLTAGE ENGINEERING CORPORATION
DISCLOSURE STATEMENT PROJECTIONS
($ IN MILLIONS)

CONSOLIDATED STATEMENT OF CASH FLOWS[1]

| | Projected Fiscal Year Ending, | | | |
| | Apr-05 | Apr-06 | Apr-07 | Apr-08 |
|---|---|---|---|---|
| **Cash Flows From Operating Activities** | | | | |
| Net Income | $3.5 | $8.6 | $9.6 | $10.8 |
| Plus: Depreciation & Amortization | 5.7 | 5.7 | 5.8 | 5.9 |
| Plus: Non-Cash Expense/(Income) | 0.4 | 0.8 | 0.8 | 0.8 |
| Plus: Net Change in Working Capital | 3.3 | 2.9 | 0.3 | (2.6) |
| Plus: Changes in Other Long-Term Accounts | 0.8 | (2.0) | (1.2) | (0.2) |
| Net Cash Flows from Operating Activities | $13.7 | $16.0 | $15.3 | $14.6 |
| | | | | |
| **Cash Flows From Investing Activities** | | | | |
| Capital Expenditures | ($8.0) | ($5.5) | ($6.3) | ($6.6) |
| Other Investing Activities | 1.2 | 0.4 | 0.3 | 0.1 |
| Net Cash Flows from Investing Activities | ($6.8) | ($5.1) | ($6.0) | ($6.5) |
| | | | | |
| **Cash Flows From Financing Activities** | | | | |
| Drawdown/(Repayment) of Long-Term Debt | ($0.9) | $0.6 | ($1.8) | ($0.6) |
| Revolver Repayment/(Draw) at Foreign Sub. | (0.7) | (1.0) | 1.4 | 0.2 |
| Net Cash Flows from Financing Activities | ($1.6) | ($0.4) | ($0.4) | ($0.4) |
| | | | | |
| **Net Cash Flow** | $5.3 | $10.6 | $8.9 | $7.7 |
| Beginning Cash | 4.8 | 10.1 | 20.6 | 29.6 |
| Ending Cash | $10.1 | $20.6 | $29.6 | $37.3 |

---

[1]    Includes Robicon, High Voltage Engineering Europa B.V., and HVE expenses.  Does not include ASI.

## ARTICLE XIX.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States federal income tax consequences of the Plan to U.S. Holders (as defined below) of Pre-Petition Senior Notes Claims that receive New Common Stock, to U.S. Holders of General Unsecured Claims that receive cash or such other treatment as agreed between the Debtors and the U.S. Holder, to U.S. Holders of Old Preferred Stock Interests that receive New Class A Warrants, and to U.S. Holders of Old Common Stock Interests that receive New Class A Warrants and New Class B Warrants. The discussion is for general purposes only, and is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the United States Treasury regulations (including temporary and proposed regulations) promulgated thereunder (the "U.S. Regulations"), judicial authorities and current administrative rulings and practice, all as of the date hereof and all of which are subject to change, possibly retroactively. This summary does not discuss all aspects of United States federal income taxation which may be important to particular holders in light of their individual investment circumstances, including, but not limited to, financial institutions, broker-dealers, insurance companies, tax-exempt organizations, traders or dealers in securities, holders reporting gain on the installment method, any person that is a member of the same affiliated group (as defined in Section 1504 of the Tax Code) as any of the Debtors, non-U.S. Holders and U.S. Holders who hold Pre-Petition Senior Notes Claims, General Unsecured Claims, Old Preferred Stock Interests, Old Common Stock Interests, New Common Stock, or New Warrants as part of a hedging transaction, straddle, conversion transaction or other integrated transaction. In addition, this summary does not address state, local or foreign tax consequences. The tax consequences of certain aspects of the Plan are uncertain because of the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below. No ruling has been requested from the Internal Revenue Service ("IRS") with respect to any of the matters discussed herein, and no opinion of counsel has been sought or obtained with respect thereto.

As used herein, a "U.S. Holder" means a beneficial owner of Pre-Petition Senior Notes Claims, General Unsecured Claims, Old Preferred Stock Interests, Old Common Stock Interests, New Common Stock or New Warrants that is, for U.S. federal income tax purposes,

- a citizen or resident of the United States;

- a corporation organized in or under the laws of the United States or any political subdivision thereof;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if, in general, the trust is subject to the supervision of a court within the United States and the control of one or more United States persons as described in section 7701(a)(30) of the Tax Code.

If a partnership (or other entity classified as a partnership for United States federal income tax purposes) is the beneficial owner of a Claim or Interest , the United States federal

income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.  If you are a partnership that is a beneficial owner of a Claim or Interest or a partner in such a partnership, you should consult your own tax advisor regarding the United States federal income tax consequences of the Plan.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN TO THEM.  THE DEBTORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF APPROVAL AND IMPLEMENTATION OF THE PLAN AS TO ANY HOLDER OF CLAIMS AND INTERESTS, NOR ARE THE DEBTORS OR THEIR COUNSEL RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

19.01   Federal Income Tax Consequences to the Debtors

The Debtors currently file a consolidated income tax return together with Letitia under the provisions of Sections 1502 and 1504 of the Tax Code.  U.S. Treasury Regulations provide that every member of the affiliated group is severally liable for any tax incurred for any taxable year for which the member was a member for all or a portion of the taxable year.  The tax year of the Debtors should end for federal income tax purposes at the end of the Effective Date, and the Reorganized Debtors expect to file a consolidated income tax return that does not include Letitia beginning the day after the Effective Date.  The following discussion assumes that all the net operating losses and loss carryforwards ("NOLs") of the affiliated group of which the Debtors are members are properly attributable to Reorganized HVE and its subsidiaries.  To the best of the Debtors' knowledge, the Debtors are current with the respect to their filing obligations with respect to all material Tax Returns.

(i)      Cancellation of Indebtedness and Reduction of Tax Attributes

The Debtors generally will realize cancellation of indebtedness ("COI") income on the discharge of existing indebtedness exchanged for property of the Debtors (including New Common Stock) to the extent that the fair market value of any such property is less than the adjusted issue price (plus the amount of any accrued but unpaid interest) of the indebtedness discharged thereby.

Under section 108 of the Tax Code, however, COI income will not be recognized if the COI income occurs in a case brought under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of the court in such case and the cancellation of indebtedness is granted by the court or is pursuant to a plan approved by the court (the "Bankruptcy Exception"). Accordingly, because the cancellation of the Debtors' indebtedness will occur in a case brought under the Bankruptcy Code, the Debtors will be under the jurisdiction of the Bankruptcy Court in such case and the cancellation of the Debtors' indebtedness will be pursuant to the Plan, the

Debtor will not be required to recognize any COI income realized as a result of the implementation of the Plan.

Under section 108(b) of the Tax Code, a taxpayer that does not recognize COI income under the Bankruptcy Exception will be required to reduce certain tax attributes, including its net operating losses and loss carryforwards ("NOLs") (and certain other losses, credits and carryforwards, if any) and its tax basis in its assets (but not below the total amount of liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of COI income excluded from income under the Bankruptcy Exception. (The federal income tax return that included the Debtors for the fiscal year that ended April 26, 2003 reflects an NOL attributable to the Debtors of approximately $53.5 million, some or all of which may be subject to an Annual Section 382 Limitation (defined in Section (ii) below) as a result of possible Ownership Changes (defined in Section (ii) below) that may have occurred prior to the Effective Date.) Complex rules apply in determining how tax attributes are reduced in a consolidated return context.

As a result of the application of section 108(b) of the Tax Code, the Debtors expect that the Debtors' NOLs will be reduced by reason of consummation of the Plan, and that the tax basis of certain assets of the debtors may be reduced. As discussed below, if there are any remaining NOLs, section 382 of the Tax Code may apply to limit the ability of the Debtors to utilize any such NOLs in future years.

(ii)    Section 382 Limitations on NOLs

Under section 382 of the Tax Code, if a corporation with NOLs (a "Loss Corporation") undergoes an "Ownership Change," the use of such NOLs (and certain other tax attributes) will generally be subject to an annual limitation as described below. In general, an "Ownership Change" occurs if the percentage of the value of the Loss Corporation's stock owned by one or more direct or indirect "five percent shareholders" has increased by more than 50 percentage points over the lowest percentage of that value owned by such five percent shareholder or shareholders at any time during the applicable "testing period" (generally, the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation). The Plan should trigger an Ownership Change of the Debtors on the Effective Date under the Tax Code.

When a Loss Corporation undergoes an Ownership Change, an annual limitation (the "Annual Section 382 Limitation") generally limits the ability of the Loss Corporation to utilize historic NOLs, capital loss carryforwards and certain subsequently recognized "built-in" losses and deductions (i.e., losses and deductions that have economically accrued but are unrecognized as of the date of the Ownership Change) if the Loss Corporation has a net unrealized built-in loss on the date of the Ownership Change. As a general rule, the Annual Section 382 Limitation equals the product of the value of the stock of the corporation (with certain adjustments) immediately before the Ownership Change and the applicable "long-term tax-exempt rate, which for Ownership Changes occurring in the month of April 2004 is 4.31%." Subject to certain limitations, any unused portion of the Annual Section 382 Limitation may be available in subsequent years. A Loss Corporation must meet certain continuity of business enterprise requirements for at least two years following an Ownership Change in order to preserve the Annual Section 382 Limitation.

A special rule under section 382 applicable to a Loss Corporation under the jurisdiction of a Bankruptcy Court will apply in calculating the Annual Section 382 Limitation. Under this special rule, the limitation will be calculated by reference to the lesser of the value of the corporation's newly issued stock (with certain adjustments) immediately after the Ownership Change (as opposed to immediately before the Ownership Change, as discussed above) or the value of the company's assets (determined without regard to liabilities) immediately before the Ownership Change.  Although such calculation may substantially increase the Annual Section 382 Limitation, the Debtors' use of any NOLs, built-in losses and deductions remaining after the implementation of the Plan may still be substantially limited after an Ownership Change.

As stated above, the Debtors should undergo an Ownership Change as a result of the implementation of the Plan. The Debtors have not yet determined whether any of them will have a net unrealized built-in loss on the Effective Date. If an Ownership Change occurs, the ability of Reorganized HVE and its subsidiaries to utilize any NOLs that may remain after the implementation of the Plan will be, and their ability to utilize certain subsequently recognized built-in losses and deductions (if any) may be, subject to an Annual Section 382 Limitation, as described above.

(iii)    Special Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies where qualified (so-called "old and cold") creditors of a debtor receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. Under this exception, a debtor's pre-change losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of all debt converted into stock in the bankruptcy proceeding. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period after the consummation of the chapter 11 plan will preclude the debtor's future utilization of any pre-change losses existing at the time of the subsequent ownership change.

The Debtors have not determined whether the receipt of the New Common Stock by holders of Pre-Petition Senior Notes Claims pursuant to the Plan may qualify for this exception.  Even if the Debtors qualify for this exception, the Debtors are likely to elect not to have the exception apply and instead remain subject to the annual limitation described above. Such election would have to be made in the Debtors' federal income tax return for the taxable year in which the change occurs.

(iv)    Alternative Minimum Tax and Dissolutions

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its

taxable income for regular tax purposes by available NOLs, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOLs (as computed for AMT purposes).

In addition, if a corporation undergoes an Ownership Change and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT. The Debtors believe that the dissolution of certain of the Debtors pursuant to the Plan will not give rise to a material amount of income for federal income tax purposes.

19.02   Federal Income Tax Consequences of the Plan to U.S. Holders of Pre-Petition Senior Notes Claims

The United States federal income tax consequences to U.S. Holders of Pre-Petition Senior Notes Claims may vary depending upon, among other things, whether the U.S. Holder has taken a "bad debt" deduction with respect to its Claim, and whether the Pre-Petition Senior Notes Claims constitute "securities" for purposes of the reorganization provisions of the Tax Code. U.S. Holders should evaluate the tax consequences of the Plan to them based on their own particular circumstances and should not rely solely on the general discussion herein.

The determination of whether a debt obligation constitutes a security for U.S. federal income tax purposes depends upon an evaluation of the nature of the debt obligation. Important factors to be considered include, among other things, length of time to maturity, degree of continuing interest in the issuer, similarity of the debt instrument to a cash payment, and the purpose of the borrowing. Generally, a maturity on corporate debt instruments when issued of less than five years is an indication that the instrument is not a security. A maturity on corporate debt instruments when issued of more than ten years is an indication that the instrument is a security. Claims for accrued interest generally are not securities.

The length of time to maturity with respect to the Pre-Petition Senior Notes for federal tax purposes is not certain. The Pre-Petition Senior Notes had an original maturity of approximately 7 years. However, there was a Consent Solicitation in 1999, when there was approximately 4 and a half years remaining on the Pre-Petition Senior Notes. Pursuant to the Consent Solicitation, HVE paid a consent fee and certain adjustments were made to the terms of the Pre-Petition Senior Notes. If the payments and adjustments pursuant to the Consent Solicitation were treated as a substantial modification for federal income tax purposes, the Pre-Petition Senior Notes would be treated as though they had been issued at that time and would have a maturity of approximately four and a half years. It is not clear whether the payments and adjustments pursuant to the Consent Solicitation gave rise to a substantial modification for federal income tax purposes.

In light of the above, it is uncertain whether the Pre-Petition Senior Notes will be treated as securities for federal income tax purposes.

If the Pre-Petition Senior Notes are treated as securities, then the exchange of the Pre-Petition Senior Notes Claims for New Common Stock should constitute a tax-free reorganization for federal income tax purposes.  Accordingly, if the exchange will be so treated for such purposes, a U.S. Holder of Pre-Petition Senior Notes Claims would, subject to the discussion below regarding market discount, not recognize any income or gain on the exchange, except for income recognized with respect to accrued interest on the Pre-Petition Senior Notes, as discussed below.  In addition, a U.S. Holder of Pre-Petition Senior Notes Claims would not recognize any loss, except as discussed below with respect to Claims for accrued and previously taxed interest on the Pre-Petition Senior Notes.  Further, a U.S. Holder's tax basis in the New Common Stock received in respect of its Pre-Petition Senior Notes Claim (not including any New Common Stock received for accrued interest) would equal the U.S. Holder's tax basis in such Pre-Petition Senior Notes Claim (adjusted to take into account the amount of any bad debt deduction previously taken with respect to such Pre-Petition Senior Notes Claim and excluding any tax basis attributable to its Claim for accrued interest in respect of the Pre-Petition Senior Notes), increased by the amount of any gain recognized in respect of accrued market discount on the exchange by such U.S. Holder, as described below.  A U.S. Holder's holding period for the New Common Stock (other than New Common Stock received for a Claim for accrued interest on the Pre-Petition Senior Notes or on account of any accrued market discount with respect to which taxable gain is recognized, as described below) would include the period during which the U.S. Holder held the Pre-Petition Senior Notes Claim exchanged therefor.  U.S. Holders should consult their tax advisors with respect to reporting requirements required of persons receiving stock and securities in a tax-free exchange in connection with a corporate reorganization.

If the Pre-Petition Senior Notes are not treated as securities, then the exchange of the Pre-Petition Senior Notes Claims for New Common Stock would be treated as an exchange of Pre-Petition Senior Notes for New Common Stock in a taxable transaction under Section 1001 of the Tax Code.  Accordingly, if the exchange will be so treated for such purposes, a U.S. Holder should recognize gain or loss equal to the difference between (i) the fair market value of the New Common Stock (as of the Effective Date) received in exchange for a Pre-Petition Senior Notes Claim (other than New Common Stock received for a Claim for accrued interest on the Pre-Petition Senior Notes), and (ii) the U.S. Holder's adjusted tax basis in the Pre-Petition Senior Notes Claim (excluding any tax basis attributable to its Claim for accrued interest in respect of the Pre-Petition Senior Notes).  Such gain or loss should be capital in nature if the Pre-Petition Senior Notes Claims are held as capital assets (subject to the "market discount" rules described below), and will be long term capital gain or loss if, as of the Effective Date, the Pre-Petition Senior Notes Claims have been held by such Holder for more than one year.  Long-term capital gains recognized by individuals are currently taxed at a maximum rate of 15%.  Net capital gains on the disposition of capital assets held for one year or less are subject to U.S. federal income tax at ordinary income tax rates.  For a corporate U.S. Holder, all capital gains are currently taxed at the same rate as ordinary income.  The deductibility of capital losses is subject to limitations.

To the extent that a portion of the New Common Stock received in exchange for the Pre-Petition Senior Notes Claim is allocable to accrued interest, (i) a U.S. Holder may recognize ordinary income, as discussed below (ii) a Holder's tax basis in such New Common Stock received should equal the fair market value of the New Common Stock as of the Effective Date and (iii) a Holder's holding period for such New Common Stock should begin on the day following the Effective Date.

(i)    <u>Market Discount</u>

The market discount provisions of the Tax Code may apply to U.S. Holders of certain Claims.  In general, a debt obligation with a fixed maturity of more than one year that is acquired by a U.S. Holder on the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that U.S. Holder if its stated redemption price (or revised issue price, in the case of a debt obligation issued with original issue discount) at maturity exceeds the tax basis of the debt obligation in the U.S. Holder hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount.

Under the market discount rules, gain recognized by a U.S. Holder with respect to a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include accrued market discount in gross income currently.  A U.S. Holder of a market discount bond that was required under the market discount rules of the Tax Code to defer deduction of all or a portion of interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on a taxable disposition of such bond.

Notwithstanding the rule described above regarding non-recognition of gain to U.S. Holders of Pre-Petition Senior Notes Claims if the Pre-Petition Senior Notes Claims are treated as securities for federal income tax purposes, it is possible that under the market discount rules of the Tax Code, gain realized by a U.S. Holder on the exchange of its Pre-Petition Senior Notes Claims for New Common Stock must be recognized as ordinary income to the extent of any accrued market discount on the Pre-Petition Senior Notes that was not previously included in its gross income, even if such exchange is treated as a tax-free reorganization under the Tax Code.  However, the market discount rules in the Tax Code also provide that, under U.S. Regulations to be promulgated by the United States Treasury, recognition of accrued market discount on exchanges such as the exchange of Pre-Petition Senior Notes Claims for New Common Stock may be limited to the amount of gain that would be recognized without regard to the market discount rules.  In this case, the application of such a provision would result in a U.S. Holder recognizing no income or gain except for income recognized with respect to accrued interest, as discussed below.  Any accrued market discount that is not recognized by a U.S. Holder would be carried to the New Common Stock received by the U.S. Holder in the exchange.  Upon the disposition of the New Common Stock, a U.S. Holder would recognize as ordinary income, to the extent of any gain recognized on the disposition, the accrued market discount carried to the New Common Stock.  It should be noted that such U.S. Regulations have not yet been issued and thus it is unclear whether this limitation on recognition of accrued market discount will apply to U.S. Holders of Pre-Petition Senior Notes Claims and whether any accrued but unrecognized market discount will be so treated.

All U.S. Holders of Pre-Petition Senior Notes Claims are urged to consult their own tax advisors regarding the application of the market discount rules to them.

(ii)    <u>Allocation of Consideration Received</u>

Under the Plan, consideration distributed to holders of Allowed Claims will be treated first as satisfying an amount equal to the stated principal amount of the Allowed Claim and then, to the extent of any excess, as satisfying accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation provided in a bankruptcy plan may be binding for federal income tax purposes.  However, the IRS may take the position that the consideration received by holders of Allowed Claims should be allocated in some other manner.  U.S. Holders of Pre-Petition Senior Notes Claims should consult their own tax advisors regarding the proper allocation of the consideration received under the Plan.

(iii)    Claims for Accrued Interest

A U.S. Holder of a Claim for accrued interest that has not previously been included in its gross income will be required to recognize ordinary income equal to the fair market value of New Common Stock received under the Plan with respect to such Claim. Conversely, a U.S. Holder generally would recognize a deductible loss to the extent that any accrued interest claimed was previously included in gross income and is not paid in full.  A U.S. Holder's tax basis in the New Common Stock received in exchange for such Claim will be the fair market value of the New Common Stock on the Effective Date.  The U.S. Holder's holding period for the New Common Stock so received will begin on the day after the Effective Date of the Plan.

19.03   Federal Income Tax Consequences of the Plan to U.S. Holders of Old Preferred Stock Interests and Old Common Stock Interests

In general, the exchange of Old Preferred Stock Interests for New Class A Warrants and the exchange of Old Common Stock Interests for New Class A Warrants and New Class B Warrants by U.S. Holders of Old Common Stock Interests and Old Preferred Stock Interests pursuant to the Plan should be treated as a taxable transaction under Section 1001 of the Tax Code.  Accordingly, U.S. Holders of Old Preferred Stock Interests and Old Common Stock Interests should recognize gain or loss equal to the difference between (i) the fair market value of the New Warrants (as of the Effective Date) received in exchange for the Old Common Stock and the Old Preferred Stock, and (ii) the U.S. Holder's adjusted tax basis in the Old Common Stock and the Old Preferred Stock.  Such gain or loss should be capital in nature so long as the Pre-Petition Senior Notes Claims are held as capital assets, and should be long term capital gain or loss if, on the Effective Date, the Old Preferred Stock Interests and Old Common Stock Interests have been held by such Holder for more than one year.  Long-term capital gains recognized by individuals are currently taxed at a maximum tax rate of 15%.  Net capital gains on the disposition of capital assets held for one year or less are subject to U.S. federal income tax at ordinary income tax rates.  For a corporate U.S. Holder, all capital gains are currently taxed at the same rate as ordinary income.  The deductibility of capital losses is subject to limitations. A U.S. Holder's tax basis in the New Warrants received should equal the fair market value of such warrants as of the Effective Date.  A U.S. Holder's holding period for warrants received should begin on the day following the Effective Date.

The tax consequences to U.S. Holders of Old Preferred Stock Interests or Old Common Stock Interests that are also Holders of Pre-Petition Senior Notes Claims may differ from those described above.  Such Holders are urged to consult their tax advisors regarding the tax consequences of their exchange of Old Preferred Stock Interests for New Class A Warrants

or their exchange of Old Common Stock Interests for New Class A Warrants and New Class B Warrants pursuant to the Plan in light of their holding Pre-Petition Senior Notes Claims.

19.04   Federal Income Tax Consequences to U.S. Holders of General Unsecured Claims

Pursuant to the Plan, Holders of General Unsecured Claims will receive cash or such other treatment as agreed to between the Debtors and the Holder.  U.S. Holders of General Unsecured Claims should generally recognize income, gain or loss equal to the amount realized under the Plan in respect of their claims less their respective tax basis in those claims (excluding any tax basis attributable to a Claim for accrued interest in respect of a General Unsecured Claim).  The amount realized for this purpose generally will equal the amount of the cash and the fair market value of other consideration (if any) received under the Plan (other than cash and other consideration received for a Claim for accrued interest on the General Unsecured Claim).  Any income, gain or loss recognized in the exchange will be capital or ordinary depending on the status of the claim in the U.S Holder's hands.  The U.S. Holder's aggregate tax basis for any consideration received under the Plan should equal the fair market value of the property received under the Plan.  The holding period for any consideration under the Plan generally will begin on the day following the Effective Date.  U.S. Holders of CP Claims are urged to consult their tax advisors regarding the tax consequences of the Plan in light of their particular circumstances.

19.05   Federal Income Tax Consequences of Ownership and Disposition of New Common Stock and New Warrants

(i)      Distributions

Distributions paid with respect to the New Common Stock will generally be includable in the gross income of a U.S. Holder to the extent that such distributions are paid out of Reorganized HVE's current or accumulated earnings and profits (as determined for U.S. federal income tax purposes) when the distribution is actually or constructively received by the U.S. Holder.  The dividends included in a non-corporate U.S. Holder's income for distributions occurring during taxable years beginning before January 1, 2009 may be eligible for U.S. Federal income taxation at capital gain rates.  Distributions in excess of Reorganized HVE's current or accumulated earnings and profits, as determined for U.S. federal income tax purposes, will be treated as a non-taxable return of capital to the extent of the U.S. Holder's tax basis in the New Common Stock and thereafter as capital gain.  Certain adjustments or failures to adjust the conversion ratio or exercise price of the New Warrants pursuant to the anti dilution provisions of such instruments may result in a taxable constructive dividend to the holders of New Warrants or New Common Stock pursuant to Section 305 of the Tax Code, to the extent of Reorganized HVE's earnings and profits.

(ii)     Dispositions of the New Common Stock

Upon the sale, exchange or other taxable disposition of New Common Stock, a U.S. Holder will recognize gain or loss for federal income tax purposes in an amount equal to the difference between the amount realized on the disposition and the U.S. Holder's tax basis in the New Common Stock.  If the New Common Stock is held as a capital asset, any such gain or loss will be a capital gain or loss and will be long-term if the New Common Stock has been held for more than one year as of the time of disposition.  However, any gain attributable to accrued

market discount in respect of a U.S. Holder's Pre-Petition Senior Notes Claim carried over to the New Common Stock will be ordinary income, as discussed above.  Net capital gains on the disposition of capital assets held for one year or less are subject to U.S. federal income tax at ordinary income tax rates.  For a corporate U.S. Holder, all capital gains are currently taxed at the same rate as ordinary income.  The deductibility of capital losses is subject to limitations.

(iii)    Exercise, Disposition and Expiration of New Warrants

No gain or loss will be recognized upon the exercise of New Warrants received pursuant to the Plan.  The tax basis of the New Common Stock acquired through the exercise of New Warrants will be equal to the sum of the exercise price paid therefor and the tax basis of the New Warrants exercised.  The holding period for New Common Stock acquired through the exercise of New Warrants will begin on the day after the date the New Warrants are exercised.

If New Warrants expire without being exercised, a U.S. Holder that holds New Warrants as a capital asset will generally recognize a capital loss in amount equal to its tax basis in the New Warrants.  Upon the sale or exchange of New Warrants, a U.S. Holder that holds New Warrants as a capital asset will generally recognize a capital gain or loss equal to the difference between the amount realized on the sale or exchange and the U.S. Holder's tax basis in the New Warrants.  The capital gain or loss will be long term capital gain or loss if, at the time of the sale or exchange, the New Warrants have been held by such Holder for more than one year.  Net capital gains on the disposition of capital assets held for one year or less are subject to U.S. federal income tax at ordinary income tax rates.  For a corporate U.S. Holder, all capital gains are currently taxed at the same rate as ordinary income.  The deductibility of capital losses is subject to limitations.

19.06   Information Reporting and Backup Withholding

In general, information reporting requirements and backup withholding may apply to all payments and distributions to non-corporate U.S. Holders of Allowed Claims and to payments to non-corporate U.S. Holders of principal, interest, dividends or other reportable payments paid in respect of the New Common Stock and New Warrants.  In general, "backup withholding" applies to such payments if the U.S. Holder fails to provide an accurate taxpayer identification number or is notified by the IRS that it has failed to report all interest and dividends required to be shown on its federal income tax returns.

Any amounts withheld under the backup withholding rules from payment to a beneficial owner would be allowed as a refund or credit against such beneficial owner's United States federal income tax provided the required information is furnished to the Internal Revenue Service.

## ARTICLE XX.
## ACCEPTANCE AND CONFIRMATION OF THE PLAN

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

20.01   Solicitation of Acceptance